UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF VIRGINIA

ALEXANDRIA  DIVISION

|  |  |
|---|---|
| **OSAMA ABU IRSHAID** and<br><br>**MUSTAFA ZEIDAN,**<br><br><br>Plaintiffs,<br><br>v.<br><br>**MERRICK GARLAND**, Attorney General of the United States, United States Department of Justice, in his official capacity only;<br><br>**CHRISTOPHER WRAY**, Director, Federal Bureau of Investigations; in his official capacity only;<br><br>**MICHAEL GLASHEEN**, Director of the Terrorism Screening Center, in his official capacity only;<br><br>**RONALD ROWE**, Director of the United States Secret Service, in her official capacity only;<br><br>**MATTHEW OLSEN**, Assistant Attorney General, National Security Division, United States Department of Justice, in his official capacity only;<br><br>**SUSAN DAVIES**, Acting Assistant Attorney General, Office of Legal Policy, United States Department of Justice, in her official capacity only;<br><br>**PETER WINN**, Acting Chief Privacy and Civil Liberties Officer, Office of Privacy and Civil Liberties, United States Department of Justice, in his official capacity only;<br><br>**AVRIL HAINES**, Director of National Intelligence, Office of the Director of National Intelligence, in her official capacity only; | Case  No. |

**BRETT HOLMGREN**, Director of the
National Counterterrorism Center, Office
of the Director of National Intelligence,
in her official capacity only;

**ALEJANDRO MAYORKAS**,
Secretary of Homeland Security, United
States Department of Homeland
Security, in his official capacity only;

**TROY MILLER**, Commissioner, U.S.
Customs and Border Protection; in his
official capacity only;

**DAVID PEKOSKE**, Administrator,
Transportation Security Administration,
in his official capacity only;

**UR JADDOU**, Director, United States
Citizenship and Immigration Services, in
her official capacity only;

**PATRICK LECHLEITNER**, Acting
Director, United States Immigration and
Customs Enforcement, in his official
capacity only;

**SHOBA WADHIA**, Officer, Office for
Civil Rights and Civil Liberties, United
States Department of Homeland
Security, in her official capacity only;

**KENNETH WAINSTEIN**, Under
Secretary, Office of Intelligence and
Analysis, United States Department of
Homeland Security, in his official
capacity only;

**JOHNATHAN MEYER**, General
Counsel, United States Department of
Homeland Security, in his official
capacity only;

**KELLI ANN BURRIESCI**, Deputy
Under Secretary, Office of Strategy,
Policy, and Plans, United States
Department of Homeland Security, in
her official capacity only;

**MASON CLUTTER**, Chief Privacy
Officer, Privacy Office, United States
Department of Homeland Security, in

her official capacity only;

**SHONNIE LYON**, Director, Office of
Biometric Identity Management, United
States Department of Homeland
Security, in her official capacity only;

**ANTONY BLINKEN**, Secretary of
State, United States Department of State,
in his official capacity only;

**HILLARY BATIER JOHNSON**,
Deputy Coordinator for Homeland
Security, Screening, and Designations,
Bureau of Counterterrorism, United
States Department of State, in her official
capacity only;

**LLOYD AUSTIN**, Secretary of Defense,
United States Department of Defense, in
his official capacity only;

**PAUL NAKASONE**, Commander,
United States Cyber Command;
Director, National Security Agency;
Chief, Central Security Service, United
States Department of Defense, in his
official capacity only;

**SCOTT BERRIER**, Director, Defense
Intelligence Agency, in his official
capacity only;

**PETE BUTTIGIEG**, Secretary of
Transportation, United States
Department of Transportation, in his
official capacity only;

**HIMAMAULI DAS**, Acting Director,
Financial Crimes Enforcement Network,
United States Department of Treasury, in
his official capacity only;

**ANDREA GACKI**, Director, Office of
Foreign Assets Control, United States
Department of Treasury, in her official
capacity only; and

**WILLIAM BURNS**, Director, Central
Intelligence Agency, in his official
capacity only;

Defendants.

## **COMPLAINT**

Plaintiffs Osama Abu Irshaid and Mustafa Zeidan, through their attorneys, CAIR Legal Defense Fund and CAIR-CA, state as follows:

### **Introduction**

1.   Dr. Osama Abu Irshaid and Mr. Mustafa Zeidan are both United States citizens of Palestinian descent.

2.   Neither Dr. Abu Irshaid nor Mr. Zeidan have ever been charged or convicted of a violent crime.

3.   Yet, recently, the federal government has placed Dr. Abu Irshaid and Mr. Zeidan on a secret list, subjecting one to a humiliating process of detention, questioning, and phone seizure at the border and barring the other from flying altogether.

4.   As a result of his status on the Government's secret list now, Dr. Abu Irshaid is detained at the border by federal agents each time he crosses it.

5.   While they detain Dr. Abu Irshaid, the federal agents ask Dr. Abu Irshaid humiliating questions about his lawful associations and work leading a non-profit organization that advocates for the rights of Palestinians.

6.   Because of his status on the Government's secret list, federal agents now seize Dr. Abu Irshaid's phone when he crosses the border and they have successfully coerced him into unlocking it.

7.   As of the filing of this complaint, federal agents continue to hold Dr. Abu Irshaid's cellphone, despite several attempts by Dr. Abu Irshaid, through his attorneys, to retrieve it.

8.   Only one thing has changed for Dr. Abu Irshaid in recent months: his constant and passionate advocacy for an end to Israel's genocide in Gaza and an end to the United States' complicity in that genocide.

9.   Mr. Zeidan has fared even worse.

10. Mr. Zeidan travels to Jordan several times a year to visit and take care of his ailing mother.

11. After purchasing a ticket to see her in May of this year, he showed up to the airport, only for officials at the airport to tell him that he was forbidden from boarding his flight because of his status on the Government's secret list.

12. The government has given Mr. Zeidan no explanation for why he's been placed on the No Fly List after years of flying overseas without any issues.

13. Only one thing has changed in the last several months for Mr. Zeidan: he organizes a weekly protest to call for an end to Israel's genocidal campaign in Gaza and the United States' complicity in that genocide.

14.  The Government is using its secret, illegal list against Dr. Abu Irshaid, Mr. Zeidan, and other innocent Americans, not for a security purpose, but because federal agents object to the lawful exercise of their constitutional rights.

## Parties

*Plaintiffs*

15. Plaintiff Dr. Osama Abu Irshaid is a United States citizen of Palestinian descent and a Muslim residing in Virginia. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

16. Plaintiff Mr. Mustafa Zeidan is a United States citizen of Palestinian descent and a Muslim residing in California. Venue is proper because a substantial part of the events or omissions giving rise to his claims—specifically, the decision to list him—occurred within this district.

### Defendant Merrick Garland

17. Defendant Merrick Garland is the United States Attorney General of the U.S. Department of Justice ("DOJ").

18. DOJ and/or its agency subcomponents, especially the Federal Bureau of Investigation and the Terrorist Screening Center, play central roles in administering, maintaining, and distributing the Terrorism Screening Dataset ("TSDS").

19. DOJ is also a regular agency attendee of the Watchlisting Advisory Council ("WLAC"), an interagency advisory group comprised of a subset of the Defendants. The WLAC, by and through those Defendants, discusses, formulates, and agrees upon shared TSDS policies, practices, and procedures, which are formally adopted by Defendants when they are approved by the National Security Council ("NSC").

20. Upon information and belief, DOJ and/or its agency subcomponents nominated one or both of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terrorist watchlist.

21. DOJ and/or its agency subcomponents also participate in the review of inquiries submitted through the Department of Homeland Security ("DHS") Traveler Redress Inquiry Program ("TRIP") process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

22. Additionally, DOJ uses the TSDS to screen persons that are applying for security clearances or employment at DOJ and/or its agency subcomponents to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOJ and/or its agency subcomponents or elsewhere.

23. DOJ also uses historical watchlist status as a basis to deny former listees security clearances, employment or appointment with DOJ or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

24. Defendant Garland is being sued in his official capacity only.

***Defendant Christopher Wray***

25. Defendant Christopher Wray is the Director of the Federal Bureau of Investigation ("FBI").

26. FBI administers the Terrorist Screening Center ("TSC"), which develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

27. FBI is also a regular agency attendee of the WLAC, an interagency advisory group comprised of a subset of the Defendants. The WLAC, by and through those Defendants, discusses, formulates, and agrees upon shared TSDS policies, practices, and procedures.

28. Upon information and belief, FBI nominated one or both Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

29. FBI is responsible for initially reviewing all nominations to the TSDS except those with a "nexus to international terrorism," which are initially reviewed by the National Counterterrorism Center ("NCTC").

