UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

OSAMA ABU IRSHAID, *et al.*
*Plaintiffs*,

v.

MERRICK GARLAND, *et al.*,
*Defendants.*

1:24-cv-01405-MSN-WPB

## MEMORANDUM OPINION AND ORDER

This is the latest in a long line of cases across the nation, including several prior cases in this district, challenging the federal government's use of terrorist watchlists. *See Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va 2014) ("*Mohamed I*"); *Mohamed v. Holder*, No. 11-cv-50-AJT-MSN, 2015 WL 4394958 (E.D. Va. July 16, 2015) ("*Mohamed II*"); *Elhady v. Piehota*, 303 F. Supp. 3d 453 (E.D. Va. 2017) ("*Elhady I*"); *Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019) ("*Elhady II*"), *rev'd*, 993 F.3d 208 (4th Cir. 2021) ("*Elhady*"); *Long v. Barr*, 451 F. Supp. 3d 507 (E.D. Va. 2020), *vacated sub nom*, *Long v. Pekoske*, 38 F.4th 417, (4th Cir. 2022). Plaintiffs, due to their inclusion on the federal terrorist watchlist, have faced heightened scrutiny whenever they travel by air domestically or abroad. They have been subjected to enhanced screenings, boarding delays, as well as interrogations and searches when they return to the United States from abroad. One plaintiff, who was placed on the No Fly List, can no longer travel by air at all.

Plaintiffs bring a raft of constitutional and statutory challenges to the federal government's watchlist-related actions and procedures, naming dozens of federal officials as Defendants. Defendants have moved to dismiss Plaintiffs' complaint both on the ground that this Court lacks

jurisdiction and that Plaintiffs have failed to state a claim. ECF 20; 21. While this Court has jurisdiction over Plaintiffs' claims all but Count I fail as a matter of law. Accordingly, and for the reasons explained below, the Court will grant Defendants' motion in part and deny it in part.

## I.    BACKGROUND

### A.    The Federal Watchlists

In 2003, in the wake of the September 11, 2001 terrorist attacks on the United States, the Department of Justice established the Terrorist Screening Center ("TSC") within the Federal Bureau of Investigation ("FBI"). Am. Compl. ¶ 208. The TSC created and maintains the federal government's Terrorism Screening Database ("TSDB"), a list of known or suspected terrorists often referred to as the federal "watchlist." *Id.*

An individual can be nominated for inclusion in the TSDB via two primary paths. The first runs through the National Counterterrorism Center ("NCTC"), which is managed by the Office of the Director of National Intelligence. Am. Compl. ¶ 210. The NCTC reviews data from other parts of the federal government and then recommends specific individuals to the TSC for inclusion on the watchlist. *Id.* The FBI may also nominate individuals, as does United States Customs and Border Protection ("CBP"), a division of the Department of Homeland Security ("DHS"). *Id.* ¶ 210-211. According to the government, a nomination to the TSDB must "rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting[,] in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." *Id.* ¶ 214.

The TSC must approve a nomination before an individual is included in the TSDB.  Am. Compl. ¶ 213. There are more than one million individuals who have been added to the TSDB, and more than 98% of the nominated names are accepted. *Id.* ¶¶ 228-229.

The TSDB itself contains only the identity of the individuals on the watchlist, and does not provide further detail regarding the basis for an individual's inclusion. Am. Compl. ¶ 246. When CBP encounters a TSDB-listed individual at a port of entry such as an airport, it automatically designates that person as "Armed and Dangerous." *Id.* ¶ 249-250. CBP may conduct additional screening of TSDB passengers who are leaving the United States from a port of entry. *Id.* ¶ 252. CBP's decisions regarding whether to detain a listee for further inspection are based solely on that individual's watchlist status, and not the "underlying derogatory information that formed the basis" for that person's inclusion. *Id.* ¶ 254.

CBP has implemented a policy regarding electronic investigation procedures for devices held by individuals on the watchlist. Am. Compl. ¶ 261. Officials are permitted to conduct an advanced forensic search of the contents of electronic devices held by individuals on the TSDB. *Id.* ¶ 261-262. CBP has determined that the presence of an individual on the watchlist is alone sufficient ground to search, copy, store, and analyze the contents of that individual's electronic device. *Id.* ¶ 263.

The Transportation Security Administration ("TSA"), a division of DHS, administers the DHS Traveler Redress Inquiry Program ("DHS TRIP"). This program allows individuals to request redress relating to travel difficulties at an airport or port of entry. 49 C.F.R. §§ 1560.3, 1560.205. These difficulties include those relating to placement in the TSDB. "If an individual is in the TSDB, the government reviews the information it relied upon in initially labeling that person and any new information to reassess whether that person belongs in the TSDB. About thirty-five full-time employees handle these reviews. At the conclusion of the process, DHS TRIP sends the traveler a letter with the result of the inquiry. However, the government does not disclose whether the petitioner was actually in the TSDB." *Elhady*, 993 F.3d at 215.

A subset of the TSDB is the "No Fly List." Individuals are placed on the No Fly List by the TSC if they meet additional requirements, and are prohibited from boarding U.S. aircraft. *See Mohamed I*, 995 F. Supp. 2d at 526; *El Ali v. Barr*, 473 F. Supp. 3d 479, 494 (D. Md. 2020).

### B.    Plaintiffs' Individual Allegations

#### 1.    Abu Irshaid

Dr. Osama Abu Irshaid is a United States Citizen and Muslim of Palestinian descent residing in Virginia. Am. Compl. ¶ 15. Between 2010 and 2017, Abu Irshaid was on the federal watchlist and subjected to secondary screening each time he would fly. *Id.* ¶¶ 268-275. When he returned from overseas trips, CBP would request he provide passwords required to unlock his electronic devices, requests to which Abu Irshaid generally acquiesced. *Id.* ¶ 271.

Abu Irshaid is active in leading civic efforts advocating for Palestine and against Israel's military actions following the October 7, 2023 attacks. Am. Compl. ¶¶ 278-279. In 2024, shortly after those attacks, Abu Irshaid was again placed in the TSDB. Am. Compl. ¶ 276. On May 22, 2024, Abu Irshaid traveled from Dulles International Airport to Doha, Qatar. *Id.* ¶ 280. Due to his watchlist status, an airline agent was initially unable to print his boarding pass, and only succeeded in doing so after a three-hour clearance process. *Id.* ¶ 282. At the TSA security checkpoint, Abu Irshaid was subject to enhanced screening procedures, during which officers conducted a full-body pat down, a search of his bags, and a chemical swab of his hands and belongings in view of other passengers. *Id.* ¶ 283. During boarding, TSA agents again patted down Abu Irshaid. *Id.* ¶ 284.