30. Upon information and belief, FBI acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them.

31. FBI also administers the National Crime Information Center ("NCIC"), a nationwide, computerized database that enables information-sharing among law enforcement agencies.

32. FBI uses the NCIC to disseminate the "known or suspected terrorists" stigmatizing label attached to Plaintiffs and other similarly situated individuals to over 18,000 federal, state, local, and tribal law enforcement agencies, as well as other federal, state, local, and tribal authorities, including pretrial service and pretrial release agencies, probation and parole offices, prosecuting attorney offices, courts and magistrate offices, correctional institutions, custodial facilities in medical or psychiatric institutions, medical examiner's offices, and others.

33. FBI also uses the NCIC to disseminate the "known or suspected terrorists" stigmatizing label attached to Plaintiff and other similarly situated individuals to foreign governments and hundreds of private entities, including airlines, gun sellers, financial institutions, hospitals, the captains of sea-faring vessels, and others.

34. Additionally, FBI participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

35. FBI uses historical watchlist status to inform decisions about who to investigate, surveil, and otherwise target for law-enforcement activity.

36. Defendant Wray is being sued in his official capacity only.

*Defendant Mihael Glasheen*

37. Defendant Michael Glasheen is the Director of the Terrorism Screening Center ("TSC") of the Federal Bureau of Investigation ("FBI").

38. TSC is a Co-Chair of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

39. TSC also develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

40. Upon information and belief, TSC reviewed the nomination of one or both of the Plaintiffs and approved them for inclusion in the TSDS.

41. TSC has the sole authority to place an individual on the TSDS. Moreover, upon information and belief, TSC nominated Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

42. TSC and/or its subcomponents, including the TSC Redress Office, also participate in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

43. TSC facilitates the FBI's distribution of the TSDS to tens of thousands of domestic and foreign entities by exporting TSDS information, including biographic information, biometric data, and watchlist status information, to the FBI and other agencies and entities.

44. Defendant Glasheen is being sued in his official capacity only.

***Defendant Ronald Rowe***

45. Defendant Ronald Rowe is the Director of the United States Secret Service ("USSS"), a component of the DHS.

9

46. Upon information and belief, USSS uses the TSDS to screen individuals that are seeking admission to federal buildings, including the White House, as well as individuals who are applying for security clearances or employment at USSS to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with USSS or elsewhere.

47. USSS also uses historical watchlist status as a basis to deny former listees security clearances, employment or appointment with the federal government or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

48. Defendant Rowe is sued in his official capacity only.

***Defendant Matthew Olsen***

49. Defendant Matthew Olsen is the Assistant Attorney General for National Security of the National Security Division ("NSD") of the DOJ.

50. NSD is a regular attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

51. Upon information and belief, NSD develops policies for frontline screening agencies— including but not limited to the FBI, TSA, CBP, USCIS, and Department of State—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them participation in programs that allow for expedited screening at ports of entry; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to

classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

52. Additionally, NSD uses the TSDS to screen persons that are applying for security clearances or employment at NSD to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with NSD or elsewhere.

53. Defendant Olsen is being used in his official capacity only.

### Defendant Susan Davies

54. Defendant Susan Davies is the Acting Assistant Attorney General for the Office of Legal Policy ("OLP") of the U.S. Department of Justice ("DOJ").

55. OLP is a regular attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

56. Upon information and belief, OLP develops policies for frontline screening agencies— including but not limited to the FBI, TSA, CBP, USCIS, and Department of State— regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them participation in programs that allow for expedited screening at ports of entry; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

57. Additionally, OLP uses the TSDS to screen persons that are applying for security clearances or employment at OLP to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OLP or elsewhere.

58. Defendant Davies is being used in her official capacity only.

**Defendant Peter Winn**

59. Defendant Peter Winn is the Acting Chief Privacy and Civil Liberties Officer of the Office of Privacy and Civil Liberties ("OPCL") of the U.S. Department of Justice ("DOJ").

60. OLP is a regular attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

61. Upon information and belief, OPCL develops policies for frontline screening agencies—including but not limited to the FBI, TSA, CBP, USCIS, and Department of State—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them participation in programs that allow for expedited screening at ports of entry; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

62. Additionally, OPCL uses the TSDS to screen persons that are applying for security clearances or employment at OPCL to deny them security clearances, access to classified

information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OPCL or elsewhere.

63. Defendant Winn is being used in his official capacity only.

**Defendant Avril Haines**

64. Defendant Avril Haines is the Director of National Intelligence.

65. The Office of the Director of National Intelligence ("ODNI") assists the FBI in administering the TSC, which develops, maintains, and administers the federal government's consolidated TSDS.

66. ODNI is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

67. Upon information and belief, ODNI and/or its agency subcomponents nominated one or both of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

68. ODNI and/or its agency subcomponents also use the TSDS to screen persons against it that are applying for security clearances or for employment to work with ODNI to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with ODNI or elsewhere.

69. Defendant Haines is sued in her official capacity only.

**Defendant Brett Holmgren**

70. Defendant Brett Holmgren is the Director of the National Counterterrorism Center ("NCTC") of the ODNI.

71. NCTC is a Co-Chair of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

72. Upon information and belief, NCTC nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

73. NCTC is also responsible for initially reviewing all nominations to the TSDS with a "nexus to international terrorism."

74. NCTC compiles and maintains the Terrorist Identities Datamart Environment ("TIDE") and, in doing so, receives regular updates from the TSC regarding the TSDS status of individuals listed in TIDE. The stigmatizing "known or suspected terrorists" label attached to Plaintiffs and other similarly situated individuals is reflected in their listings in TIDE.

75. NCTC uses the TSDS and TIDE to screen individuals, including Plaintiffs and other similarly situated individuals, in order to recommend that other federal agencies deny them government benefits and impose consequences upon them, including but not limited to denying or revoking refugee status, immigrant statuses, visas, visa waiver program benefits, and asylum applications.

76. NCTC also distributes TIDE, including the stigmatizing "known or suspected terrorists" label attached to Plaintiffs and similarly situated individuals, to federal agencies and other entities.

77. Additionally, NCTC uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with NCTC to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with NCTC or elsewhere.

78. Defendant Abizaid is sued in her official capacity only.

*Defendant Alejandro Mayorkas*

79. Defendant Alejandro Mayorkas is the Secretary of the DHS.

80. DHS and/or its agency subcomponents assist the FBI in administering the TSC, which develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

81. DHS and/or its agency subcomponents, including U.S. Customs and Border Protection ("CBP"); Transportation Security Administration ("TSA"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); and various DHS headquarters offices, including the Office for Civil Rights & Civil Liberties ("CRCL"); the Office of Intelligence & Analysis ("OIA"); the Office of the General Counsel ("OGC"); the Office of Strategy, Policy, and Plans ("DHS Policy"); and the Privacy Office are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

82. Upon information and belief, DHS and/or its agency subcomponents nominated one or both of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

83. Upon information and belief, DHS and/or its agency subcomponents are some of the most active and frequent frontline users of the TSDS. They use the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border

crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

84. Additionally, DHS oversees and administers the DHS TRIP, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

85. DHS and/or its agency subcomponents also administer the DHS Automated Biometric Identification System (IDENT), a system of biometric records and biographic information, including TSDS records and the stigmatizing "known or suspected terrorist" label attached to Plaintiffs and similarly situated individuals, that is shared with federal, state, local, tribal, foreign, and international governmental agencies.

86. Additionally, DHS and/or its agency subcomponents use the TSDS to screen persons against it that are applying for security clearances or for employment to work with DHS and/or its agency subcomponents to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DHS and/or its agency subcomponents or elsewhere.

87. Defendant Mayorkas is sued in his official capacity only.

***Defendant Troy Miller***

88. Defendant Troy Miller is the Acting Commissioner of U.S. Customs and Border Protection ("CBP") of the U.S. Department of Homeland Security ("DHS").

89. CBP is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

90. Upon information and belief, CBP nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

91. Upon information and belief, CBP acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

92. CBP also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

93. Additionally, CBP uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with CBP to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with CBP or elsewhere.

94. CBP also retains historical watchlist information in its TECS system, even after an individual has been removed from the TSDS. CBP uses that historical watchlist information

to inform decisions to harm former listees in a range of ways, including to: (1) deny them entry into the United States; (2) subject them to invasive searches and interrogations at ports of entry; and (3) to deny them other benefits and licenses, including access to programs like Global Entry that provide privileged access to ports of entry.