On June 3, 2024, Abu Irshaid returned from Doha to Dulles Airport. Am. Compl. ¶ 286. At Doha airport, the ticket agent needed to make a phone call before printing his boarding pass. *Id.* ¶ 288. When he arrived at Dulles, federal agents confronted him and referred to him by a nickname known only to his close friends. *Id.* ¶ 289. Agent Kenneth Johnson took Abu Irshaid to a room for secondary inspection, and asked questions for an hour about Abu Irshaid's

relationships, overseas and travel activities. *Id.* ¶¶ 290-295. After the questioning was complete, Johnson asked Abu Irshaid to provide his cell phone. He did so, handing over a backup phone that he traveled with out of fear that his primary phone might be searched on his return. *Id.* ¶¶ 296-298. After Abu Irshaid complied in providing both the phone and his password, Johnson left the interrogation room and returned two hours later without the phone, telling him they would return it at a later date. *Id.* ¶¶ 298-300. As of December 2024, the government had not returned Abu Irshaid's phone despite multiple requests from Abu Irshaid and his attorneys. *Id.* ¶¶ 301, 304. On June 19, 2024, Abu Irshaid filed a DHS TRIP inquiry seeking relief for his treatment relating to his presence on the watchlist. *Id.* ¶ 302. As of December 2024, TSA had not provided a response. *Id.*

On August 8, 2024, Abu Irshaid traveled from Amman, Jordan to Dulles via London Heathrow Airport. Am. Compl. ¶ 306. He once again had difficulty obtaining his boarding pass to the United States. *Id.* ¶¶ 307-309. When he arrived at Dulles, Abu Irshaid was met by CBP agents and brought to an area for secondary screening, where he was once again questioned about his travels and acquaintances. *Id.* ¶¶ 312-315. Abu Irshaid refused to answer the agents' questions. *Id.* The agents asked Abu Irshaid for his cell phone and password, and he complied. *Id.* ¶¶ 316-318. After some time, the agents returned the cell phone and allowed him to leave, with the entire encounter lasting over three hours. *Id.* ¶¶ 319-320.

In light of these experiences and his placement on the federal watchlist, Abu Irshaid has felt humiliated and declines to travel with his family so that his wife and children are not subjected to similar treatment. Am. Compl. ¶¶ 321-323.

### 2. Zeidan

Mustafa Zeidan is a United States citizen of Palestinian origin, residing in southern California with his family. Am. Compl. ¶¶ 324-325. Zeidan has frequently traveled to Jordan over

the last two years to visit and care for his mother, who suffers from diabetes, visual impairment, and hypertension, and relies on Zeidan for care during parts of the year. *Id.* ¶¶ 325-329.

Since October 2023, Zeidan has been a local leader in pro-Palestinian activism. Am. Compl. ¶¶ 329-331.

In March 2024, Zeidan planned to travel from Los Angeles to Amman. Am. Compl. ¶ 332. When he arrived at the airport, the airline agents were unable to print his boarding pass, and then informed him he would not be able to board his plane. *Id.* ¶¶ 332-334. A TSA agent confirmed to Zeidan that he could not board, and suggested he file a DHS TRIP inquiry. *Id.* ¶¶ 335-336. Zeidan filed an inquiry the next day. *Id.* ¶ 338. On May 16, 2024, TSA responded to his inquiry, confirming he had been placed on the No Fly List as a person who "may be a threat to civil aviation or national security." *Id.* ¶ 339. Zeidan is now struggling to find care for his mother since he cannot travel by plane to visit her. *Id.* ¶ 344.

### 3. Doe

John Doe is a United States citizen who has been placed on the TSDB. Am. Compl. ¶¶ 345-347. This placement has resulted in additional screenings, delays, searches, and interrogations when Doe travels by air. *Id.* ¶ 348. In March 2023, when traveling home to Boston from Spain, a CBP agent pulled Doe him aside for additional questioning. Am. Compl. ¶¶ 350-352. In May 2023, on a trip to London with his wife, both were subjected to additional security screening in public view, and interviewed upon returning. Am. Compl. ¶¶ 358-369. During the interview upon their return, CBP took Doe and his wife's electronic devices for analysis and returned them after more than two hours. *Id.* ¶ 370. That same month, Doe filed a DHS TRIP inquiry. *Id.* ¶ 371. He received a final determination letter from DHS on August 31, and his treatment did not change. *Id.* ¶¶ 373-374.

Doe faced similar circumstances during a January 2024 business trip from Boston to Dallas, where he was again unable to print his boarding pass and selected for heightened security screening at both the TSA checkpoint and the gate before boarding. Am. Compl. ¶¶ 375-388. In another 2024 encounter on a business trip, Doe was subjected to secondary screening and patted down at his departure gate in front of fifty work colleagues. *Id.* ¶ 390. Doe experiences similar treatment whenever he travels. *Id.* ¶¶ 390-393. He has filed two further DHS TRIP requests since May 2023, each of which has had no effect. *Id.* ¶¶ 394-396. His placement on the watchlist has left him feeling degraded and humiliated. *Id.* ¶ 698.

### 4. Zaarour

Hasaan Zaarour is a United States citizen of Lebanese descent living in Michigan. Am. Compl. ¶ 400. He previously served as a member of his community's reserve police force. *Id.* ¶ 401. In 2015, when traveling home from Beirut, Lebanon, he faced challenges retrieving his boarding pass, and was interviewed by CBP and FBI agents on his reentry into the United States. *Id.* ¶¶ 402-406. During this incident, he was detained, threatened, and questioned for more than three hours. *Id.* ¶ 407. Since that incident, he has been subjected to enhanced screening and other challenges each time he travels by air due to his placement on the federal watchlist. *Id.* ¶¶ 408-410.

In April 2024, Zaarour traveled to Cancun, Mexico with his wife and children, and suffered delays obtaining their boarding passes as the airline obtained clearance. Am. Compl. ¶¶ 411-415. He and his family were subjected to separate enhanced screening in public view, and an additional pat-down at their departure gate. *Id.* ¶¶ 416-418. He felt humiliated and degraded by this experience. *Id.* ¶ 419. When he returned with his family to the United States, they were escorted off their plane in front of other passengers, and subjected to extensive questioning by CBP agents. *Id.* ¶¶ 420-424. Zaarour has continued to face similar challenges whenever he travels, and tries to

avoid traveling with his wife. *Id.* ¶¶ 428-434. He filed a DHS TRIP inquiry in 2023, and received a final determination letter on January 9, 2024. *Id.* ¶¶ 435-436.

Zaarour presently hopes to serve again as a law enforcement officer. Since his placement on the watchlist, he has been rejected from one law enforcement position to which he applied. Am. Compl. ¶ 439.

### 5. Hageali

Abbas Hageali is a Lebanese-born United States citizen who resides in Florida. Am. Compl. ¶¶ 443-444. Since 2017, Hageali has experienced travel delays, enhanced screening, questioning, and electronics searches when he travels due to his placement on the TSDB. *Id.* ¶ 445. This began during a 2017 trip to Lebanon to visit his mother, and has consistently caused delays and humiliation when he travels. *Id.* ¶¶ 447-468.

Hageali's family has also experienced consequences as a result of his placement on the watchlist. His brother has faced challenges immigrating to the United States, and his mother and sister have been stopped and questioned by CBP in a manner that caused his ailing mother pain and distress. Am. Compl. ¶¶ 470-489.

On an October 2023 return trip from Lebanon to the United States, Hageali was questioned by CBP officers about his views on the Israel-Palestine conflict, and his phone was taken to a separate room to be searched. Am. Compl. ¶¶ 483-485.

### 6. Ayyad

Sharif Ayyad is a United States citizen of Palestinian descent. Am. Compl. ¶¶ 487. Since 2011, he has been placed on the TSDB and has had similar travel experiences to the other plaintiffs. *Id.* ¶¶ 488-498. This includes a recent trip with his family to Jordan, where they were asked at security screening whether they "associate with Hamas," and they were denied boarding on their initial flight. *Id.* ¶¶ 499-506. Upon their return, Ayyad and his family were subjected to further

interrogations, and had to spend a night in a hotel after missing their connecting return flight home. *Id.* ¶¶ 507-511. They felt frustrated, humiliated, and disrespected. *Id.* ¶¶ 511-513.