95. Defendant Miller is sued in his official capacity only.

***Defendant David Pekoske***

96. Defendant David Pekoske is the Administrator of the Transportation Security Administration ("TSA") of the DHS.

97. Upon information and belief, TSA nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

98. Upon information and belief, TSA acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) impeding their air travel at airports; (2) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; and (3) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

99. TSA also implements the "Quiet Skies" program and its international counterpart "Silent Partner." The Quiet Skies program cross-references the TSDS as part of a systems of targeting rules that identifies and then flags for investigation and surveillance "unknown or partially known terrorists" on flights originating from the United States. Silent Partner does

the same for flights originating from foreign destinations. The resulting scrutiny results in individuals being treated like TSDS Listees and may result in nomination to the TSDS.

100.     Upon information and belief, the nominations of one or both Plaintiffs to the TSDS resulted from Quiet Skies and/or Silent Partner identification, investigation, and surveillance.

101.     TSA also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

102.     Additionally, TSA uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with TSA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with TSA or elsewhere.

103.     Defendant Pekoske is sued in official capacity only.

**Defendant Ur Jaddou**

104.     Defendant Ur Jaddou is the Director of the U.S. Citizenship and Immigration Services ("USCIS") of the DHS.

105.     USCIS is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

106.     Upon information and belief, USCIS nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

107.    USCIS also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

108.    Additionally, USCIS uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with USCIS to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with USCIS or elsewhere.

109.    Defendant Jaddou is sued in her official capacity only.

### Defendant Patrick Lechleitner

110.    Defendant Patrick Lechleitner is the Acting Director of U.S. Immigration and Customs Enforcement ("ICE") of the DHS.

111.    Upon information and belief, ICE nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

112.    ICE also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

113.    Additionally, ICE uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with ICE to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with ICE or elsewhere.

114.    Defendant Lechleitner is sued in official capacity only.

***Defendant Shoba Wadhia***

115.     Defendant Shoba Wadhia is the Officer of the Office for Civil Rights and Civil Liberties ("CRCL") of the U.S. Department of Homeland Security ("DHS").

116.     CRCL is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

117.     Upon information and belief, CRCL develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

118.     CRCL also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with CRCL to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with CRCL or elsewhere.

119.     Defendant Wadhia is sued in his official capacity only.

***Defendant Kenneth Wainstein***

120.     Defendant Kenneth Wainstein is Under Secretary of the Office of Intelligence and Analysis ("OIA") of the U.S. Department of Homeland Security ("DHS").

121.     OIA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

122.     Upon information and belief, OIA develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the DHS and/or its agency subcomponents or elsewhere.

123.     Upon information and belief, OIA nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

124.     Additionally, OIA uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with OIA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OIA or elsewhere.

125.     Defendant Wainstein is sued in his official capacity only.

**Defendant Johnathan Meyer**

126.     Defendant Johnathan Meyer is General Counsel ("GC") of the U.S. Department of Homeland Security ("DHS").

127.     GC is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

128.     Upon information and belief, GC develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying them immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

129.     GC also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with GC to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the GC or elsewhere.

130.     Defendant Meyer is sued in his official capacity only.

**Defendant Kelli Ann Burriesci**

131.     Defendant Kelli Ann Burriesci is Deputy Under Secretary of the Office of Strategy, Policy, and Plans ("DHS Policy") of the U.S. Department of Homeland Security ("DHS").

132.     DHS Policy is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures, and coordinates DHS's policy positions on the Watchlisting Guidance and other TSDS-related policies for WLAC meetings.

133.     Upon information and belief, DHS Policy develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

134.     DHS Policy also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DHS Policy to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DHS Policy or elsewhere.

135.     Defendant Burriesci is sued in her official capacity only.

24

*Defendant Mason Clutter*

136.     Defendant Mason Clutter is the Chief Privacy Office of the Privacy Office ("DHS Privacy") of the DHS.

137.     DHS Privacy is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

138.     Upon information and belief, DHS Privacy develops policies for frontline screening agencies—including but not limited to CBP, TSA, and ICE—regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

139.     DHS Privacy also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DHS Privacy to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DHS Privacy or elsewhere.

140.     Defendant Clutter is sued in her official capacity only.

*Defendant Shonnie Lyon*

141.     Defendant Shonnie Lyon is the Director of the Office of Biometric Identity Management ("OBIM") of the DHS.

142.     OBIM administers the DHS Automated Biometric Identification System (IDENT), a system of biometric records and biographic information, which includes TSDS records and the stigmatizing "known or suspected terrorist" label attached to Plaintiffs and similarly situated individuals, that is shared with federal, state, local, tribal, foreign, and international governmental agencies.

143.     Upon information and belief, OBIM nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

144.     OBIM also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with OBIM to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OBIM or elsewhere.

145.     Defendant Lyon is sued in her official capacity only.

*Defendant Antony Blinken*

146.     Defendant Antony Blinken is the Secretary of State at the Department of State ("DOS").

147.     DOS and/or its agency subcomponents assist the FBI in administering the TSC, which develops, maintains, and administers the federal government's consolidated TSDS.

148.     DOS and/or its agency subcomponents, including but not limited to the Bureaus of Counterterrorism; Consular Affairs; Democracy, Human Rights and Labor; Diplomatic Security; and the Office of the Legal Adviser, are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

149.     Upon information and belief, DOS and/or its agency subcomponents nominated one or both of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

150.     DOS also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DOS to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOS or elsewhere.

151.     DOS and/or its agency subcomponents also participate in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

152.     Defendant Blinken is sued in his official capacity only.

*Defendant Hillary Batjer Johnson*

153.     Defendant Hillary Batjer Johnson is the Deputy Coordinator for Homeland Security, Screening, and Designations of the Bureau of Counterterrorism ("DOSCT") of the U.S. Department of State ("DOS").

154.     DOSCT is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

155.     Upon information and belief, DOSCT develops policies for frontline screening agencies regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government and elsewhere.

156.     Upon information and belief, DOSCT nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

157.     DOSCT also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DOSCT to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOSCT or elsewhere.

158.     Defendant Johnson is sued in her official capacity only.

***Defendant Lloyd Austin***

159.     Defendant Lloyd Austin is the Secretary of Defense at the U.S. Department of Defense ("DOD").

160.     DOD and/or its agency subcomponents, including but not limited to the National Security Agency ("NSA") and the Defense Intelligence Agency ("DIA"), are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

161.     Upon information and belief, DOD and/or its agency subcomponents nominated one or both of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

162.     Upon information and belief, DOD and/or its agency subcomponents act as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to military bases and other DOD facilities.

163.     DOD and/or its agency subcomponents also use the TSDS to screen persons against it that are applying for security clearances or for employment to work with DOD to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOD or elsewhere.

164.     Defendant Austin is sued in his official capacity only.

***Defendant Paul Nakasone***

165.     Defendant Paul Nakasone is Commander of the U.S. Cyber Command, Director of the National Security Agency ("NSA"), and Chief of the Central Security Service of the U.S. Department of Defense ("DOD").

166.     NSA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

167.     Upon information and belief, NSA develops policies for frontline screening agencies regarding using the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government and elsewhere.

168.     Upon information and belief, NSA nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

169.     NSA also acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to military bases and NSA facilities, information, systems, and personnel.

170.     NSA also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with NSA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with NSA or elsewhere.

171.     Defendant Nakasone is sued in his official capacity only.

***Defendant Scott Berrier***

172.     Defendant Scott Berrier is the Director of the Defense Intelligence Agency ("DIA") of the U.S. Department of Defense ("DOD").

173.     DIA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures, where it is usually represented by the Defense Combating Terrorism Center ("DCTC").

174.     Upon information and belief, DIA nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

175.     DIA also acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to military bases and access to DIA facilities, information, systems, and personnel.

176.     DIA also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with DIA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DIA or elsewhere.

177.    Defendant Berrier is sued in his official capacity only.

***Defendant Pete Buttigieg***

178.    Defendant Pete Buttigieg is Secretary of the U.S. Department of Transportation ("DOT").

179.    DOT and/or its agency subcomponents are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

180.    Upon information and belief, DOT and/or its agency subcomponents nominated one or both of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

181.    DOT and/or its agency subcomponents also use the TSDS to screen persons against it that are applying for security clearances or for employment to work with  to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOT and/or its agency subcomponents or elsewhere.

182.    Defendant Buttigieg is sued in his official capacity only.

***Defendant Himamauli Das***

183.    Defendant Himamauli Das is the Acting Director of the Financial Crimes Enforcement Network ("FinCEN") of the Office of Terrorism and Financial Intelligence of the U.S. Department of Treasury ("DOT").

184.    FinCEN is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

185.     FinCEN also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with FinCEN to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with FinCEN or elsewhere.