### C.    Procedural Background

Plaintiffs Abu Irshaid and Zeidan filed the initial complaint in this case on August 12, 2024, naming more than two dozen federal Defendants in their official capacity. ECF 1. Defendants moved to dismiss that complaint for lack of jurisdiction and failure to state a claim on November 12, 2024. ECF 14. Plaintiffs did not respond to that motion, but instead on December 3, 2024 filed an amended complaint which joined the four additional plaintiffs (Ayyad, Doe, Zaarour, and Hageali) and raised substantially similar claims to those in the initial complaint. ECF 19.

Plaintiffs' Amended Complaint contains six counts:

- **Count I** alleges Defendants have violated the Fourth Amendment by, as a matter of official policy and practice by conducting forensic searches of watchlisted individuals' electronic devices when they enter the United States via air travel. Am. Compl. ¶¶ 521-531. The Count also cites Defendants "permanent[]" seizure of Abu Irshaid's cell phone. *Id.* ¶ 527. Count I is framed as both an as-applied challenge on Abu Irshaid's behalf and as a facial challenge to Defendants' alleged policy. *Id.* ¶ 520.

- **Count II** alleges that Defendants have violated the Fifth Amendment by, as a matter of official policy, demanding that individuals whose electronic devices are seized provide the passwords for those devices by threatening continued detention if the watchlisted individuals do not comply. Am. Compl. ¶¶ 534-539. Count II too is brought both as an as-applied challenge on Abu Irshaid's behalf and as a facial challenge to Defendants' alleged policy. *Id.* ¶ 533.

- **Count III** alleges procedural due process violations of the Fifth Amendment arising from Defendants' deprivation of Plaintiffs' protected liberty interest in intra- and international travel without any meaningful process. Am. Compl. ¶¶ 542-556.[1]

- **Count IV** alleges substantive due process violations of the Fifth Amendment arising from the placement of Mr. Zeidan on the No Fly List. Am. Compl. ¶¶ 559-

---

[1] While the Complaint states that Count III is brought only on behalf of Abu Irshaid and facially, *Am. Compl.* ¶ 533, it in fact appears to allege violations of all Plaintiffs' rights, and particularly Zeidan's. Since the parties have construed Count III as applying to all Plaintiffs, the Court will too.

564. Count IV is brought on behalf of Mr. Zeidan and as a facial challenge. *Id.* ¶ 558.

- **Count V** alleges violations of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, claiming that Defendants' placement of Plaintiffs on the federal terrorist watchlist and subsequent DHS TRIP and TSC processes regarding their status are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful. Am. Compl. ¶¶ 567-569. Count V is brought on behalf of all Plaintiffs and as a facial challenge. *Id.* ¶ 566.

- **Count VI** alleges violation of the APA, 5 U.S.C. § 702, on the ground that Defendants' maintenance of the federal watchlist is undertaken without statutory authority. Am. Compl. ¶¶ 571-572.

On December 17, 2024, Defendants moved to dismiss Plaintiffs' amended complaint for lack of jurisdiction and for failure to state a claim. ECF 20; ECF 21 ("MTD"). Plaintiffs have opposed Defendants' motion, ECF 25 ("Opp.") and Defendants have submitted a reply brief, ECF 29 ("Reply").

## II.    STANDARD OF REVIEW

### A.    12(b)(1)

This Court must dismiss any case wherein it appears that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). Under Fed. R. Civ. P. 12(b)(1), a federal district court may entertain a facial challenge to its jurisdiction, considering whether the pleadings are sufficient to invoke its jurisdiction. *Id.*[2]

### B.    12(b)(6)

A court may grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) when a complaint fails as a matter of law "to state a claim on which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion under Rule 12(b)(6), a court must assume the truth

---

[2] Defendants also invoke a second manner of considering a motion under 12(b)(1), by which a defendant may challenge a plaintiff's ability to establish facts necessary to invoke the court's subject matter jurisdiction. MTD 10-11. Defendants' motion, however, appears to bring only a facial challenge.

of all well-pleaded factual allegations "and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## III.    ANALYSIS

### A.    12(b)(1)

Because Defendants' challenge to subject matter jurisdiction invokes this Court's "power to hear the case," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), that is where the Court must begin. Defendants' jurisdictional challenge relies on 49 U.S.C. § 46110(a), which provides the United States Courts of Appeals with exclusive jurisdiction over challenges to any "order issued by . . . the Administrator of the Transportation Security Administration . . . in whole or in part." According to Defendants, this provision locates exclusive jurisdiction over challenges to the DHS TRIP process or TSA's screening procedures in the Courts of Appeals. MTD 12-14.

In support of their argument, Defendants point first to *Blitz v. Napolitano*, 700 F.3d 733 (4th Cir. 2012). MTD 12. *Blitz* involved a challenge to the TSA's use of "advanced imaging technology ('AIT') scanners and invasive pat-downs at airport screening checkpoints in the United States." 700 F.3d at 735. At issue were "the TSA's standard operating procedures for checkpoint screening," which required the use of such methods. *Id.* In determining whether the district court below had jurisdiction over the case, the Fourth Circuit looked to whether those standard operating procedures "constitute[d] an order subject to 49 U.S.C. § 46110." *Id.* at 739-740. The Fourth Circuit applied "the plain text of the statute" to determine that the procedures being challenged *did* constitute an order. *Id.* at 740. That is because the procedures "conclusively settled the agency's position with respect to the use of AIT scanners and passenger pat-downs," and thus constituted the "final disposition of the matter [they] addresse[d]." *Id.* (quoting *City of Alexandria v. Helms*, 728 F.2d 643, 646 (4th Cir. 2012)).

Defendants also point to two cases in the Sixth and Ninth Circuits applying Section 46110. MTD 12-13. But, apart from the fact that they are nonbinding on this Court, they do not support Defendants' argument. *Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015) involved two sorts of challenges: to "the adequacy of the procedures established . . . to contest . . . inclusion on the No Fly List" and to "placement on the No Fly List." *Id.* at 811. The Sixth Circuit held that the TSA, which was not named as a defendant in Mokdad's suit, was a necessary defendant under Fed. R. Civ. P. 19 since it was the agency that was "required 'to establish [the DHS TRIP procedure].". *Id.* (quoting 49 U.S.C. § 44903(j)(2)(C)(iii)(I)); *see also* 49 U.S.C. § 44903(j)(2)(G)(i); 49 C.F.R. §§ 1560.201-207. The *Mokdad* court declined, however, "to opine" as to "whether § 46110 would deprive the district court of subject-matter jurisdiction over Mokdad's claims challenging the adequacy of the redress process, including any broad constitutional claims." *Mokdad*, 804 F.3d at 812. And the Ninth Circuit decision in *Magassa v. Mayorkas,* 52 F.4th 1156 (9th Cir. 2022), involved an airline employee challenging the TSA's redress process after his eligibility for a security badge and airport privileges were revoked. While the Ninth Circuit held that district courts lacked jurisdiction over Magassa's claim in light of Section 46110, *id.* at 1164-1167, in doing so it relied on an earlier Ninth Circuit case, *Latif v. Holder*, 686 F.3d 1122 (9th Cir. 2012). There, the Ninth Circuit held that the DHS TRIP process was an order "issued both by TSA, which is named in § 46110, and by TSC, which is not," and that with respect to DHS TRIP, "TSA is merely a conduit" that "passes grievances along to TSC and informs travelers when TSC has made a final determination." *Id.* at 1128. That is, it is "TSC—not TSA—that established the policies" governing the review of "classified intelligence information about travelers and [the decision] whether to remove them from the list." *Id.* Accordingly, the Ninth Circuit held that "[t]he considerations that

have led us to limit a district court's jurisdiction to review claims against § 46110 agencies do not apply here." *Id.* at 1129.