186.     Defendant Das is sued in his official capacity only.

***Defendant Andrea Gacki***

187.     Defendant Andrea Gacki is the Director of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury ("DOT").

188.     Upon information and belief, OFAC nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

189.     Upon information and belief, OFAC oversees the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Plaintiffs and other similarly situated individuals to financial institutions, leading those financial institutions to impose consequences upon them, including but not limited to closing their bank accounts without notice and blocking them from conducting wire transfers.

190.     OFAC also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with OFAC to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with OFAC or elsewhere.

191.     Defendant Gacki is sued in her official capacity only.

***Defendant William Burns***

192.     Defendant William Burns is the Director of the Central Intelligence Agency ("CIA").

193.     CIA is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

194.     Upon information and belief, CIA nominated one or both of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

195.     Upon information and belief, CIA acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to access to CIA facilities.

196.     CIA also uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with CIA to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with CIA or elsewhere.

197.     Defendant Burns is sued in his official capacity only.

## Jurisdiction and Venue

198.     Under U.S. Const. Art. III § 2, this Court has jurisdiction because the rights sought to be protected herein are secured by the U.S. constitution.

199.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

200.     This Court has authority to grant the declaratory relief requested herein pursuant to the Declaratory Judgment Act, 28 U.S.C.. § § 2201-02, because the action presents

an actual case or controversy within the Court's jurisdiction, and pursuant to the general, legal, and equitable powers of this Court.

201.     Nothing in 49 U.S.C. § 46110 eliminates that jurisdiction. See, e.g. *Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340, at *5-6 (4th Cir. May 28, 2013); *Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (D.C. Cir. 2015); Latif v. Holder, 686 F.3d 1122, 1128-29 (9th Cir. 2012); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1304 (D. Minn. 2018).

202.     A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia.

203.     Venue is proper under 42. U.S.C. § 1391(e)(1) because at least one of the Plaintiffs resides in the district; because Defendants are officers or employees of agencies of the United States sued in their official capacities, because Defendants regularly conduct business in the State of Virginia; because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district; and because the action involves no real property.

## Factual Background

### The Federal Government's Expansive TSDB Inclusion Standards Capture Broad Categories of Innocent Travelers

204.     In September 2003, without the authorization of Congress and relying expressly on Executive order HSPD-6, then Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") as a division of the FBI focused on building what the federal officials running the program call their "watchlist enterprise." The TSC develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB" or "federal terrorist watchlist").  TSC's watchlist, and the tens of thousands of agreements the

FBI maintains to compel agencies, companies, and organizations of all kinds to check its lists, is how the federal government is able to impose a disfavored status on Plaintiffs and more than one million other people.

205.   Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watchlist—NCTC and FBI.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watchlist.  The FBI, in turn, nominates to the watchlist individuals with what it characterizes as suspected ties to domestic terrorism.

206.   CBP also nominates individuals for inclusion in the terrorist watchlist.

207.   CBP employs risk-based targeting rules to single out travelers at ports of entry for secondary inspection, detention, investigation and deportation.  Upon information and belief, CBP utilizes the results of high-risk targeting rules and resulting inspections and investigation as a factual predicate for nominating individuals to the TSDB.

208.   All nominations to the TSDB must be approved and implemented by the TSC. The TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watchlist as a known or suspected terrorist.  TSC also decides which screening systems will receive information about that individual.

209.   The federal government publicly states that to be included in the TSDB, an individual must be reasonably suspected of being a known or suspected terrorist.  More specifically, a government nominator, including CBP, "must rely upon articulable intelligence

or information which, based on the totality of the circumstances and taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."

210.     The "totality of the circumstances" analysis for TSDB inclusion may include assessment of an individual's race, ethnicity, country of origin, religion, religious practices, languages spoken, family, associations, travel history, social media history, and other activities protected by the First Amendment, Fifth Amendment, Fourteenth Amendment, and U.S. Constitution.

211.     Former Director of the Terrorism Screening Center Timothy Healy testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watchlist, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

212.     The federal government has provided only limited information about and otherwise not stated publicly what standards or criteria they use to assign and annotate a status.

213.     Defendants are not compelled by statute or regulation to use any standard in particular. In the absence of a prescribed statute or regulation, Defendants apply infinitely flexible standards and criteria.

214.     The Government publicly states that, to be included in the TSDS, an individual must be reasonably suspected of being a known or suspected terrorist. More specifically, a government nominator "must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."[1]

215.     That standard does not evince even an internal logic. By its own description, the government places American citizens and other individuals on the federal terrorist watchlist based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities. These standards fall far below the typical "reasonable suspicion" and "probable cause" standards required for criminal investigation. Individuals may also be added to the TSDB based on guilt-by-association as a basis for watchlist inclusion.  For example, immediate relatives of listed persons can become TSDB listees without any derogatory information—other than the bonds of family.  Likewise, they can be subjected to CBP rules-based 'terrorist' monitoring on the basis of family affiliation alone.  Such annotations signals to screening agencies, officers, employers, and others that the immediate relative is a violent threat engaged in nefarious activities.

216.     Individuals may be added to the TSDB for being a known associate—a friend, colleague, fellow community member, etc.—of a TSDB listed individual.

---

[1] January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures, *Elhady v. Piehota*, 1:16-cv-00375-AJT-JFA, Dkt 196-16 at 4 (E.D. Va. Apr. 27, 2018.), https://www.aclu.org/sites/default/files/field_document/ex._7_elhady_-_overview_of_watchlisting_system_-_4-27-18_cover.pdf

217.     Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, they can and routinely are added to the watchlist.

218.     American citizens can be and are routinely added even if they are not the subject of a federal investigation.

219.     Individuals can be added to the federal terrorist watchlist without any information regarding whether or not an intended target exists, and without any information about whether an individual poses a threat to commercial aviation or to a U.S. land border.

220.     Individuals can be added to the federal terrorist watchlist without ever having been charged or convicted of any crime.

221.     The FBI has conceded that because the federal terrorist watchlist "only includes identifiers of known or suspected terrorists, by itself [the FBI] is not aware of any instance where that identifying information alone prevented an act of terrorism."

222.     CBP has also conceded that it has never publicly identified an act of terrorism that its use of TSDB information prevented.

223.     Because of these loose standards and practices, the federal terrorist watchlist's rate of growth has dramatically increased.  In fiscal 2009, there were 58,999 new additions to the watchlist.  Over 1.1 million new names have been added to the watchlist since 2009.  In fiscal 2016, for example, there were 176,014 new additions.  These additions include thousands of U.S. citizens and lawful permanent residents.

224.     More than 98% of the names nominated to the TSDB are accepted.  In 2013, TSC accepted 98.96 percent of all nominations made.  A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watchlist.[2]

225.     Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  By 2009, the number grew to approximately 3,400.  By 2016, that number increased to approximately 81,000.

226.     At a March 10, 2010, Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watchlist is "getting bigger, and it will get even bigger."

227.     The federal terrorist watchlist's and rules-based terror lists' inclusion standards are so permissive, pliable, and laden with discriminatory assessments of race, ethnicity, national origin, and religion, that they bear at best a fleetingly marginal connection to actual terrorist activities.

228.     Based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by less than 250 persons.

229.     Only one of these perpetrators was designated on the federal terrorist watchlist by the federal government prior to their criminal conduct.  This single person designated on

---

[2] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watchlist Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

the federal terrorist watchlist, however, was removed from the federal terrorist watchlist prior to perpetrating the terrorist attack.

230.     Upon information and belief, in order to designate a person on the federal terrorist watchlist, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terrorist watchlist's inclusion standards.

231.     The precise size of this subset is unknown; however, a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

232.     Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include innocent persons who do not pose a threat of terrorism.

233.     Upon further information and belief, the federal government does not screen the entire subset of people known to it.  Moreover, federal government does not make individual determinations as to whether each person about whom they have information should be placed on the federal terrorist watchlist.

234.     Additionally, the federal government utilizes automated algorithms and risk-based targeting rules to select individuals for scrutiny, investigation, and nomination to one or more terrorist watchlists.

235.     In order to designate a person on the federal terrorist watchlist, a federal government official, including a CBP officer, must make a nomination in accordance with

the established nomination policies and procedures described above, and a TSC official must accept the nomination.   TSC officials accept nominations at a rate above 98 percent.

236.     Based on the facts alleged in this Complaint and the publicly known processes of the federal terrorist watchlist, a quantitative analysis can be constructed to measure and describe the performance and efficacy of the federal terrorist watchlist.

237.     A quantitative analysis requires that, in order to accomplish the federal terrorist watchlist's stated objectives, Defendants must have at least some greater-than-random abilities to identify future terrorists.  This is due to the nature of the processes the federal government utilizes to place persons on the federal terrorist watchlist and the size of the population Defendants can—if they so choose—screen against the federal terrorist watchlist's inclusion standards.