More importantly, there are in-circuit cases that *support* a finding of jurisdiction. *Mohamed v. Holder*, No. 11-1924 (4th Cir. May 28, 2013), involved claims by a plaintiff challenging his placement on the No Fly List and his lack of a "meaningful opportunity to contest this classification." Slip. Op. at 3. The Fourth Circuit looked at the statutory review process at issue, which it found "involves a general congressional directive that the DHS and the TSA establish a 'timely and fair process' for aggrieved travelers to contest their identification as a threat to air travel and 'correct any erroneous information.'" *Id.* at 4 (quoting 49 U.S.C. §§ 44903(j)(2)(C)(iii), (G)(i); 49 U.S.C. § 44926(a)). It followed the Ninth Circuit's analysis in *Latif* to find that because "resolving substantive and procedural due process challenges to an individual's inclusion on the No-fly list necessarily requires scrutiny of both the TSC's and the TSA's actions," the Courts of Appeals could not readily review an order involving DHS TRIP. *Id.* at 5-6. Accordingly, it distinguished the challenges there from those in *Blitz* and remanded the case for further proceedings in district court. *Id.* at 5-6. District courts in this circuit have adhered to *Mohamed*'s jurisdictional analysis. *See El Ali v. Barr*, 473 F. Supp. 3d 479, 502-503 (D. Md. 2020) (holding that "for an order to be subject to Section 46110's jurisdictional channeling, it must be the 'consummation of TSA's *independent* action,' and not action undertaken by any other agencies such as the TSC"); *Elhady I*, 303 F. Supp. 3d at 461-462 (similar).

While this Court must follow *Blitz* to the extent Plaintiffs' claims involve a challenge to TSA screening procedures, *see* 700 F.3d at 740, this Court finds that the weight of authority and the text of Section 46110 do not preclude its jurisdiction over Plaintiffs' challenges to their placement on the watchlist or the DHS TRIP process. As the Ninth Circuit put it in *Magassa*:

"Claims remain in district court if they involve agencies not covered by § 46110." 52 F.4th at 1165 (cleaned up). And as the court in *El Ali* outlined in detail, TSC, an agency not covered by 46110, "remains integral to any DHS TRIP procedures" for individuals on the watchlist. 473 F. Supp. 3d at 504. Thus, this Court lacks jurisdiction over Plaintiffs' claims only to the extent that they address TSA screening policies and procedures.[3]

### B.    Exhaustion of Administrative Remedies

Defendants next argue that this Court should dismiss the claims of those plaintiffs who have not yet fully exhausted their administrative remedies because they have either not yet availed themselves of DHS TRIP or have not yet received a final determination. MTD 14-15. As Defendants point out, Plaintiffs Hageali and Ayyad do not allege that they have used DHS TRIP, and Abu Irshaid has not yet received a response to his DHS TRIP inquiry. *Id.* at 14 (citing Am. Compl. ¶ 302). Further, Plaintiff Zeidan, while he received a response from DHS TRIP regarding his placement on the No Fly List, does not allege that he has "availed himself of the follow-up procedures to request additional information regarding his placement on the No Fly List and to submit his own, responsive information in advance of a final decision by the TSA Administrator." *Id.* at 14-15 (citing Am. Compl. ¶¶ 338-340).

Defendants acknowledge that "exhaustion is not mandatory" for Plaintiffs' claims, but point to the principle of "deference to Congress' delegation of authority to coordinate branches of Government" such that "agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). In response, Plaintiffs first point out that the exhaustion requirement cannot be applied

---

[3] While the Complaint contains detailed factual allegations, recounted above, regarding the TSA's enhanced screening procedures as applied to the individual plaintiffs, none of the individual counts appears to challenge those procedures themselves, and Defendants have not argued that any particular count should be dismissed on this ground.

to their APA claims. Opp. 6; *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). They next cite several cases in which district courts have declined to require exhaustion of DHS TRIP. Opp. 7 (citing *Mohamed I*, 995 F. Supp. 2d at 539; *Crooker v. TSA*, 323 F. Supp. 3d 148, 157-158 (D. Mass. 2018); *Kovac v. Wray*, 363 F. Supp. 3d 721, 747 (N.D. Tex. 2019); *El Ali v. Barr*, 473 F. Supp. 3d 479, 505-507 (D. Md. 2020)).

In *Mohamed I*, Judge Trenga considered the government's argument that plaintiffs should exhaust DHS TRIP in the context of similar constitutional challenges. 995 F. Supp. 2d at 533-534. He determined that it was "inappropriate to require exhaustion," as it was "difficult to see how exhaustion of DHS TRIP would significantly assist the Court in adjudicating or resolving" claims involving the processes by which the plaintiff was placed on the watch list, as DHS TRIP would not provide him with substantive information or an opportunity to challenge the specific grounds for his inclusion. *Id.* at 534. More to the point, DHS TRIP did not provide "any opportunity [for the plaintiff] to present and have considered his constitutional claims," nor would exhaustion "create a record more helpful than the one that already exists." *Id.* at 534-535.

This Court is persuaded by the analysis in *Mohamed I* and subsequent cases in this Circuit. *See Elhady II*, 391 F. Supp. 3d at 576; *El Ali*, 473 F. Supp. 3d at 506. Exhaustion would not, as Defendants argue, meaningfully protect agency authority or promote judicial efficiency. Reply 5. Plaintiffs may therefore proceed in this Court without fully exhausting the DHS TRIP process.

## C.    Failure to State a Claim

### 1.    Count I – Fourth Amendment Search and Seizure

Plaintiff Abu Irshaid alleges in Count I that the government undertook an unlawful search and seizure by engaging in a forensic search of and confiscating his cell phone without reasonable suspicion. The Government argues that Abu Irshaid has failed to state a claim because he has not

plausibly alleged a forensic search of his cell phone, and that even if he has, the government had the authority to engage in such a search based on reasonable suspicion. MTD 15-18.

The Fourth Amendment, which protects the "right of persons to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures," generally requires an officer to obtain a warrant before searching or seizing a person's property. U.S. Const. amend. IV; *see Riley v. California*, 573 U.S. 373, 382 (2014). There is an exception to this requirement at our Nation's borders, where agents "need no warrant, nor any individualized suspicion, to conduct 'routine searches of the persons and effects of entrants.'" *United States v. Nkohngo*, 107 F.4th 373, 381 (4th Cir. 2024) (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985)). In *Nkohngo*, the Fourth Circuit affirmed that "forensically searching a traveler's electronic devices may be vital to promoting" the government's interests in a secure border. That is, the intrusive and sweeping nature of such non-routine searches requires the government to show that it had "individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *Id.* (quoting *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019)). "Reasonable suspicion exists when specific and articulable facts known to the searching officers, along with rational inferences from those facts, demonstrate that criminal activity is afoot." *El Ali*, 473 F. Supp. 3d at 520 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)) (internal quotation marks removed). And the reasonable suspicion at issue in these circumstances must relate to the border exception's purposes—suspicion of "grave *domestic* crimes" is not enough. *Aigbekaen*, 943 F.3d at 721 (emphasis added).

Here, Defendants first argue that Abu Irshaid has not plausibly pled facts allowing an inference that a forensic search—i.e. a nonroutine border search—of his electronic devices

16

occurred at all. MTD 16-17. They characterize the amended complaint as presenting the "bald claim that [the searches] of his cell phones" were forensic, and claim "Abu Irshaid could not possibly know what kind of search was conducted, since he admits that neither search was performed in his presence." MTD 16 (citing Am. Compl. ¶¶ 300, 319).