238.     A quantitative analysis demonstrates that the federal government's watchlisting system would perform similarly if inclusion on the watchlist was done via random selection instead of the existing inclusion standards it utilizes.

239.     A quantitative analysis indicates that the federal government has no ability to watchlist persons whose placement on the watchlist would further the federal government's— or CBP's—stated objectives.

## CBP Policies Violate the Constitutional Rights
## of TSDB Listees

240.     Anyone listed in the TSDB is subjected to varying forms of heightened scrutiny and adverse repercussions by CBP.

241.    The "information in [the] TSDB [contains] merely the identifying information of the person entered into the TSDB, and does not include the "derogatory information," or "totality of the circumstances," that is the basis of a nomination by the FBI."

242.    As such, TSDB information shared with CBP also contains merely the identifying information of TSDB listee and does not include the "derogatory information," or "totality of the circumstances," that formed the basis of a nomination by the FBI.

243.    Although CBP has access to TSDB information provided by the TSC, it is the TSC that maintains and controls the TSDB database.

244.    CBP automatically designates TSDB listees as "Armed and Dangerous," refers them to secondary inspection, and otherwise automatically flags them as potential terrorists in automated alerts sent to officers.

245.    All travelers, including Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals, that present themselves at a port of entry, whether at a land border crossing or an airport, interact with officers from CBP for entry into the United States and are queried by CBP against TECS, a CBP system that includes TSDB information shared by the Terrorist Screening Center "seamlessly and in realtime."

246.    Airlines are required to provide a complete passenger manifest to CBP before a flight can depart or enter the United States and CBP queries the identities of all passengers on those manifests against the Advance Passenger Information System ("APIS"), an automated targeting system that feeds biographical information of passengers into TECS.

247.    CBP can also conduct additional screening and questioning of individual airline passengers prior to departing the United States if a passenger matches TSDB information in TECS.

248.    As a matter of policy and practice, CBP primary inspection officers are alerted that TSDB listees are a "potential match" to TSDB in TECS and refer them to secondary inspection for questioning to determine if the traveler is in fact a "potential match."

249.    In deciding whether to detain someone for further inspection, CBP officers do not use the underlying derogatory information that formed the basis for a traveler being listed in the TSDB. CBP officers, instead, use a person's watchlist status alone and the fact that its automated processes have yielded a "potential match."

250.    CBP Officers conducting the secondary inspection are directed to contact the National Targeting Center ("NTC"), a division within CBP Field Operations that works with the TSC, which ultimately makes a final determination on whether the traveler is a match to the TSDB.

251.    CBP records in TECS a summary of the secondary inspection that includes whether a determination was made by NTC as to whether the traveler was confirmed to be a match.

252.    Despite having gone through this TSDB matching process during secondary inspection, each time a traveler who was previously confirmed as a match to the TSDB presents themselves for inspection at a port of entry, CBP primary inspection officers receive the same alert that the traveler is a "potential match" because they do not have access to or knowledge of previous inspections, and accordingly the TSDB listee is referred back to secondary inspection to go through the TSDB match process all over again.

253.    Even if CBP determines a traveler is not a match to the TSDB and records that information in TECS, unless the TSC updates the TSDB, the next time that traveler presents themselves at a port of entry for inspection, the CBP primary inspection officer will receive

the same alert that the traveler is a "potential match" to the TSDB and will refer that traveler to secondary inspection to undergo the TSDB match process all over again.

254.     Pursuant to official CBP policy, CBP officers refer TSDB listees to secondary inspection and the TSDB listees are compelled as a matter of process to provide biometric fingerprints to determine whether they are a match to the TSDB.

255.     Pursuant to official CBP policy, CBP officers may handcuff TSDB listees before referring them to secondary inspection.

256.     Pursuant to official CBP policy issued in 2018, CBP officers are directed to conduct an advanced forensic search of any electronics carried by TSDB listees:

257.     An advanced search is any search in which an officer connects external equipment through a wired or wireless connection to an electronic device not merely to gain access to the device, but to review, copy, and analyze its contents.[3]

258.     "The presence of an individual on a government operated and government vetted terrorist watch list," alone constitutes grounds for the CBP to search, copy, store, and analyze the contents of laptops, tablets, and smartphones, etc. without requesting or obtaining consent. (Hereinafter the "CBP electronic devices policy").

259.     Pursuant to the CBP electronic devices policy, CBP officers are directed to disregard factors for and against a search and seizure of electronic devices in the possession of TSDB listees and to conduct a nonroutine forensic search and seizure of all electronics despite not having access to the underlying derogatory information that formed the basis of the TSDB listees' nomination to the TSDB.

---

[3] *See* CBP Directive No. 3340-049A (January 2018).

260.     CBP officers seize, search, download, copy, analyze, and conduct a forensic search of the contents of the electronic devices, including those of each of the Plaintiff and similarly situated American citizens, permanent residents, and foreign nationals.

261.     The prior version of the CBP electronic devices policy adopted in 2008 similarly directed CBP officers to copy data off of the electronic devices of TSDB listees, and it was and continues to be standard practice to do so and outside the view of the TSDB listee.

### Dr. Osama Abu Irshaid

262.     Dr. Osama Abu Irshaid is a naturalized American citizen of Palestinian descent.

#### *Past Watchlist Treatment*

263.     Upon information and belief, Dr. Abu Irshaid was placed on the federal watchlist between 2010 and removed around 2017. Dr. Abu Irshaid flew dozens of times during this time period.

264.     Each time Dr. Abu Irshaid traveled by flight during this time period, he would need to retrieve his boarding pass from an airline agent rather than online or via a kiosk. Every boarding pass would be stamped with "SSSS" (Secondary Security Screening Selection), indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

265.     Each time Dr. Abu Irshaid traveled by flight between 2010 and 2017, he would be subjected to secondary screening by CBP. The secondary screening would include pat downs, chemical swabs, and questions about Dr. Abu Irshaid's travel plans.

266.     From 2010 to 2017, when Dr. Abu Irshaid would return by plane from overseas, CBP agents repeatedly seized Dr. Abu Irshaid's electronic devices. CBP Agents

demanded he provide his password to unlock his devices, and Dr. Abu Irshaid would acquiesce because he believed CBP agents would prolong his detention if he refused.

267.    Only once did Dr. Abu Irshaid refuse to provide his password, but CBP Agents were still able to unlock and access the phone against his will.

268.    Due to his placement on the federal watchlist, Dr. Abu Irshaid's would be delayed up to three hours each time he traveled.

269.    Due to his placement on the federal watchlist, Dr. Abu Irshaid felt degraded and humiliated.

270.    Due to his placement on the federal watchlist, Dr. Abu Irshaid avoids traveling with his family so that his wife and kids would not be subjected to the same humiliating treatment he had to endure.

### Dr. Abu Irshaid Placed on Watchlist Again in 2024

271.    Upon information and belief, Dr. Abu Irshaid was, again, placed on the federal watchlist in 2024 and now remains on the federal watchlist.

272.    Upon information and belief, Dr. Abu Irshaid was re-listed because of his work and activism opposing Israel's ongoing military attacks on, and likely genocide of [4] Palestinians in Gaza.

273.    Because Dr. Abu Irshaid helps lead civic efforts in the Muslim and Arab communities to speak out against Israel's violence, the Government views the lawful associations that Dr. Abu Irshaid maintains with suspicion and the contents of his phone as useful intelligence.

---

[4] *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip* (South Africa v. Israel) Order, 2024 I.C.J. Rep. 192 (January 2024) (finding it "plausible" Israel is committing genocide in Gaza).

274.     Because Dr. Abu Irshaid works to convene people of conscience to work towards justice for Palestinians, the Government believes his lawful associations can be used to map the civic infrastructure of a particular community expressing a view Defendants fear.

275.     On May 22, 2024, Dr. Abu Irshaid traveled from Dulles International Airport in Dulles, Virginia (IAD) to Hamad International Airport (DOH) in Doha, Qatar.

276.     At IAD, Dr. Abu Irshaid was unable to print his boarding pass. He approached an airline agent who made multiple phone calls before finally printing and giving Dr. Abu Irshaid his boarding pass.

277.     The airline agent was unable to print Dr. Abu Irshaid's boarding pass because of his watchlist status. That status triggered a clearance process that took over three hours. Upon that process's conclusion, Defendants permitted the airline agent to print Dr. Abu Irshaid's boarding pass, but it was stamped with SSSS, indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

278.     At the security checkpoint, TSA officers publicly subjected Dr. Abu Irshaid to an extensive and lengthy screening, including an invasive full-body pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings. Dr. Abu Irshaid was eventually allowed to pass through the security checkpoint.