Abu Irshaid has alleged that on June 3, 2024, agents at Dulles Airport seized his phone, gave him "a slip indicating that the phone was being taken, searched, and kept for the time being," and that the government has never returned the phone. Am. Compl. ¶¶ 300, 303. He further alleges that on August 8, 2024, agents at Dulles seized another phone and held it for hours before returning it and allowing him to leave. *Id.* ¶¶ 319-320. The Complaint further points to CBP Directive 3340-049A. *Id.* ¶¶ 262-264. That policy directive provides that an officer "may perform an advanced search of an electronic device"—that is, a "search in which an Officer connects external equipment . . . to an electronic device not merely to gain access to the device, but to review, copy and/or analyze its contents"—when there is "reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern." CBP Directive 3340-049A § 5.1.4. It further notes that "the presence of an individual on a government-operated and government-vetted terrorist watchlist" may create reasonable suspicion. *Id.* The directive requires "[s]earches of electronic devices [to] be conducted in the presence of the individual whose information is being examined unless there are national security, law enforcement, officer safety, or other operational considerations that make it inappropriate to permit the individual to remain present." *Id.* § 5.1.6.

Here, the circumstances of the searches and the CBP's policies permit a reasonable inference that a forensic search was performed on Abu Irshaid's electronic devices. As alleged, Abu Irshaid is in the TSDB, which means the agents were permitted (under CBP policy, if not the

Fourth Amendment), to conduct a forensic search of his devices. Further, he specifically alleges that both searches were performed outside of his presence, which is allowed by CBP policy only when "there are national security, law enforcement, officer safety, or other operational considerations" that would render a search in his presence inappropriate. This policy, the duration of the searches, and the fact that a "forensic search generally entails the connection of external equipment and/or the use of specialized software," *Aigbekaen*, 943 F.3d at 718 n.2, is enough to push Plaintiffs' allegations over "the line between possibility and plausibility." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

Since Abu Irshaid has plausibly alleged a forensic search, the only question is whether—on the facts set forth in the amended complaint—the officers at Dulles had reasonable suspicion to conduct such a search. Defendants argue that his inclusion in the TSDB was enough to establish reasonable suspicion each time he reentered the United States. MTD 17-18. According to Defendants, since inclusion in the TSDB requires a "'reasonable suspicion' that [a person] has engaged, is engaging, or intends to engage in terrorist activity," the officers in each instance had the requisite reasonable suspicion relating to "protecting national security" when he re-entered the United States from abroad. *Id.* (quoting *Overview of the U.S. Government's Terrorist Watchlisting Process and Procedures as of April 2024* at 3);[4] *Nkongho*, 107 F.4th at 382. Defendants compare the information that Abu Irshaid was on the watchlist to the "anonymous phone tip" in *Navarette v. California*, 572 U.S. 393, 397 (2014), which the Supreme Court found created reasonable suspicion. MTD 18. Plaintiffs, on the other hand, rely on *El Ali*, where the District of Maryland found that "[t]he TSDB cannot serve as a proxy for individualized reasonable suspicion that an

---

[4] https://www.fbi.gov/file-repository/terrorist-watchlisting-transparency-document-april-2024-050224.pdf/view

individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at the time of the search." Opp. 10 (quoting 473 F. Supp. 3d at 521).

Abu Irshaid has alleged that the officers who conducted the search of his devices relied on nothing more than the fact that his name appeared in the TSDB. Am. Comp. ¶ 526. To be placed in the TSDB, an agent was required to rely on information that "creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage in conduct constituting preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities." Am. Compl. ¶ 24. The fact that at the time of nomination a government agent determined that a TSDB candidate met this standard, however, is a poor fit for the reasonable suspicion standard required to justify a non-routine border search. For one, inclusion in the TSDB supports, at best, an inference that reasonable suspicion of national security-related crimes existed at and around the time of nomination—not months or years later. *See Reid v. Georgia*, 448 U.S. 438, 440 (officer must possess "a reasonable and articulable suspicion that the person seized *is* engaged in criminal activity") (emphasis added). Second, it is far from clear that the scope of activities that might satisfy the standard for inclusion in the TSDB necessarily relate to "protecting national security." *Nkohngo*, 107 F.4th at 381.

> For example, is the academic study of terrorism or the investigative reporting of terrorist activities "related to terrorism and terrorist activities"? Is providing financial support to a charitable organization enough, even without knowledge that some of the organization's activities are "in aid of . . . terrorist activities"? Is it enough to be a member of a lawfully operating social or religious organization whose membership may include other persons suspected of terrorism? Is studying Arabic abroad, as Mohamed concedes he did, conduct "in preparation for . . . terrorist activities"?

*Mohamed I*, 995 F. Supp. 2d at 532. Because reasonable suspicion must be based on the "facts, and their rational inferences, known to [the searching officer]," *Montoya de Hernandez*, 473 U.S. at 541, and the officers here only knew that Abu Irshaid was on the TSDB, Plaintiffs have

19

sufficiently alleged that they lacked knowledge of "specific and articulable facts" to "warrant th[e] intrusion." *Terry*, 392 U.S. at 21.[5]

In addition to the allegation of unlawful searches, Abu Irshaid has also plausibly alleged a Fourth Amendment violation arising from the indefinite seizure of his device on June 3, 2024. Am. Compl. ¶ 527. As the Fourth Circuit noted in *United States v. Kolsuz*, 890 F.3d 133, 141 (4th Cir. 2018), "[t]he Fourth Amendment protects property as well as privacy, and a seizure reasonable at its inception must remain reasonable in scope and duration to satisfy the Fourth Amendment." (internal citation omitted). While the Fourth Circuit has allowed for a nine-day seizure of an electronic device prior to execution of a search warrant, it has found that holding a phone for thirty-one days prior to searching it was unreasonable. *Nkongho*, 107 F.4th at 385 (citing *United States v. Pratt*, 915 F.3d 266, 273 (4th Cir. 2019)). Here, the government's apparently indefinite deprivation of Abu Irshaid's property also violates the Fourth Amendment regardless of the nature of any search performed.

### 2. Count II – Fifth Amendment Self-Incrimination

The Fifth Amendment provides that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In addition to the alleged Fourth Amendment violations arising out of the search of his electronic devices, Plaintiff Abu Irshaid claims that his Fifth Amendment right against self-incrimination was violated when agents demanded he provide the passwords to those devices. Am. Compl. ¶¶ 532-539.

Defendants argue that Abu Irshaid has failed to state a claim under the Fifth Amendment because he has not plausibly alleged that his statements were used at a criminal trial. MTD 18-19.

---

[5] This case is therefore unlike *Navarette*. There, "[b]y reporting that she had been run off the road by a specific vehicle—a silver Ford F–150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving." 572 U.S. at 399. None of the specificity that made the tip there sufficient to generate reasonable suspicion is present in this case.

Defendants point to law establishing that "a constitutional violation" of the Fifth Amendment "occurs only *at trial*." MTD 18 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990)); *see also Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (plurality) (finding that a plaintiff cannot allege a Fifth Amendment violation if he "was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case"). As the Fourth Circuit has put it: "Even with regard to statements made under circumstances that would otherwise be viewed as coercive, the Self-Incrimination Clause is violated *only* if those statements are used in a criminal trial." *United States v. Riley*, 920 F.3d 200, 205 (4th Cir. 2019).