279.     During boarding, TSA agents awaited Dr. Abu Irshaid on the jetway. The TSA agents again patted down Dr. Abu Irshaid and searched his carry on in full view of other passengers. The TSA agents apologized for the treatment and said they "had to" do it before allowing Dr. Abu Irshaid to board.

280.     Dr. Abu Irshaid felt degraded and humiliated as a result of this treatment.

281.     On June 3, 2024, Dr. Abu Irshaid traveled from DOH to IAD.

282.     Anticipating additional screening, Dr. Abu Irshaid arrived at DOH three hours and forty-five minutes before his flight.

283.     At DOH, Dr. Abu Irshaid was unable to print his boarding pass. He sought the assistance of a ticket agent, who needed to make a call before printing his boarding pass and giving it to Dr. Abu Irshaid. The boarding pass was stamped with SSSS, indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

284.     Upon arrival at IAD, Dr. Abu Irshaid was confronted by federal agents. One agent who identified himself as Kenneth Johnson referred to Dr. Abu Irshaid as "Dr. O," a nickname only his close friends and associates know of. Dr. Abu Irshaid asked how he knew about his nickname, and the agent responded that he had been "looking into [him]."

285.     Agent Johnson took Dr. Abu Irshaid to a room for secondary inspection and asked him a series of invasive questions.

286.     Agent Johnson asked Dr. Abu Irshaid about his relationships overseas, including whether he knew a founding member of a designated terrorist organization and whether a member of a designated organization spoke on a panel with him.

287.     Both of these topics came from baseless internet rumors propagated by bigots, yet the federal government caused Dr. Abu Irshaid an unreasonable delay while he traveled in order to interrogate him about internet smears.

288.     Agent Johnson asked Dr. Abu Irshaid what he did and who he met with while he was in Qatar.

289.     Agent Johnson also asked Dr. Abu Irshaid about his activities in his capacity as executive director of American Muslims for Palestine.

290.     In total, the questioning lasted around one hour.

291.     After asking these questions, Agent Johnson asked Dr. Abu Irshaid whether he had a cell phone. Dr. Abu Irshaid replied that he did, but it had no information saved in it.

292.     Dr. Abu Irshaid made a habit of traveling with a backup phone as a result of past encounters where federal agents seized Dr. Abu Irshaid's phone when he traveled into the United States. Because his phone had been seized in the past, he did not want to risk having his primary cell phone seized again while traveling.

293.     Agent Johnson still demanded Dr. Abu Irshaid's phone. Dr. Abu Irshaid complied, believing that if he didn't turn over his phone, he would not be allowed to proceed past security and go home.

294.     Agent Johnson then demanded the password to Dr. Abu Irshaid's phone and Dr. Abu Irshaid, again, complied, believing that if he didn't provide his password, he would not be allowed to proceed past security and go home.

295.     Agent Johnson left the room with Dr. Abu Irshaid's phone. Two hours later, the agent returned to tell Dr. Abu Irshaid that he and other agents had not completed the inspection but that a shift change was coming. The agent told Dr. Abu Irshaid that they would need to keep his phone and return it at a later date. The agents gave Dr. Abu Irshaid a slip indicating that the phone was being taken, searched, and kept for the time being. The slip also contained contact information for a "Kenneth Johnson" and the agents instructed Dr. Abu Irshaid that if he had issues getting his phone

296.     As of the time of this filing, the CBP agents have not returned Dr. Abu Irshaid's phone.

297.     On June 19, 2024, Dr. Abu Irshaid, through his attorneys, filed a DHS TRIP traveler inquiry seeking relief from the treatment he received when traveling. As of the time of this filing, he has not received a response to this inquiry.

298.     After June 19, 2024, Dr. Abu Irshaid, through his attorneys, made multiple attempts to contact Agent Johnson and have his phone returned. Agent Johnson has still failed to return the phone.

299.     On July 10, 2024, Dr. Abu Irshaid, through his attorneys, sent a letter to Agent Johnson, demanding the immediate return of his cell phone.

300.     As of the time of this filing, he has not received a response to that letter.

301.     On August 8, 2024, Dr. Abu Irshaid traveled from Queen Alis International Airport in Amman, Jordan (AMM) to IAD with a layover at Heathrow Airport in London (LHR).

302.     Upon arriving at AMM, Dr. Abu Irshaid was unable to print his boarding pass for his connecting flight from LHR to IAD at a kiosk. An airline agent informed him that he would, instead, need to retrieve his boarding pass for that flight upon arriving at LHR.

303.     When he arrived at LHR, a ticketing agent made multiple phone calls over forty minutes before finally printing Dr. Abu Irshaid's boarding pass. The boarding pass was not stamped with SSSS.

304.     Approximately one hour later, while sitting in an airport lounge, Dr. Abu Irshaid was approached by the same ticketing agent who said she received a call from "Homeland Security," and that he was given the wrong boarding pass. The ticketing agent

gave Dr. Abu Irshaid a new boarding pass stamped with "SSSS" indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

305.     Upon arriving at IAD, after taking a shuttle, Dr. Abu Irshaid was met by four plainclothes agents who later identified themselves as CBP agents.

306.     In front of other passengers and people at the airport, two CBP agents walked Dr. Abu Irshaid from the shuttle to an area for secondary screening.

307.     At secondary screening, the agents subjected Dr. Abu Irshaid to a series of harassing and intrusive questions over thirty to forty minutes.

308.     The agents asked Dr. Abu Irshaid why he traveled to Jordan and where else he traveled. Dr. Abu Irshaid responded that was traveling for pleasure.

309.     The agents also asked Dr. Abu Irshaid who he met with and saw while he was traveling. Dr. Abu Irshaid refused to answer this question.

310.     The agents continued to prod Dr. Abu Irshaid about what he did, who he saw, and where he was staying, but Dr. Abu Irshaid continued to try to refuse to answer these questions.

311.     The agents demanded Dr. Abu Irshaid's cell phone. Dr. Abu Irshaid informed the agents that, because of his past experiences, he traveled with a backup phone. Dr. Abu Irshaid showed them the phone, which was still in its original box.

312.     Regardless, the agents, again demanded his cell phone. Dr. Abu Irshaid complied, believing that if he didn't turn over his phone, he would not be allowed to proceed past security and go home.

313.     The agents then demanded the password to Dr. Abu Irshaid's phone and Dr. Abu Irshaid, again, complied, believing that if he didn't provide his password, he would not be allowed to proceed past security and go home.

314.     The agents left the screening area for a period of time with Dr. Abu Irshaid's electronic device before eventually coming back and returning Dr. Abu Irshaid's electronic device and allowing him to leave.

315.     Between the questioning and the cell phone seizure, CBP agents detained Dr. Abu Irshaid for over three hours.

316.     Due to his placement on the federal watchlist, Dr. Abu Irshaid feels degraded and humiliated.

317.     Due to his placement on the federal watchlist, Dr. Abu Irshaid avoids traveling with his family so that his wife and kids would not be subjected to the same humiliating treatment he had to endure.

318.     On this trip from Jordan, for example, Dr. Abu Irshaid booked completely separate flights for his wife and three kids despite the fact that they were in Jordan together. Dr. Abu Irshaid does not want his family degraded and humiliated the way he is.

**Mustafa Zeidan**
**(No Fly List Plaintiff)**

319.     Mr. Zeidan is a naturalized United States citizen of Palestinian origin.

320.     Mr. Zeidan resides in Southern California with his children and wife, and frequently travels abroad to Jordan to visit and care for his ailing and elderly mother.

321.     In the past two years, Mr. Zeidan has routinely traveled to Jordan every two to three months, for two weeks at a time, without issue.

322.     Mr. Zeidan's mother is diabetic, visually impaired, and hypertensive. She struggles to complete activities of daily living and similarly struggles to maintain the intense medicinal regimen that her ailments require.

323.     For large swaths of the year, Mr. Zeidan is his mother's primary caregiver.

324.     Mr. Zeidan's mother relies on Mr. Zeidan to pick up and sort her numerous medications, take her to doctor's appointments, and take care of her at home. Since October 2023 Mr. Zeidan has actively led and organized pro-Palestinian protests throughout the High Desert region of Southern California, where he has frequently and consistently led anti-genocide community actions since October 8th.

325.     On a weekly basis, Mr. Zeidan has been organizing protests and demonstrations and proudly displays and shares his activism with his larger community.

326.     A few months after he began prominently and zealously advocating against genocide and for Palestinian rights, Mr. Zeidan discovered he was placed on the No Fly list when he arrived at the Los Angeles International Airport for a scheduled flight on March 28, 2024.

327.     On March 28th, Mr. Zeidan sought to travel from Los Angeles International Airport (LAX) to Queen Alis International Airport (AMM) with a layover at Istanbul Airport (IST). Mr. Zeidan planned to make his regular visit to his mother.