In response, Plaintiffs do not claim that Abu Irshaid has faced or will face criminal proceedings. They instead insist that "the only real question for this Court is whether the access Dr. Abu Irshaid is compelled to give—and punished when he is refused—is compulsory." Opp. 14. They first point to *United States v. Hubbell*, 530 U.S. 27, 35-36 (2000), for the proposition that "required provision[] of passwords violate[s] the Fifth Amendment precisely because providing those passwords [is] testimonial in nature." Opp. 13. Plaintiffs argue that *Verdugo-Urquidez* and *Chavez*, to the extent that they require a criminal trial, "would apply [only] were Dr. Irshaud [sic] simply seeking damages for giving incriminating testimony." Opp. 15. They point to several cases they argue would permit the Court to enjoin future coercion, regardless of the existence of any criminal prosecution. *Id.* (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 804 (1977); *United States v. Kirschner*, 823 F. Supp. 2d 665, 669 (E.D. Mich. 2010); *Pentlarge v. Murphy*, 541 F. Supp. 2d 421, 427 (D. Mass. 2008)).

Plaintiffs' theory of the Fifth Amendment finds no support in the law. This much is clear from a cursory examination of the Amendment's text, which protects against self-incrimination "in any criminal case." Nor does *Hubbell* help their case, as it involved an effort to overcome a

person's assertion of criminal immunity relating to his production of documents in response to a grand jury subpoena. 530 U.S. at 31-32. The Court held that the Defendant there could not be indicted based on information ultimately derived from his compelled production of documents. *Id.* at 45-46. That is, they could not be used against him "in any criminal case." Contrary to Plaintiffs' assertion, *Hubbell* does not mention passwords, or support the theory that mere compulsion (absent a criminal prosecution) violates the Fifth Amendment. *Lefkowitz* too is inapposite. There, the Supreme Court affirmed the principle that "that government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized." 431 U.S. at 806. The Court thus prevented enforcement of a New York law that would have barred an individual from holding public office as punishment for refusing to waive his Fifth Amendment privilege. *Id.* at 808-809. Abu Irshaid has not here alleged that he properly invoked his Fifth Amendment right, or that any sanction rising to the level of those held unconstitutional in *Lefkowitz* would be applied if he did. Nor do Plaintiffs' other cases support their theory of the law. While *Kirshner* involved the compelled testimony regarding a password pursuant to a grand jury subpoena, at issue was whether the Defendant could be compelled to waive his Fifth Amendment privilege as to information derived from that password. 823 F. Supp. 2d at 668-669. And *Pentlarge* simply applied *Lefkowitz* and its progeny to find that the plaintiffs could not be required to waive their Fifth Amendment rights as a condition of receiving sexual offender treatment. 541 F. Supp. 2d at 428-429.[6]

---

[6] The District of Maryland in *El Ali*, as Plaintiffs point out, did find Fifth Amendment self-incrimination violations arising from individuals being "forced to provide cellphone and laptop passwords." 473 F. Supp. 3d at 521-523. This Court respectfully departs from that decision, noting that the court there did not consider (and the government did not brief) the issue of whether a criminal case existed. *See* 541 F. Supp. 2d at 428-429.; ECF No. 49-1 at 65-71, Case No. 8:18-cv-02415-PX (D. Md. Apr. 29, 2019).

Because Abu Irshaid's Fifth Amendment claim finds no support in the law, the Court will grant Defendants' motion as to Count II.[7]

### 3. Count III – Procedural Due Process

The Fifth Amendment also provides that no person shall "be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. "These words mean that the government may not take certain actions without providing procedural protections meant to prevent erroneous decisions." *Elhady*, 993 F.3d at 219. Plaintiffs jointly assert a procedural due process claim on the theory that their liberty interest in travel has been impaired without sufficient process. Defendants argue this count should be dismissed because Plaintiffs do not allege infringement of a liberty interest, and the process available is adequate.

Defendants' first ground for dismissal is that Plaintiffs have not alleged deprivation of a protected liberty interest. "[N]ot every government action creates a constitutional question over what procedures are required. The Supreme Court has explained that a procedural due process claim must demonstrate a substantial infringement of liberty or property in order to proceed." *Elhady*, 993 F.3d at 219 (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 570 (1972). To merit constitutional protection, a liberty interest "must be 'objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty.'" *Id.* (quoting *Kerry v. Din*, 576 U.S. 86, 94 (2015) (plurality)).

The Fourth Circuit in *Elhady* considered circumstances similar to those alleged by all but one of the Plaintiffs here. The twenty-three individual plaintiffs had not been barred from flying, but suffered "delays and detentions ranging from a few minutes to twelve hours" when they

---

[7] This finding is, of course, without prejudice to Abu Irshaid's right to raise a Fifth Amendment defense in any future criminal proceeding to the extent that the government utilizes information recovered from his electronic devices. Plaintiffs

traveled by air. 993 F. 3d at 216. One plaintiff, when crossing the border, "was ordered out of his car, handcuffed, and placed in a very cold room" before being "interrogated for several hours." *Id.* Another plaintiff's "phone was seized twice during border searches." *Id.* In determining whether the plaintiffs in *Elhady* had suffered deprivation of a protected liberty interest, the Fourth Circuit canvassed the history of the "right to travel," which goes back at least as far as the Magna Carta. *Id.* at 219-220 (citing 1 William Blackstone, Commentaries on the Laws of England *134 (1769)). The Court proceeded to outline a "careful description of the asserted fundamental liberty interest," *id.* at 220 (quoting *Kerry*, 5576 U.S. at 93). Looking to history and precedent as a guide, the *Elhady* Court held that there is no constitutionally protected interest in being able to travel domestically or internationally without incurring some burdens." *Id.* at 221 (citing *Haig v. Agee*, 453 U.S. 280, 305 (1981)). Applying these principles, it held that "[t]he experiences alleged . . . do not rise to the level of constitutional concern." *Id.* There is simply not "a constitutional right to convenient travel," and "*subjective* deterrence" from flying due to heightened inconvenience was insufficient to create a Constitutional claim. *Id.*

The parties agree that *Elhady* controls here as to all Plaintiffs' travel-related procedural due process claims except for Zeidan's. MTD 20; Opp. 22. Plaintiffs argue, however, that they have stated a claim as to Zeidan, who is on the No Fly List, Zaarour, who was denied a law enforcement job, and Doe, whose TSA Pre-Check status was revoked. The Court will consider those arguments in turn.

For the Defendants, *Elhady* controls as to Zeidan's claim, because "there is no allegation that Mr. Zeidan cannot 'travel domestically without interference by train or automobile,' or that he is unable to 'travel internationally by boat.'" *Id.* (quoting *Elhady*, 993 F.3d at 222). The implication appears to be that Zeidan is not in fact prohibited from traveling to Lebanon if he so

wishes, since his placement on the No Fly List does not prevent him booking a boat ticket across the Atlantic. Plaintiffs see things differently. But their focus on establishing the existence of a right to interstate and international travel misses the point. Opp. 16-18. The issue is not *whether* Zeidan has a protected interest in travel—*Elhady* is clear as to the fact that he does—but whether it is infringed upon by his placement on the No Fly List. On this front, Plaintiff points to *Mohamed II*. There, this Court held that this right "cannot be understood as . . . without any correlative rights with respect to the usual and available means in a modern society." 2015 WL 4394958, at *6; *see also El Ali*, 473 F. Supp 3d at 508 (finding that "a total ban on air travel" amounts to "deprivation of a protected liberty interest").