328.     Upon arrival at the airport, Mr. Zeidan was unable to print his boarding pass at a kiosk. The kiosk directed Mr. Zeidan to an airline agent.

329.     Mr. Zeidan approached an airline agent who was also unable to print his boarding pass. The airline agent made a call and, after almost thirty minutes, informed Mr. Zeidan he would not be allowed to board.

330.     Mr. Zeidan was then approached by two TSA agents, one of whom identified herself as a supervisor.

331.     The supervisor confirmed to Mr. Zeidan that he would not be allowed to board his flight and advised Mr. Zeidan to file a DHS TRIP Inquiry online. The supervisor did not provide any additional reasons for why Mr. Zeidan was denied boarding to his flight.

332.     Mr. Zeidan was shocked, ashamed, and embarrassed. Mr. Zeidan did not receive any explanation for why he was denied boarding to his flight. He also feared for his mother because she was dependent on him for care.

333.     Given the urgency of the situation, Mr. Zeidan filed a DHS TRIP inquiry the very next day.

334.     On May 16, 2024, Mr. Zeidan received a response to his DHS TRIP Inquiry. The response confirmed Mr. Zeidan's placement on the No Fly List because he had been identified "as an individual who 'may be a threat to civil aviation or national security.' 49 U.S.C. § 114(h)(3)(A)."

335.     The response to Mr. Zeidan's inquiry included no further explanation for why Mr. Zeidan, who had peaceably traveled overseas dozens of times since moving to the United States, was now considered a national security threat.

336.     Prior to his prominent activism following October 7, 2023, Mr. Zeidan had never been prevented from boarding a flight, nor had he ever experienced significant travel issues.

337.     Upon information and belief, Mr. Zeidan was placed on the federal watchlist because of his activism opposing Israel's ongoing military attacks on, and likely genocide of, Palestinians in Gaza.

338.     As a result of Mr. Zeidan's placement on the No Fly List, he feels humiliated and confused. Mr. Zeidan is particularly fearful for his mother's safety and wellbeing, who he cannot visit and whose physical health now hangs in the balance.

339.     Mr. Zeidan is now desperately trying to find care for his mother, which will force him to pay a stranger to monitor her health and medicinal regiment.

340.

## COUNT I
## VIOLATION OF THE FOURTH AMENDMENT – ILLEGAL SEARCH OF PLAINTIFF OSAMA ABU IRSHAID'S ELECTRONIC DEVICES
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C § 702)

341.     The foregoing allegations are realleged and incorporated therein.

342.     The Fourth Amendment of the Constitution provides that a person shall not be subjected to "unreasonable searches and seizures."

343.     Defendants violate that guarantee by seizing and confiscating, as a matter of official policy and practice, watchlisted individuals' electronic devices, particularly but not exclusively when they cross the border to enter the United States. Defendants routinely refuse to return the confiscated electronic devices to watchlisted individuals for weeks or months—if they ever return them at all.

344.     As a matter of official policy and practice, when watchlisted individuals cross the border, Defendants routinely download and copy the contents of watchlisted individuals' electronic devices into Defendants' systems and upload those contents to

Defendants' watchlisting and intelligence databases. Defendants then review that material in a manner that constitutes a search for Fourth Amendment and other purposes.

345.    As a matter of official policy and practice, Defendants use the contents of watchlisted individuals' electronic devices as a source of intelligence. Defendants use the contents of watchlisted individuals' electronic devices to launch investigations into the associates of watchlisted individuals, and also to nominate associates of the watchlisted individuals for rules-based terrorist monitoring and inclusion in the federal terrorist watchlist.

346.    As a matter of official policy and practice, Defendants undertake these searches and seizures of watchlisted individuals' electronic devices based solely on the watchlisted individuals' placement in the TSDS.

347.    Defendants have confiscated Plaintiff Abu Irshaid's electronic devices, copied their contents, and searched and used those contents for intelligence and investigations, after initiating those searches and seizures solely because Plaintiff Abu Irshaid was listed on the federal terrorist watchlist.

348.    Watchlist placement does not satisfy any probable cause standard sufficient to invade Plaintiff Abu Irshaid and other similarly situated Americans' right to be free from unreasonable searches and seizures.

349.    Defendants' forensic searches of Plaintiff Abu Irshaids electronic devices and the electronic devices of similarly situated American citizens, permanent residents, and foreign nationals are nonroutine border searches that required and were not based on individualized suspicion in violation of their Fourth Amendment rights. *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538, 540-42 & n.4 (1985); *United States v. Kolsuz*, 890 F.3d 133, 144

(4th Cir. 2018), as amended (May 18, 2018); *U.S. v. Cotterman*, 709 F.3d 952, 963–68
(holding that forensic examination of computer is nonroutine border search requiring
reasonable suspicion); *U.S. v. Saboonchi*, *United States v. Saboonchi*, 990 F. Supp. 2d 536, 548
(D. Md. 2014) (same as to smartphones and flash drives).

350.     Defendants' forensic searches of Plaintiff Abu Irshaid's electronic devices and
the electronic devices of similarly-situated American citizens, permanent residents, and
foreign nationals are not subject to the border search exception because there is no direct
link between the search of Plaintiff Abu Irshaid's electronic devices and the electronic
devices of similarly situated Americans and any government interest that justified the
searches on any account of a nexus requirement in violation of their Fourth Amendment
rights. *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018), <u>as amended</u> (May 18,
2018).

351.     Plaintiff Abu Irshaid's experiences are substantially similar to those of
thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded
Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist
screening lists. Plaintiff Abu Irshaid's experiences are representative of Defendants' current
practices and policies. Accordingly, Plaintiff Aburishad  brings this Fourth Amendment
challenge both as applied to himself and facially to the category of watchlisted individuals
who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiff Abu Irshaid requests this Honorable Court grant declaratory
and injunctive relief in the form described in the Prayer for Relief below, plus all such other
relief this Court deems just and proper including costs and attorneys' fees incurred in this
action.

### COUNT II
### VIOLATION OF PLAINTIFF OSAMA ABU IRSHAID'S FIFTH AMENDMENT—
### SELF INCRIMINATION RIGHTS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

352.    The foregoing allegations are realleged and incorporated therein.

353.    The Fifth Amendment provides that a person shall not be "compelled in any criminal case to be a witness against himself."

354.    The Fifth Amendment protects every person from incrimination by the use of evidence obtained through search or seizure made in violation of his or her rights under the Fourth Amendment. *Agnello v. United States,* 269 U.S. 20, 33-34 (1925).

355.    As a matter of official practice and policy, Defendants, after seizing Plaintiff Abu Irshaid's electronic devices, demanded the password to gain access to the device to review, copy, and analyze its contents.

356.    Defendants' demands were not mere requests and, given the circumstance of the demand (including the ongoing seizure of Plaintiff Abu Irshaid) and the implied consequences of noncompliance (lengthy and indefinite detention), no reasonable person in Plaintiff Abu Irshaid's position would take Defendant's demands to be a mere request.

357.    Defendants have thus violated the Fifth Amendment by forcibly seizing Dr. Abu Irshaid's cell phone for the purpose of viewing its contents.

358.    Plaintiff Abu Irshaid's experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiff Abu Irshaid's experiences are representative of Defendants' current

practices and policies. Accordingly, Plaintiff Abu Irshaid brings this Fifth Amendment challenge both as applied to himself and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiff Abu Irshaid requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT III**
**VIOLATION OF THE FIFTH AMENDMENT—PROCEDURAL DUE PROCESS**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**
**(All Plaintiffs)**

359. The foregoing allegations are realleged and incorporated herein.

360. The Fifth Amendment of the Constitution provides that a person shall not "be deprived of life, liberty, or property, without due process of law."

361. Defendants violate that guarantee by placing and maintaining Plaintiffs and other similarly-situated Americans, lawful permanent residents, and foreign citizens in the Terrorist Screening Dataset, as well as its subsets like the No Fly List and Selectee List, without any meaningful process.

362. The processes by which Defendants nominated Plaintiffs and other similarly-situated individuals to the watchlist and approved their nominations were arbitrary, unconnected to actual national security interests, reliant on algorithmic systems operated without meaningful oversight, and nothing more than rubberstamps that lacked substantive review.

363. Defendants provided no notice to the Plaintiffs or similarly-situated individuals of their placement. Defendants did not inform Plaintiffs or similarly-situated

individuals of the derogatory information on which the Defendants relied to place them on the watchlist. Nor did Defendants provide an opportunity for Plaintiffs or similarly-situated individuals to rebut that derogatory information.