While *Elhady* was decided subsequent to *Mohamed II* and *El Ali*, this Court is not convinced that its logic bars Zeidan's claim here. The portions of *Elhady* that Defendants cite addressed the claim that the plaintiffs "have *subjectively* been deterred from traveling by the inconveniences and humiliations experiences in airports." 993 F.3d at 222 (emphasis in original). In the context of finding that a "subjective standard for measuring travel burdens was" was inappropriate, the Court found that "even if . . . these inconveniences have actually deterred them from flying, our analysis would stand firm" because "individuals do not have a protected liberty interest to travel via a particular mode of transportation." *Id.* (citing *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999)). Since the plaintiffs in *Elhady* could "travel by boat or *by taking some later flight*," and "[n]o plaintiff alleges he is unable to get to a particular destination," they lacked any constitutional claim. *Id.* (emphasis added).

This analysis does not fit Zeidan's allegations. His claim is not that he is unwilling to put up with the *inconveniences* of air travel in order to visit his ailing mother in Lebanon. It is that he cannot travel at all. Am. Comp. ¶¶ 339, 344; *see Mohamed II*, 2015 WL 4394958, at *6. Moreover,

this complete bar to flight means he cannot do so on "some later flight." Finally, this Court cannot conclude that the metaphysical possibility of a weeks-long nautical journey is sufficient to cure any deprivation of his right to travel. If such a right is to have any meaning, it must encompass the customary modes of transport of the present day. *Cf. Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1315 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) ("The First Amendment endures, and it applies to modern means of communication as it did to the publishers, pamphleteers, and newspapers of the founding era."). If any deprivation implicates the right to travel it is Zeidan's complete inability, for all intents and purposes, to visit and care for his mother abroad due to the Government's restrictions, and the Fifth Amendment's due process protections apply to his claim.

The same cannot be said for Zaarour or Doe. Zaarour claims that he has a protected liberty interest in a job as a law enforcement officer and that his watchlist status creates "an inability to gain employment" as such. Opp. 23 (quoting *Elhady*, 993 F.3d at 227). This, they suggest, creates a "stigma-plus" injury sufficient to invoke the Fifth Amendment's procedural due process protections. Doe alleges that his deprivation of TSA Pre-check status also qualifies as a deprivation of a protected right under the stigma-plus doctrine. Opp. 23-24. Defendants suggest these claims fail because Zaarour and Doe have not alleged public disclosure, and that "Pre-Check status and a single denied job application do not satisfy the altered-legal status requirement." Reply 10-11 .

Here, the fact that no public disclosure has been alleged is sufficient to reject Zaarour's and Doe's procedural due process claims. As the Fourth Circuit has held, the fact that a stigmatizing fact "may be available" to potential employers, *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 647 (4th Cir. 2007), or that Defendants have engaged in "intragovernmental dissemination of TSDB information" are inadequate to satisfy the public disclosure prong.[8]

---

[8] Notably, Zaarour has not pled facts indicating—beyond his mere suspicion—that the employer he applied to had access to his TSDB status or denied his application on those grounds.

With only Zeidan sufficiently alleging deprivation of a protected liberty interest, the Court must determine whether he has alleged constitutionally inadequate process. Defendants point out that Zeidan has not alleged that he has availed himself of the available process for contesting his inclusion on the No Fly List. MTD 23-24 (citing *Manion v. North Carolina Med. Bd.*, 693 F. App'x 178, 181 (4th Cir. 2017).[9] Indeed, Zeidan does not allege that he took any further action to contest his placement on the No Fly List subsequent to his May, 16, 2024 receipt of a response to his DHS TRIP inquiry. Am. Compl. ¶¶ 339-344. The general requirement that a plaintiff bringing a due process claim to avail himself of the available process arises because a procedural due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide to process." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use federal courts as a means to get back what he wants." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d. Cir. 2000). Here, there is at the very least an apparently adequate process available to Zeidan to contest the basis for his inclusion on the No Fly List. *See Busic v. TSA*, 62 F.4th 547, 549-550 (D.C. Cir. 2023) (approving redress process under *Mathews* balancing); *Kashem*, 941 F.3d at 390 (same). His failure to utilize it bars his claim under Count III.

Accordingly, none of the plaintiffs have stated a claim under Count III. Only Zeidan has plausibly alleged a deprivation of a protected liberty interest, but his failure to avail himself of the

---

[9] For individuals on the No Fly List, the redress procedures "provide[] an opportunity to request and receive additional information regarding their status. These applicants will be provided an opportunity to request and receive additional information regarding their status. Such additional information shall include as much unclassified information as possible supporting the applicant's No Fly status, and be reasonably calculated to permit the individual to respond, considering the national security and law enforcement interests at stake. . . . Applicants are then provided an opportunity to submit any information they consider relevant to their status on the No Fly List. The TSC reviews all submissions and takes appropriate action." *Overview of the U.S. Government's Terrorist Watchlisting Process and Procedures as of April 2024* at 8; *see also Kashem v. Barr*, 941 F.3d 358, 366 (9th Cir. 2019).

available and apparently adequate process defeats his ability to demonstrate a procedural due process violation.

### 4.  Count IV – Substantive Due Process

Plaintiff Zeidan also alleged a substantive due process violation on the ground that his placement on the No Fly List impairs his ability to travel internationally. Am. Compl. ¶¶ 557-564. The substantive due process component of the Fifth Amendment "provides heightened protection against governmental interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). More specifically, "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Id.* at 720-721 (quoting *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) (plurality)).

Defendant argues that no fundamental right is implicated by Zeidan's placement on the No Fly List because there is no "fundamental right to travel *by airplane*." MTD 25 (quoting *Busic*, 62 F.4th at 550). As described above, however, there are circumstances like Zeidan's in which a barrier to air travel extinguishes any meaningful ability to travel internationally in our modern age. *See supra* § III.C.3. Nevertheless, a half-century of Supreme Court precedent strongly indicates that there is no fundamental right to international travel as part of the Due Process Clause of the Fifth Amendment. While the Supreme Court has recognized that "[t]he constitutional right of *interstate* travel is virtually unqualified," "the 'right' of *international* travel has been considered no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment." *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978) (citation omitted). "As such, this 'right,' the Court has held, *can be regulated within the bounds of due process*." *Id* (emphasis added); *see also Haig* 453 U.S. at 306 ("The Court has made it plain that the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States.").

This Court has repeatedly relied on *Califano* and *Haig*, among other cases, to find that there is no fundamental right—as a matter of substantive due process—to international travel. *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877-880 (E.D. Va. 2017); *Long*, 451 F. Supp. 3d at 535. In an apparent attempt to situate a right of international travel as among those "deeply rooted in this Nation's history and tradition," Plaintiffs in their opposition brief cite a century-long line of cases from the Supreme Court and various courts of appeals discussing the right to travel. Opp. 16-18. However, the vast majority of these cases deal with intra- and inter-state travel, not international travel. *See id.* And while Plaintiff cites *Califano*'s framing of "the right to travel abroad," Opp. 18, it ignores the case's statement that it is simply a liberty interest which "can be regulated within the bounds of due process," 439 U.S. at 176. At the end of the day, Plaintiffs have not pointed to evidence of a deeply rooted right to international travel sufficient for this Court to ignore the Supreme Court's clear statements that government restrictions on the freedom to travel internationally invoke only procedural due process.

### 5. Counts V and VI – APA

Plaintiffs' Count V alleges that Defendants' actions in placing American citizens in the TSDB and providing "no constitutionally adequate avenue for redress" violate the APA, 5 U.S.C. § 706. Am. Compl. ¶ 569. They further allege in Count VI that "[n]o statute authorizes Defendants to maintain the federal watchlist and add people, including Plaintiffs, to the federal watchlist as they do." Am. Compl. ¶ 571. Accordingly, they claim, Defendants actions are in violation of 5 U.S.C. § 702.