364.     Defendants have also placed Plaintiffs' names and the names of similarly-situated individuals on TSA and CBP watchlists, including in the TECS platform and other lists generated by Quiet Skies and Silent Partner, without any meaningful process, notice of the placement or the derogatory information on which the Defendants relied to place them there, or an opportunity to rebut that derogatory information.

365.     The DHS TRIP process provides no meaningful opportunity for listed individuals, including Plaintiffs, to challenge their inclusion in the TSDS, Selectee List, No Fly List, other subsets of the watchlist, or systems and records that reflect past watchlist status. With the exception of the limited additional information provided to individuals placed on the No Fly List, the DHS TRIP process does not disclose watchlist status, the grounds for inclusion on the watchlist, or provide listees with a meaningful opportunity to contest their watchlisting.

366.     Moreover, even for individuals placed on the No Fly List, the DHS TRIP process often does not disclose watchlist status or provide any reasons for an individual's nomination and placement. Upon information and belief, Mr. Zeidan is on the No Fly List. But he received only a boilerplate response to his DHS TRIP traveler inquiry.

367.     Defendants use the watchlist to target the Muslim community. Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, Muslim-sounding names, or First Amendment protected activities, Defendants consider and rely upon those protected traits as factors supporting placement on the federal terrorist

watchlist, its subsets, and other similar watchlists. Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and other similarly situated American citizens, lawful permanent residents, and foreign nationals on federal terrorist watchlists.

368.     Plaintiffs have experienced deprivations of their liberty interests in travel and their reputations as the result of Defendants' process-free placement of them on the watchlist.

369.     Plaintiffs have suffered delays, humiliation, searches, seizures, and outright denial of boarding when they attempt to travel.

370.     Defendants' placement of Plaintiffs on the watchlist will haunt the Plaintiffs for the rest of their lives, even if Defendants eventually remove them from the list, because Defendants also use former watchlist status as a basis for denying government benefits and inflicting other hams.

371.     Plaintiffs and other similarly-situated individuals are also harmed by the Defendants' widespread dissemination of the Terrorist Screening Dataset and the stigmatizing "known or suspected terrorist" label attached to their names.

372.     Defendants disseminate the watchlist, including records associated with Plaintiffs, to federal government agencies, state and local government agencies, private entities, and foreign governments, with the purpose and hope that those entities will impose consequences on listed individuals.

373.     The consequences of watchlist placement play out in public, amplifying the shame and stigma that listed individuals, including Plaintiffs, endure.

374.     Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this procedural due process challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IV
## VIOLATION OF THE FIFTH AMENDMENT—SUBSTANTIVE DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
### (Plaintiff Zeidan)

375.     The foregoing allegations are realleged and incorporated herein.

376.     The Fifth Amendment of the Constitution provides that a person shall not "be deprived of life, liberty, or property, without due process of law."

377.     Defendants violate that guarantee by placing and maintaining Mr. Zeidan on the No Fly List, thereby depriving him of his fundamental right to travel.

378.     Mr. Zeidan's placement on the No Fly List completely bans him from flying into, out of, or through U.S. airspace on a commercial flight. As a result, he is unable to travel to the United States absent great, practically-insurmountable difficulty.

379.     Despite the immense burden on the fundamental rights of Mr. Zeidan and other similarly-situated individuals on the No Fly List, the List does nothing to protect U.S. national security or other interests.

380.    The watchlist—including the No Fly List—is radically under- and over-inclusive, inclusion on the watchlist and the No Fly List is governed by vaguely-articulated and arbitrarily-applied criteria, and Defendants are focused on targeting Muslims on the basis of their race, ethnicity, and religion. As a result, the watchlist and No Fly List have no meaningful connection to actual threats to aviation.

381.    Mr. Zeidan's experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly List. Mr. Zeidan's experiences are representative of Defendants' current practices and policies. Accordingly, Mr. Zeidan brings this substantive due process challenge both as applied to himself and facially to the category of individuals placed on the No Fly List who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT V
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C.. § 706— PLACEMENT AND REMOVAL
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

### (All Plaintiffs)

382.    The foregoing allegations are realleged and incorporated herein.

383.    Defendants' placements of Plaintiffs on the federal terrorist watchlist, and subsequent DHS TRIP and TSC determinations regarding their watchlist status, are agency actions.

384.     Plaintiffs' experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiffs' experiences are representative of Defendants' current practices and policies. Accordingly, Plaintiffs bring this APA challenge both as applied to themselves and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism related offense.

385.     Defendants' actions in placing Plaintiffs and similarly-situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for redress, were and are arbitrary, capricious, and abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful to 5 U.S.C. § 706.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT VI
## NO STATUTORY AUTHORITY TO CREATE, MAINTAIN THE WATCHLIST
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)
### (All Plaintiffs)

386.     The foregoing allegations are realleged and incorporated herein.

387.     No statute authorizes Defendants to maintain the federal watchlist and add people, including Plaintiffs, to the federal watchlist as they do.  The statutes Defendants rely

upon for authority to use the already-created lists do not authorize the FBI and CBP to do so.

388.     Defendants thus act without statutory authority in violation of 5 U.S.C. § 702.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request against the Official Capacity Defendants:

389.     A declaratory judgment that Defendants' policies, practices, and customs violate the Fourth and Fifth Amendment to the United States Constitution and the Administrative Procedure Act.

390.     A declaratory judgment that Defendants' policies, practices, and customs related to the federal terrorist watchlisting system are not authorized by statute.

391.      A declaratory judgment that Defendants require reasonable suspicion of a border related crime, contraband, or inadmissibility, apart from watchlist status, before performing a nonroutine search or seizure of persons on the watchlist or forensic searches of their electronic devices.

392.     A declaratory judgment that Defendants placed Plaintiffs on the watchlist illegally and unlawfully imposed consequences tied to that status.

393.     An injunction that:

   a. Orders Defendants to remove the status and annotations imposed on Plaintiffs, expunge any records regarding his illegal status and annotations, and expunge any information illegally seized from Plaintiff;

   b. Provides individuals nominated for inclusion to and placed on the federal terrorist watchlist, its subsets, and other rules-based targeting lists with a

legal mechanism that affords them notice of the reasons and bases for their placement on the federal terrorist watchlist and a meaningful opportunity to contest their continued inclusion on the federal terrorist watchlist;

c. Removes Plaintiffs from the Terrorist Screening Dataset and any other watchlist or database that burdens or prevents them from flying; entering the United States across the border; or obtaining a security clearance, access to federal buildings, TSA PreCheck®, Global Entry, or other government benefits;

d. Permanently removes and expunges, in any and all record or system, Plaintiffs' placement in the Terrorist Screening Dataset and any other watchlist or database that burdens or prevents them from flying; entering the United States across the border; or obtaining a security clearance, access to federal buildings, TSA PreCheck®, Global Entry, or other government benefits;

e. Reforms the watchlisting system to eliminate the discriminatory focus on Muslim identity, religious practice, and other First Amendment activity;

f. Enjoins Defendants from searching electronic devices at the border absent a warrant supported by probable cause;

g. Enjoins Defendants from requiring individuals detained at the border to provide passwords or biometric information for the purposes of unlocking their electronic devices;

h. Requires Defendants to expunge all information gathered from, or copies made of, the contents of Plaintiffs' electronic devices, and all other information gleaned from searches of those devices;

i. Enjoins Defendants from detaining individuals at the border absent a warrant supported by probable cause;

j. Prohibits Defendants from sharing TSDS information with through the National Crime Information Center or other means with state, local, tribal, and foreign governments, private entities, and any other institutions or individuals;

k. Enjoins Defendants from maintaining, administering, using, or otherwise taking action related to the federal watchlisting system until Congress authorizes such activity by statute;

394.    An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and,

395.     Such other and further relief as the Court may deem just and proper.

WHEREFORE, Plaintiff requests this Honorable Court grant damages to Plaintiffs against the Defendant CBP Officers in an amount to be proved at trial, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## JURY DEMAND

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand trial by jury of the above-referenced causes of action

Dated: August 12, 2024                          Respectfully Submitted,

/s/ Lena Masri
Lena Marsi
Gadeir Abbas*
Justin Sadowsky
**CAIR Legal Defense Fund**
453 New Jersey Ave SE
Washington, D.C. 20003
Tel: (202) 742-6420
Fax: (202) 379-3317

/s/ Dina Chehata
DINA CHEHATA, ESQ.^
(CA # 295596)
dchehata@cair.com
AMR SHABAIK, ESQ.^
(CA # 288109)
ashabaik@cair.com
**Council on American-Islamic Relations, California**
2180 W. Crescent Ave., Suite F
Anaheim, CA 92801
T: (714) 776-1177

*Licensed in Virginia. Practice limited to federal matters
^Pro Hac Vice application forthcoming.