With respect to Count V, Section 706 provides that agency action may be set aside if "arbitrary, capricious, an abuse of discretion," "otherwise not in accordance with law," or "contrary to constitutional right, power, privilege or immunity." Neither Plaintiffs' Complaint nor its brief clarifies which aspect of Section 706 allegedly applies to the Defendants' placement of

them on the watchlist and procedures for challenging watchlist placement. However, as Defendants argue, to the extent that Plaintiffs raise procedural or substantive due process challenges (thus arguing that Defendants' actions are "contrary to constitutional right"), this Court's findings as to Counts III and IV control, and those challenges fail. MTD 26. Plaintiffs further fail to articulate in what manner Defendants' actions are arbitrary and capricious. *Id.* (citing *Webster v. United States Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012)). Plaintiff does not appear to address these arguments regarding Count V. *See Robinson v. Prince William-Manassas Reg'l Adult Detention Ctr.*, No. 1:22-cv-00744-MSN-JFA, 2022 WL 17085916, at *3 (E.D. Va. Nov. 18 2022) ("Where as here, a plaintiff does not challenge the legal arguments of the motion to dismiss . . . she 'waives the right to contest the arguments made therein.'"). Accordingly, Count V of Plaintiffs' Complaint will be dismissed.

In response to Plaintiffs' claim in Count VI that the watchlist lies outside the bounds of congressional authorization, Defendants point to several statutes that specifically reference watchlist-related obligations and activities. MTD 27. First is the TSA's statutory mandate to "assess current and potential threats to the domestic air transportation system" and to "identify individuals on passenger lists who may be a threat to civil aviation or national security" and "prevent [such] individual[s] from boarding an aircraft." 49 U.S.C. §§ 44904(a); 114(h)(3). Defendants further highlight statutes relating to the collection of intelligence, sharing of relevant information within the federal government, and screening individuals against the TSC's watchlist. MTD 27 (citing statutes). In response, Plaintiffs cite to the major questions doctrine to argue that the government's creation of the watchlist is an "extraordinary case" for which agencies must identify "clear congressional authorization." Opp. 28 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022)).

The "major questions doctrine" crystallizes the principle that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle devices.'" *West Virginia*, 597 U.S. at 723 (quoting *Whitman v. American Trucking Assns.*, 531 U.S. 457, 468 (2001)). Presuming that "Congress intends to make major policy decisions itself," Courts are thus "reluctant to read into ambiguous statutory text" such extraordinary regulatory authority. *Id.* (citations omitted). The government claiming delegated authority in such cases must therefore "point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Accepting (without deciding) that the creation and maintenance of the watchlist is such an extraordinary grant of regulatory authority, their arguments fail because Congress has authorized the maintenance and use of the watchlist in no uncertain terms. As the Fifth Circuit found in *Kovac v. Wray*, 109 F.4th 331, 336 (5th Cir. 2024), "the statutory authority for TSA to collect, share, and screen identifying information about airline passengers, and to use that information to prevent certain passengers from boarding or to conduct enhanced screening, is clear." (citing 49 U.S.C. §§ 114(h); 44904(a)). Furthermore, the Intelligence Reform and Terrorism Prevention Act of 2004 "charged DHS and TSA to implement 'advanced passenger prescreening' and specifically required the agencies 'to assume the performance of . . . comparing passenger information to the automatic *selectee and no fly lists* and utilize all appropriate records in the consolidated and integrated *terrorist watchlist* maintained by the Federal Government in performing that function." *Kovac*, 109 F.4th at 337 (quoting 49 U.S.C. § 44903(j)(2)(c)) (emphasis added). That law also expressly contemplated the authority of the TSC in maintaining "guidelines, policies, and operating procedures" for the "no fly and automatic selectee lists." 49 U.S.C. § 44903(j)(2)(E)(iii). This is simply not a case in which federal agencies have "claime[d] to discover in a long-extant statute

an unheralded power" or read novel and wide-ranging authority into "ambiguous statutory text." *Utility Air*, 573 U.S. at 324. Rather, Congress has explicitly contemplated the watchlist along with the TSA's and TSC's role in maintaining and utilizing it. Accordingly, Plaintiffs' major questions argument fails.[10]

### D.    Facial Challenges

Defendants have argued that this Court should dismiss Plaintiffs' facial challenges as part of each claim. MTD 28-29. Because the Court finds that the individual Plaintiffs have failed to state a claim (even as-applied to themselves) as to every count except for Count I, Counts II-VI "are *a fortiori* inadequate to state plausible facial claims." MTD 29. Defendants argue that even if the individual Plaintiffs have stated claims, the complaint has not demonstrated that there is "no set of circumstances under which" Defendants' policies "would be valid." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Plaintiffs Complaint does not include facts indicating that the conduct or policies in Count I that resulted in a violation of Abu Irshaid's Fourth Amendment rights would not be valid under any and all circumstances.

### E.    Additional Defendants

Defendants further argue that this Complaint should be dismissed as to twenty-three of the Defendants who are mentioned only in the portion of Plaintiffs' Complaint where they are listed as a party. MTD 29-30. Finding that the complaint lacks "factual allegations of injury resulting from [those] defendant[s'] conduct," particularly as to Abu Irshaid's Fourth Amendment claim, which is the only remaining count, the Court will dismiss those defendants from the case.

---

[10] Congress's explicit contemplation of the TSC's role, noted above, also bars Plaintiffs' argument that the TSA and FBI have "impermissibly redelegated its limited authority to a subagency." Opp. 28-29.

## IV.    CONCLUSION

Plaintiffs have each been harmed as a result of their inclusion in the TSDB. Nonetheless, their sweeping legal claims nearly all fail as a matter of law. The Court will therefore dismiss under Rule 12(b)(6) all counts of the amended complaint as to all parties except Count I as applied to Plaintiff Abu Irshaid. The Court will further dismiss the amended complaint as to Defendants Rowe, Olsen, Davies, Winn, Haines, Holmgren, Jaddou, Lechleitner, Wadhia, Wainstein, Meyer, Burriesci, Clutter, Lyon, Blinken, Batjer Johnson, Austin, Nakasone, Berrier, Buttigieg, Das, Gacki, and Burns. Accordingly, it is hereby

**ORDERED** that Defendant's Motion to Dismiss Plaintiffs' Amended Complaint (ECF 20) is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED** that Counts II, III, IV, V, and VI of Plaintiffs' Amended Complaint are **DISMISSED** without prejudice; and it is further

**ORDERED** that Count I is **DISMISSED** without prejudice insofar as it raises a facial challenge to CBP's border search policies, but not as to Plaintiff Abu Irshaid's as-applied challenge; and it is further

**ORDERED** that Defendants Ronald Rowe, Matthew Olsen, Susan Davies, Peter Winn, Avril Haines, Brett Holmgren, Ur M. Jaddou, Patrick Lechleitner, Shoba Wadhia, Kenneth Wainstein, Jonathan Meyer, Kelly Ann Burriesci, Mason Clutter, Shonnie Lyon, Antony Blinken, Hillary Batier Johnson, Lloyd Austin, Paul Nakasone, Scott Berrier, Pete Buttigieg, Himamauli Das, Andrea Gacki, and William Burns are **DISMISSED** from this case.

**SO ORDERED.**

/s/
_____
Michael S. Nachmanoff
United States District Judge

March 10, 2025
Alexandria, Virginia