## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

### ALEXANDRIA DIVISION

| | |
|---|---|
| **OSAMA ABU IRSHAID,**<br><br>          Plaintiff,<br><br>     v.<br><br>**PAMELA BONDI**, Attorney General of the United States, United States Department of Justice, in her official capacity only;<br><br>**KASH PATEL**, Director, Federal Bureau of Investigations; in his official capacity only;<br><br>**MICHAEL GLASHEEN**, Director of the Terrorism Screening Center, in his official capacity only;<br><br>**KRISTI NOEM**, Secretary of Homeland Security, United States Department of Homeland Security, in her official capacity only; and<br><br>**RODNEY SCOTT**, Commissioner, U.S. Customs and Border Protection; in his official capacity only;<br><br>          Defendants. | **Case No.** 1:24-cv-01405-MSN-WBP |

### SECOND AMENDED COMPLAINT

Plaintiff Osama Abu Irshaid through his attorneys, CAIR Legal Defense Fund and CAIR-CA, state as follows:

### Introduction

1. Dr. Osama Abu Irshaid, is a United States citizen of Palestinian descent.

1

2.   Plaintiff has never been charged or convicted of a violent crime.

3.   Yet, recently, the federal government has placed the Plaintiff on a secret list, subjecting him to a humiliating process of detention, questioning, and phone seizure at the border.

4.   As a result of his status on the Government's secret list now, Dr. Abu Irshaid is detained at the border by federal agents each time he crosses it.

5.   While they detain Plaintiff, the federal agents ask them humiliating questions about their lawful associations, family members, weapon ownership, and advocacy for the rights of Palestinians.

6.   Because of his status on the Government's secret list, federal agents now seize Dr. Abu Irshaid's phone when he crosses the border. On more than one occasion, after seizing the Plaintiff's electronic devices, federal agents have successfully coerced Plaintiff into unlocking it.

7.   Federal agents continued to hold Dr. Abu Irshaid's cellphone for months, despite several attempts by his counsel to retrieve it, until shortly after the filing of this lawsuit.

8.   The Government is using its secret, illegal list against Dr. Abu Irshaid and other innocent Americans, not for a security purpose, but because federal agents object to the lawful exercise of their constitutional rights.

## Parties

### Plaintiff

9.   Plaintiff Dr. Osama Abu Irshaid is a United States citizen of Palestinian descent and a Muslim residing in Virginia. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district.

### Defendant Pamela Bondi

10. Defendant Pamela Bondi is the United States Attorney General of the U.S. Department of Justice ("DOJ").

11. DOJ and/or its agency subcomponents, especially the Federal Bureau of Investigation and the Terrorist Screening Center, play central roles in administering, maintaining, and distributing the Terrorism Screening Dataset ("TSDS").

12. DOJ is also a regular agency attendee of the Watchlisting Advisory Council ("WLAC"), an interagency advisory group comprised of a subset of the Defendants. The WLAC, by and through those Defendants, discusses, formulates, and agrees upon shared TSDS policies, practices, and procedures, which are formally adopted by Defendants when they are approved by the National Security Council ("NSC").

13. Upon information and belief, DOJ and/or its agency subcomponents nominated some or all of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terrorist watchlist.

14. DOJ and/or its agency subcomponents also participate in the review of inquiries submitted through the Department of Homeland Security ("DHS") Traveler Redress Inquiry Program ("TRIP") process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

15. Additionally, DOJ uses the TSDS to screen persons that are applying for security clearances or employment at DOJ and/or its agency subcomponents to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DOJ and/or its agency subcomponents or elsewhere.

16. DOJ also uses historical watchlist status as a basis to deny former listees security clearances, employment or appointment with DOJ or elsewhere, licenses or credentials, access to facilities, and eligibility to access national security information.

17. Defendant Bondi is being sued in her official capacity only.

***Defendant Kash Patel***

18. Defendant Kash Patel is the Director of the Federal Bureau of Investigation ("FBI").

19. FBI administers the Terrorist Screening Center ("TSC"), which develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

20. FBI is also a regular agency attendee of the WLAC, an interagency advisory group comprised of a subset of the Defendants. The WLAC, by and through those Defendants, discusses, formulates, and agrees upon shared TSDS policies, practices, and procedures.

21. Upon information and belief, FBI nominated some or all Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

22. FBI is responsible for initially reviewing all nominations to the TSDS except those with a "nexus to international terrorism," which are initially reviewed by the National Counterterrorism Center ("NCTC").

23. Upon information and belief, FBI acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them.

24. FBI also administers the National Crime Information Center ("NCIC"), a nationwide, computerized database that enables information-sharing among law enforcement agencies.

25. FBI uses the NCIC to disseminate the "known or suspected terrorists" stigmatizing label attached to Plaintiffs and other similarly situated individuals to over 18,000 federal, state, local, and tribal law enforcement agencies, as well as other federal, state, local, and tribal authorities, including pretrial service and pretrial release agencies, probation and parole offices, prosecuting attorney offices, courts and magistrate offices, correctional institutions, custodial facilities in medical or psychiatric institutions, medical examiner's offices, and others.

26. FBI also uses the NCIC to disseminate the "known or suspected terrorists" stigmatizing label attached to Plaintiff and other similarly situated individuals to foreign governments and hundreds of private entities, including airlines, gun sellers, financial institutions, hospitals, the captains of sea-faring vessels, and others.

27. Additionally, FBI participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

28. FBI uses historical watchlist status to inform decisions about who to investigate, surveil, and otherwise target for law-enforcement activity.

29. Defendant Patel is being sued in his official capacity only.

*Defendant Mihael Glasheen*

30. Defendant Michael Glasheen is the Director of the Terrorism Screening Center ("TSC") of the Federal Bureau of Investigation ("FBI").

31. TSC is a Co-Chair of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

32. TSC also develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

33. Upon information and belief, TSC reviewed the nomination of some or all of the Plaintiffs and approved them for inclusion in the TSDS.

34. TSC has the sole authority to place an individual on the TSDS. Moreover, upon information and belief, TSC nominated Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

35. TSC and/or its subcomponents, including the TSC Redress Office, also participate in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

36. TSC facilitates the FBI's distribution of the TSDS to tens of thousands of domestic and foreign entities by exporting TSDS information, including biographic information, biometric data, and watchlist status information, to the FBI and other agencies and entities.

37. Defendant Glasheen is being sued in his official capacity only.

***Defendant Kristi Noem***

38. Defendant Kristi Noem is the Secretary of the DHS.

39. DHS and/or its agency subcomponents assist the FBI in administering the TSC, which develops, maintains, and administers the federal government's consolidated TSDS, reviews all nominations to the TSDS, and has the final authority to approve or reject any nomination to the TSDS.

40. DHS and/or its agency subcomponents, including U.S. Customs and Border Protection ("CBP"); Transportation Security Administration ("TSA"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); and various DHS headquarters offices, including the Office for Civil Rights & Civil Liberties ("CRCL"); the Office of Intelligence & Analysis ("OIA"); the Office of the General Counsel ("OGC"); the Office of Strategy, Policy, and Plans ("DHS Policy"); and the Privacy Office are regular agency attendees of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

41. Upon information and belief, DHS and/or its agency subcomponents nominated some or all of the Plaintiffs for inclusion in the TSDS and continue to nominate other similarly situated American citizens to the federal terror watchlist.

42. Upon information and belief, DHS and/or its agency subcomponents are some of the most active and frequent frontline users of the TSDS. They use the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

43. Additionally, DHS oversees and administers the DHS TRIP, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

44. DHS and/or its agency subcomponents also administer the DHS Automated Biometric Identification System (IDENT), a system of biometric records and biographic information, including TSDS records and the stigmatizing "known or suspected terrorist" label attached to Plaintiffs and similarly situated individuals, that is shared with federal, state, local, tribal, foreign, and international governmental agencies.

45. Additionally, DHS and/or its agency subcomponents use the TSDS to screen persons against it that are applying for security clearances or for employment to work with DHS and/or its agency subcomponents to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with DHS and/or its agency subcomponents or elsewhere.

46. Defendant Noem is sued in her official capacity only.

*Defendant Rodney Scott*

47. Defendant Rodney Scott is the Commissioner of U.S. Customs and Border Protection ("CBP") of the U.S. Department of Homeland Security ("DHS").

48. CBP is a regular agency attendee of the WLAC, an interagency advisory group that drafts the Watchlisting Guidance and other TSDS-related policies, practices, and procedures.

49. Upon information and belief, CBP nominated some or all of the Plaintiffs for inclusion in the TSDS and continues to nominate other similarly situated American citizens to the federal terror watchlist.

50. Upon information and belief, CBP acts as a frontline agency that uses the TSDS to screen individuals, including Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences on them, including but not limited to: (1) impeding their air travel at airports; (2) burdening their travel at land border crossings and other ports of entry; (3) denying them approval for Trusted Traveler Programs including TSA PreCheck®, Global Entry, SENTRI, and FAST; (4) indefinitely delaying or denying their immigration benefits; and (5) denying them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with the federal government or elsewhere.

51. CBP also participates in the review of inquiries submitted through the DHS TRIP process, the only administrative complaint process by which Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDS.

52. Additionally, CBP uses the TSDS to screen persons against it that are applying for security clearances or for employment to work with CBP to deny them security clearances, access to classified information, assignment to certain duties, contracts, or positions in the course of their employment, and employment with CBP or elsewhere.

53. CBP also retains historical watchlist information in its TECS system, even after an individual has been removed from the TSDS. CBP uses that historical watchlist information to inform decisions to harm former listees in a range of ways, including to: (1) deny them entry into the United States; (2) subject them to invasive searches and interrogations at ports of entry; and (3) to deny them other benefits and licenses, including access to programs like Global Entry that provide privileged access to ports of entry.

54. Defendant Scott is sued in his official capacity only.

**Jurisdiction and Venue**

55. Under U.S. Const. Art. III § 2, this Court has jurisdiction because the rights sought to be protected herein are secured by the U.S. constitution.

56. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, 5 U.S.C.  § 706, the United States Constitution, and federal common law.

57. This Court has authority to grant the declaratory relief requested herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, because the action presents an actual case or controversy within the Court's jurisdiction, and pursuant to the general, legal, and equitable powers of this Court.

58. Nothing in 49 U.S.C. § 46110 eliminates that jurisdiction. *See, e.g.*, *Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340, at *5–6 (4th Cir. May 28, 2013); *Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (D.C. Cir. 2015); *Latif v. Holder*, 686 F.3d 1122, 1128–29 (9th Cir. 2012); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1304 (D. Minn. 2018).

59. A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia.

60. Venue is proper under 42 U.S.C. § 1391(e)(1) because the Plaintiff resides in the district; because Defendants are officers or employees of agencies of the United States sued in their official capacities, because Defendants regularly conduct business in the Commonwealth of Virginia; because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district; and because the action involves no real property.

**Factual Background**

**The Federal Government's Expansive TSDB Inclusion Standards
Capture Broad Categories of Innocent Travelers**

61. In September 2003, without the authorization of Congress and relying expressly on Executive order HSPD-6, then Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") as a division of the FBI focused on building what the federal officials running the program call their "watchlist enterprise." The TSC develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB" or "federal terrorist watchlist"). TSC's watchlist, and the tens of thousands of agreements the FBI maintains to compel agencies, companies, and organizations of all kinds to check its lists, is how the federal government is able to impose a disfavored status on Plaintiffs and more than one million other people.

62. The watchlist's standard operating procedure is called the Watchlisting Guidance. Defendants, through their participation in the Watchlisting Advisory Council, draft and then unanimously approve the Watchlisting Guidance.

63. In accordance with the Watchlisting Guidance approved of by all Defendants, two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watchlist—NCTC and FBI. The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watchlist. The FBI, in turn, nominates to the watchlist individuals with what it characterizes as suspected ties to domestic terrorism.

64. CBP also nominates individuals for inclusion in the terrorist watchlist.

65. CBP employs risk-based targeting rules to single out travelers at ports of entry for secondary inspection, detention, investigation and deportation. Upon information and belief, CBP utilizes the results of high-risk targeting rules and resulting inspections and investigation as a factual predicate for nominating individuals to the TSDB.

66. All nominations to the TSDB must be approved and implemented by the TSC. The TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watchlist as a known or suspected terrorist. TSC also decides which screening systems will receive information about that individual.

67. The federal government publicly states that to be included in the TSDB, an individual must be reasonably suspected of being a known or suspected terrorist. More specifically, a government nominator, including CBP, "must rely upon articulable intelligence or information which, based on the totality of the circumstances and taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."

68. The "totality of the circumstances" analysis for TSDB inclusion may include assessment of an individual's race, ethnicity, country of origin, religion, religious practices, languages spoken, family, associations, travel history, social media history, and other activities protected by the First Amendment, Fifth Amendment, Fourteenth Amendment, and U.S. Constitution.

69. Former Director of the Terrorism Screening Center Timothy Healy testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watchlist, the TSC determines whether the nominated individual is "reasonably suspected"

of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

70. The federal government has provided only limited information about and otherwise not stated publicly what standards or criteria they use to assign and annotate a status.

71. Defendants are not compelled by statute or regulation to use any standard in particular. In the absence of a prescribed statute or regulation, Defendants apply infinitely flexible standards and criteria.

72. The Government publicly states that, to be included in the TSDS, an individual must be reasonably suspected of being a known or suspected terrorist. More specifically, a government nominator "must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."[1]

73. That standard does not evince even an internal logic. By its own description, the government places American citizens and other individuals on the federal terrorist watchlist based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities. These standards fall far below the typical "reasonable suspicion" and "probable cause" standards required for criminal investigation. Individuals may also be added to the

---

[1] January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures, *Elhady v. Piehota*, 1:16-cv-00375-AJT-JFA, Dkt 196-16 at 4 (E.D. Va. Apr. 27, 2018.), https://www.aclu.org/sites/default/files/field_document/ex._7_elhady_-_overview_of_watchlisting_system_-_4-27-18_cover.pdf

TSDB based on guilt-by-association as a basis for watchlist inclusion. For example, immediate relatives of listed persons can become TSDB listees without any derogatory information—other than the bonds of family. Likewise, they can be subjected to CBP rules-based 'terrorist' monitoring on the basis of family affiliation alone. Such annotations signals to screening agencies, officers, employers, and others that the immediate relative is a violent threat engaged in nefarious activities.

74. Individuals may be added to the TSDB for being a known associate—a friend, colleague, fellow community member, etc.—of a TSDB listed individual.

75. Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, they can and routinely are added to the watchlist.

76. American citizens can be and are routinely added even if they are not the subject of a federal investigation.

77. Individuals can be added to the federal terrorist watchlist without any information regarding whether or not an intended target exists, and without any information about whether an individual poses a threat to commercial aviation or to a U.S. land border.

78. Individuals can be added to the federal terrorist watchlist without ever having been charged or convicted of any crime.

79. The FBI has conceded that because the federal terrorist watchlist "only includes identifiers of known or suspected terrorists, by itself [the FBI] is not aware of any instance where that identifying information alone prevented an act of terrorism."

80. CBP has also conceded that it has never publicly identified an act of terrorism that its use of TSDB information prevented.

81. Because of these loose standards and practices, the federal terrorist watchlist's rate of growth has dramatically increased.  In fiscal 2009, there were 58,999 new additions to the watchlist.  Over 1.1 million new names have been added to the watchlist since 2009.  In fiscal 2016, for example, there were 176,014 new additions.  These additions include thousands of U.S. citizens and lawful permanent residents.

82. More than 98% of the names nominated to the TSDB are accepted.  In 2013, TSC accepted 98.96 percent of all nominations made.  A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watchlist.[2]

83. Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  By 2009, the number grew to approximately 3,400.  By 2016, that number increased to approximately 81,000.

84. At a March 10, 2010, Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watchlist is "getting bigger, and it will get even bigger."

85. The federal terrorist watchlist's and rules-based terror lists' inclusion standards are so permissive, pliable, and laden with discriminatory assessments of race, ethnicity, national origin, and religion, that they bear at best a fleetingly marginal connection to actual terrorist activities.

---

[2] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watchlist Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

86. Based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade. These terrorist acts were perpetrated by fewer than 250 persons.

87. Only one of these perpetrators was designated on the federal terrorist watchlist by the federal government prior to their criminal conduct. This single person designated on the federal terrorist watchlist, however, was removed from the federal terrorist watchlist prior to perpetrating the terrorist attack.

88. Upon information and belief, in order to designate a person on the federal terrorist watchlist, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terrorist watchlist's inclusion standards.

89. The precise size of this subset is unknown; however, a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

90. Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include innocent persons who do not pose a threat of terrorism.

91. Upon further information and belief, the federal government does not screen the entire subset of people known to it. Moreover, federal government does not make individual determinations as to whether each person about whom they have information should be placed on the federal terrorist watchlist.

92. Additionally, the federal government utilizes automated algorithms and risk-based targeting rules to select individuals for scrutiny, investigation, and nomination to one or more terrorist watchlists.

93. In order to designate a person on the federal terrorist watchlist, a federal government official, including a CBP officer, must make a nomination in accordance with the established nomination policies and procedures described above, and a TSC official must accept the nomination.   TSC officials accept nominations at a rate above 98 percent.

94. Based on the facts alleged in this Complaint and the publicly known processes of the federal terrorist watchlist, a quantitative analysis can be constructed to measure and describe the performance and efficacy of the federal terrorist watchlist.

95. A quantitative analysis requires that, in order to accomplish the federal terrorist watchlist's stated objectives, Defendants must have at least some greater-than-random abilities to identify future terrorists.  This is due to the nature of the processes the federal government utilizes to place persons on the federal terrorist watchlist and the size of the population Defendants can—if they so choose—screen against the federal terrorist watchlist's inclusion standards.

96. A quantitative analysis demonstrates that the federal government's watchlisting system would perform similarly if inclusion on the watchlist was done via random selection instead of the existing inclusion standards it utilizes.

97. A quantitative analysis indicates that the federal government has no ability to watchlist persons whose placement on the watchlist would further the federal government's—or CBP's—stated objectives.

**CBP Policies Violate the Constitutional Rights**
**of TSDB Listees**

17

98. Anyone listed in the TSDB is subjected to varying forms of heightened scrutiny and adverse repercussions by CBP.

99. The "information in [the] TSDB [contains] merely the identifying information of the person entered into the TSDB, and does not include the "derogatory information," or "totality of the circumstances," that is the basis of a nomination by the FBI."

100. As such, TSDB information shared with CBP also contains merely the identifying information of TSDB listee and does not include the "derogatory information," or "totality of the circumstances," that formed the basis of a nomination by the FBI.

101. Although CBP has access to TSDB information provided by the TSC, it is the TSC that maintains and controls the TSDB database.

102. CBP automatically designates TSDB listees as "Armed and Dangerous," refers them to secondary inspection, and otherwise automatically flags them as potential terrorists in automated alerts sent to officers.

103. All travelers, including Plaintiffs and similarly situated American citizens, permanent residents, and foreign nationals, that present themselves at a port of entry, whether at a land border crossing or an airport, interact with officers from CBP for entry into the United States and are queried by CBP against TECS, a CBP system that includes TSDB information shared by the Terrorist Screening Center "seamlessly and in realtime."

104. Airlines are required to provide a complete passenger manifest to CBP before a flight can depart or enter the United States and CBP queries the identities of all passengers on those manifests against the Advance Passenger Information System ("APIS"), an automated targeting system that feeds biographical information of passengers into TECS.

105.     CBP can also conduct additional screening and questioning of individual airline passengers prior to departing the United States if a passenger matches TSDB information in TECS.

106.     As a matter of policy and practice, CBP primary inspection officers are alerted that TSDB listees are a "potential match" to TSDB in TECS and refer them to secondary inspection for questioning to determine if the traveler is in fact a "match."

107.     In deciding whether to detain someone for further inspection, CBP officers do not use the underlying derogatory information that formed the basis for a traveler being listed in the TSDB. CBP officers, instead, use a person's watchlist status alone and the fact that its automated processes have yielded a "potential match."

108.     CBP Officers conducting the secondary inspection are directed to contact the National Targeting Center ("NTC"), a division within CBP Field Operations that works with the TSC, which ultimately makes a final determination on whether the traveler is a match to the TSDB.

109.     CBP records in TECS a summary of the secondary inspection that includes whether a determination was made by NTC as to whether the traveler was confirmed to be a match.

110.     Despite having gone through this TSDB matching process during secondary inspection, each time a traveler who was previously confirmed as a match to the TSDB presents themselves for inspection at a port of entry, CBP primary inspection officers receive the same alert that the traveler is a "potential match" because they do not have access to or knowledge of previous inspections, and accordingly the TSDB listee is referred back to secondary inspection to go through the TSDB match process all over again.

111.    Even if CBP determines a traveler is not a match to the TSDB and records that information in TECS, unless the TSC updates the TSDB, the next time that traveler presents themselves at a port of entry for inspection, the CBP primary inspection officer will receive the same alert that the traveler is a "potential match" to the TSDB and will refer that traveler to secondary inspection to undergo the TSDB match process all over again.

112.    Pursuant to official CBP policy, CBP officers refer TSDB listees to secondary inspection and the TSDB listees are compelled as a matter of process to provide biometric fingerprints to determine whether they are a match to the TSDB.

113.    Pursuant to official CBP policy, CBP officers may handcuff TSDB listees before referring them to secondary inspection.

114.    Pursuant to official CBP policy issued in 2018, CBP officers are directed to conduct an advanced forensic search of any electronics carried by TSDB listees:

115.    An advanced search is any search in which an officer connects external equipment through a wired or wireless connection to an electronic device not merely to gain access to the device, but to review, copy, and analyze its contents.[3]

116.    "The presence of an individual on a government operated and government vetted terrorist watch list," alone constitutes grounds for the CBP to search, copy, store, and analyze the contents of laptops, tablets, and smartphones, etc. without requesting or obtaining consent. (Hereinafter the "CBP electronic devices policy").

117.    Pursuant to the CBP electronic devices policy, CBP officers are directed to disregard factors for and against a search and seizure of electronic devices in the possession of TSDB listees and to conduct a nonroutine forensic search and seizure of all electronics

---

[3] *See* CBP Directive No. 3340-049A (January 2018).

despite not having access to the underlying derogatory information that formed the basis of the TSDB listees' nomination to the TSDB.

118.    CBP officers seize, search, download, copy, analyze, and conduct a forensic search of the contents of the electronic devices, including those of each of the Plaintiff and similarly situated American citizens, permanent residents, and foreign nationals.

119.    The prior version of the CBP electronic devices policy adopted in 2008 similarly directed CBP officers to copy data off of the electronic devices of TSDB listees, and it was and continues to be standard practice to do so and outside the view of the TSDB listee.

**Dr. Osama Abu Irshaid**

120.    Dr. Osama Abu Irshaid is a naturalized American citizen of Palestinian descent.

121.    Dr. Osama Abu Irshaid is the Executive Director of American Muslims for Palestine ("AMP").

122.    AMP also does business as AJP Educational Foundation, Inc ("AJP").

123.    AMP is a 501(c)(3) non-profit with the purpose of educating the American public and media about issues related to Palestine and Palestine's rich cultural history.

124.    AJP is a 501(c)(4) with a stated mission to fiercely and unapologetically advocate for the rights of Palestinians in the face of apartheid, occupation, and genocide.

125.    Both AMP and AJP have spent substantial time and resources toward opposing Israel's genocide of Palestinians in Gaza and American policy in support of Israel.

126.    For its advocacy in support of Palestinians and critical of Israel, AMP has earned the contempt of several government actors.

21

127.    In May and June of 2024, the House Committee on Oversight and Accountability, citing its "broad authority to investigate 'any matter' at 'any time,'" issued letters declaring an investigation of AMP's alleged ties to terror groups.

128.    In December 2023, Attorney General of Virginia Jason Miyares issued a "Civil Investigative Demand" against AMP, alleging, in part, that AMP and AJP used "funds raised by a solicitation of contributions to provide support to terrorists . . . ."

129.    Neither "investigation" has yielded fruit and, given the nature and circumstances of each investigation, neither must be predicated on reasonable suspicion. To this day, neither AMP nor its officers have ever even been charged with a terror related offense.

130.    Despite the lack of any criminal history that regards Dr. Abu Irshaid in any way, AMP continues to be scrutinized by the federal government, including through false accusations that it has ties to Hamas.

*Past Watchlist Treatment*

131.    Upon information and belief, Dr. Abu Irshaid was placed on the federal watchlist between 2010 and removed around 2017. Dr. Abu Irshaid flew dozens of times during this time period.

132.    Each time Dr. Abu Irshaid traveled by flight during this time period, he would need to retrieve his boarding pass from an airline agent rather than online or via a kiosk. Every boarding pass would be stamped with "SSSS" (Secondary Security Screening Selection), indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

133.     Each time Dr. Abu Irshaid traveled by flight between 2010 and 2017, he would be subjected to secondary screening by CBP. The secondary screening would include pat downs, chemical swabs, and questions about Dr. Abu Irshaid's travel plans.

134.     From 2010 to 2017, when Dr. Abu Irshaid would return by plane from overseas, CBP agents repeatedly seized Dr. Abu Irshaid's electronic devices. CBP Agents demanded he provide his password to unlock his devices, and Dr. Abu Irshaid would acquiesce because he believed CBP agents would prolong his detention if he refused.

135.     Only once did Dr. Abu Irshaid refuse to provide his password, but CBP Agents were still able to unlock and access the phone against his will.

136.     Due to his placement on the federal watchlist, Dr. Abu Irshaid's would be delayed up to three hours each time he traveled.

137.     Due to his placement on the federal watchlist, Dr. Abu Irshaid felt degraded and humiliated.

138.     Due to his placement on the federal watchlist, Dr. Abu Irshaid avoids traveling with his family so that his wife and kids would not be subjected to the same humiliating treatment he had to endure.

***Dr. Abu Irshaid Placed on Watchlist Again in 2024***

139.     Upon information and belief, Dr. Abu Irshaid was, again, placed on the federal watchlist in 2024 and now remains on the federal watchlist.

140.     Upon information and belief, Dr. Abu Irshaid was re-listed because of his work and activism opposing Israel's ongoing military attacks on, and genocide of Palestinians in Gaza.

141.     Because Dr. Abu Irshaid helps lead civic efforts in the Muslim and Arab communities to speak out against Israel's violence, the Government views the lawful

23

associations that Dr. Abu Irshaid maintains with suspicion and the contents of his phone as useful intelligence.

142.     Because Dr. Abu Irshaid works to convene people of conscience to work towards justice for Palestinians, the Government believes his lawful associations can be used to map the civic infrastructure of a particular community expressing a view Defendants fear.

143.     On May 22, 2024, Dr. Abu Irshaid traveled from Dulles International Airport in Dulles, Virginia (IAD) to Hamad International Airport (DOH) in Doha, Qatar.

144.     At IAD, Dr. Abu Irshaid was unable to print his boarding pass. He approached an airline agent who made multiple phone calls before finally printing and giving Dr. Abu Irshaid his boarding pass.

145.     The airline agent was unable to print Dr. Abu Irshaid's boarding pass because of his watchlist status. That status triggered a clearance process that took over three hours. Upon that process's conclusion, Defendants permitted the airline agent to print Dr. Abu Irshaid's boarding pass, but it was stamped with "SSSS", indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

146.     At the security checkpoint, TSA officers publicly subjected Dr. Abu Irshaid to an extensive and lengthy screening, including an invasive full-body pat down, a search of all of his carry-on bags, and a chemical swab of his hands and belongings. Dr. Abu Irshaid was eventually allowed to pass through the security checkpoint.

147.     During boarding, TSA agents awaited Dr. Abu Irshaid on the jetway. The TSA agents again patted down Dr. Abu Irshaid and searched his carry on in full view of other passengers. The TSA agents apologized for the treatment and said they "had to" do it before allowing Dr. Abu Irshaid to board.

148.     Dr. Abu Irshaid felt degraded and humiliated as a result of this treatment.

149.     On June 3, 2024, Dr. Abu Irshaid traveled from DOH to IAD.

150.     Anticipating additional screening, Dr. Abu Irshaid arrived at DOH three hours and forty-five minutes before his flight.

151.     Defendant CBP made the decision to subject Dr. Abu Irshaid to additional screening and to search his phone based on content it found on the public internet before his arrival and without determining whether the information they found on the public internet was true and accurate.

152.     At DOH, Dr. Abu Irshaid was unable to print his boarding pass. He sought the assistance of a ticket agent, who needed to make a call before printing his boarding pass and giving it to Dr. Abu Irshaid. The boarding pass was stamped with "SSSS", indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

153.     Upon arrival at IAD, Dr. Abu Irshaid was confronted by federal agents. One agent who identified himself as Kenneth Johnson referred to Dr. Abu Irshaid as "Dr. O," a nickname only his close friends and associates know of. Dr. Abu Irshaid asked how he knew about his nickname, and the agent responded that he had been "looking into [him]."

154.     Agent Johnson's questioning reflected his without-a-basis belief, based on false public smears, that the lawfully operating organizations Dr. Abu Irshaid works with are criminal enterprises. At the time CBP decided to search Dr. Abu Irshaid's phone, Agent Johnson had these false beliefs and relied upon them without anything more than the say-so of others on the internet.

155.     Agent Johnson took Dr. Abu Irshaid to a room for secondary inspection and asked him a series of invasive questions.

25

156.     Agent Johnson asked Dr. Abu Irshaid about his relationships overseas, including whether he knew a founding member of a designated terrorist organization and whether a member of a designated organization spoke on a panel with him.

157.     Both of these topics came from baseless internet rumors propagated by bigots, yet the federal government caused Dr. Abu Irshaid an unreasonable delay while he traveled in order to interrogate him about internet smears.

158.     Agent Johnson asked Dr. Abu Irshaid what he did and who he met with while he was in Qatar.

159.     Agent Johnson also asked Dr. Abu Irshaid about his activities in his capacity as executive director of American Muslims for Palestine.

160.     In total, the questioning lasted around one hour.

161.     After asking these questions, Agent Johnson asked Dr. Abu Irshaid whether he had a cell phone. Dr. Abu Irshaid replied that he did, but it had no information saved in it.

162.     Dr. Abu Irshaid made a habit of traveling with a backup phone as a result of past encounters where federal agents seized Dr. Abu Irshaid's phone when he traveled into the United States. Because his phone had been seized in the past, he did not want to risk having his primary cell phone seized again while traveling.

163.     Agent Johnson still demanded Dr. Abu Irshaid's phone. Dr. Abu Irshaid complied, believing that if he didn't turn over his phone, he would not be allowed to proceed past security and go home.

164.     Agent Johnson then demanded the password to Dr. Abu Irshaid's phone and Dr. Abu Irshaid, again, complied, believing that if he didn't provide his password, he would not be allowed to proceed past security and go home.

26

165.     Agent Johnson left the room with Dr. Abu Irshaid's phone. Two hours later, the agent returned to tell Dr. Abu Irshaid that he and the other agents had not completed the inspection but that a shift change was coming. The agent told Dr. Abu Irshaid that they would need to keep his phone and return it at a later date. The agents gave Dr. Abu Irshaid a slip indicating that the phone was being taken, searched, and kept for the time being. The slip also contained contact information for a "Kenneth Johnson" and the agents instructed Dr. Abu Irshaid that if he had issues getting his phone

166.     As of the time of this filing, the CBP agents have not returned Dr. Abu Irshaid's phone and have given no indication that they ever intend to return the phone despite repeated efforts to contact CBP directly and via DOJ lawyers to obtain the phone.

167.     On June 19, 2024, Dr. Abu Irshaid, through his attorneys, filed a DHS TRIP traveler inquiry seeking relief from the treatment he received when traveling. As of the time of this filing, he has not received a response to this inquiry.

168.     Since June 19, 2024, Dr. Abu Irshaid, through his attorneys, has made multiple attempts to contact Agent Johnson and have his phone returned. Agent Johnson has still failed to return the phone.

169.     On July 10, 2024, Dr. Abu Irshaid, through his attorneys, sent a letter to Agent Johnson, demanding the immediate return of his electronic device.

170.     As of the time of this filing, he has not received a response to that letter.

171.     On August 8, 2024, Dr. Abu Irshaid sought to travel from Queen Alis International Airport in Amman, Jordan (AMM) to IAD with a layover at Heathrow Airport in London (LHR).

172.    Upon arriving at AMM, Dr. Abu Irshaid was unable to print his boarding pass for his connecting flight from LHR to IAD at a kiosk. An airline agent instead informed him that he would, instead, need to retrieve his boarding pass for that flight upon arriving at LHR.

173.    When he arrived at LHR, a ticketing agent made multiple phone calls over forty minutes before finally printing Dr. Abu Irshaid's boarding pass. The boarding pass was not stamped with "SSSS."

174.    Approximately an hour later, Dr. Abu Irshaid was approached by the ticketing agent who said she received a call from "Homeland Security," and that he was given the wrong boarding pass. The ticketing agent gave Dr. Abu Irshaid a new boarding pass stamped with "SSSS" indicating that Dr. Abu Irshaid was designated as a "known or suspected terrorist."

175.    Upon arriving at IAD, after taking a shuttle, Dr. Abu Irshaid was met by four plainclothes agents who later identified themselves as CBP agents.

176.    In front of other passengers and people at the airport, two CBP agents walked Dr. Abu Irshaid from the shuttle to an area for secondary screening.

177.    At secondary screening, the agents subjected Dr. Abu Irshaid to a series of harassing and intrusive questions over thirty to forty minutes.

178.    The agents asked Dr. Abu Irshaid why he traveled to Jordan and where else he traveled. Dr. Abu Irshaid responded that was traveling for pleasure.

179.    The agents also asked Dr. Abu Irshaid who he met with and saw while he was traveling. Dr. Abu Irshaid refused to answer this question.

180.    The agents continued to prod Dr. Abu Irshaid about what he did, who he saw, and where he was staying, but Dr. Abu Irshaid continued to try to refuse to answer these questions.

181.    The agents asked for Dr. Abu Irshaid's electronic device. Dr. Abu Irshaid informed the agents that, because of his past experiences, he traveled with a backup phone. Dr. Abu Irshaid showed them the phone, which was still in its original box.

182.    Regardless, the agents again demanded his electronic device. Dr. Abu Irshaid complied, believing that if he didn't turn over his phone, he would not be allowed to proceed past security and go home.

183.    The agents then demanded the password to Dr. Abu Irshaid's phone and Dr. Abu Irshaid, again, complied, believing that if he didn't provide his password, he would not be allowed to proceed past security and go home.

184.    The agents left the screening area for a period of time with Dr. Abu Irshaid's electronic device before eventually coming back and returning Dr. Abu Irshaid's electronic device and allowing him to leave.

185.    Between the questioning and the electronic device seizure, CBP agents detained Dr. Abu Irshaid for over three hours.

186.    Defendants' searched Abu Irshaid's phone is because of his placement on the federal watchlist.

187.    In the alternative, Defendants' searched Abu Irshaid's phone because of his affiliation with American Muslims for Palestine.

188.     By searching Dr. Abu Irshaid's phone for his affiliation with AMP, Defendants punished Abu Irshaid for his work with AMP to advocate for Palestinians and being subjected to invasive phone searches.

189.     Due to his placement on the federal watchlist, Dr. Abu Irshaid feels degraded and humiliated.

190.     Due to his placement on the federal watchlist, Dr. Abu Irshaid avoids traveling with his family so that his wife and kids would not be subjected to the same humiliating treatment he had to endure.

191.     On this trip from Jordan, for example, Dr. Abu Irshaid booked completely separate flights for his wife and three kids despite the fact that they were in Jordan together. Dr. Abu Irshaid does not want his family degraded and humiliated the way he is.

## COUNT I
## VIOLATION OF THE FOURTH AMENDMENT – ILLEGAL SEARCH AND SEIZURE OF PLAINTIFF OSAMA ABU IRSHAID'S ELECTRONIC DEVICES
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C § 702)

192.     The foregoing allegations are realleged and incorporated therein.

193.     This claim is brought as-applied to Plaintiff Abu Irshaid and facially.

194.     The Fourth Amendment of the Constitution provides that a person shall not be subjected to "unreasonable searches and seizures."

195.     Defendants violate that guarantee by seizing and confiscating, as a matter of official policy and practice, watchlisted individuals' electronic devices, particularly but not exclusively when they cross the border to enter the United States. Defendants routinely refuse to return the confiscated electronic devices to watchlisted individuals for weeks or months—if they ever return them at all.

196.     As a matter of official policy and practice, when watchlisted individuals cross the border, Defendants routinely download and copy the contents of watchlisted individuals' electronic devices into Defendants' systems and upload those contents to Defendants' watchlisting and intelligence databases. Defendants then review that material in a manner that constitutes a search for Fourth Amendment and other purposes.

197.     As a matter of official policy and practice, Defendants use the contents of watchlisted individuals' electronic devices as a source of intelligence. Defendants use the contents of watchlisted individuals' electronic devices to launch investigations into the associates of watchlisted individuals, and also to nominate associates of the watchlisted individuals for rules-based terrorist monitoring and inclusion in the federal terrorist watchlist.

198.     As a matter of official policy and practice, Defendants undertake these searches and seizures of watchlisted individuals' electronic devices based solely on the watchlisted individuals' placement in the TSDS.

199.     Defendants have confiscated Plaintiff Abu Irshaid's electronic devices, copied their contents, and searched and used those contents for intelligence and investigations, after initiating those searches and seizures because Plaintiff Abu Irshaid was listed on the federal terrorist watchlist.

200.     Defendants have seized Plaintiff Abu Irshaid's phone. Despite repeated attempts to get the phone back, CBP and its lawyers declined to return the phone—even though the contents of the phone could have been repeatedly searched, copied, and analyzed during the months they had the phone.

201.    Watchlist placement does not satisfy any probable cause standard sufficient to invade Plaintiff Abu Irshaid and other similarly situated Americans' right to be free from unreasonable searches and seizures.

202.    Defendants' forensic searches of Plaintiff Abu Irshaid's electronic devices and the electronic devices of similarly situated American citizens, permanent residents, and foreign nationals are nonroutine border searches that required and were not based on individualized suspicion in violation of their Fourth Amendment rights. *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538, 540–42 & n.4 (1985); *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018), *as amended* (May 18, 2018); *U.S. v. Cotterman*, 709 F.3d 952, 963–68 (holding that forensic examination of computer is nonroutine border search requiring reasonable suspicion); *United States v. Saboonchi*, 990 F. Supp. 2d 536, 548 (D. Md. 2014) (same as to smartphones and flash drives).

203.    Defendants' forensic searches of Plaintiff Abu Irshaid's electronic devices and the electronic devices of similarly-situated American citizens, permanent residents, and foreign nationals are not subject to the border search exception because there is no direct link between the search of Plaintiff Abu Irshaid's electronic devices and the electronic devices of similarly situated Americans and any government interest that justified the searches on any account of a nexus requirement in violation of their Fourth Amendment rights. *United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018), *as amended* (May 18, 2018).

204.    Plaintiff Abu Irshaid's experiences are substantially similar to those of thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDS, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists. Plaintiff Abu Irshaid's experiences are representative of Defendants' current

32

practices and policies. Accordingly, Plaintiff Abu Irshaid brings this Fourth Amendment challenge both as applied to himself and facially to the category of watchlisted individuals who have not been arrested, charged, or convicted of a terrorism-related offense.

WHEREFORE, Plaintiff Abu Irshaid requests this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT II
## VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS BY RETALIATION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C § 702)

205.    The foregoing allegations are realleged and incorporated herein.

206.    The First Amendment protects association for the purpose of engaging in expression or speech.

207.    The First Amendment forbids the federal government from retaliating against individuals for engaging in constitutionally protected rights, including association and speech.

208.    Defendants searched Abu Irshaid's phones on May 22 and June 2, 2024 because of his affiliation with American Muslims for Palestine. They decided to do so prior to his arrival and based on accusations they found on the internet. Prior to executing these searches, Defendants did nothing to confirm that the smears they found on the internet were accurate.

209.    Defendants retaliated against Dr. Abu Irshaid for advocating for Palestinians through AMP by subjecting him to invasive phone searches.

210.    The phone searches conducted because of Dr. Abu Irshaid's affiliation with AMP objectively chill his speech.

211.    Because of Dr. Abu Irshaid's continued affiliation with AMP, his First Amendment activity has the effect subjecting him to phone searches in the future.

212.    Defendants thus violate Dr. Abu Irshaid's Free Speech Clause rights by retaliating against him for those activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request against the Official Capacity Defendants:

213.    A declaratory judgment that Defendants' practice of searching Plaintiff's electronic devices because of his watchlist status and without reasonable suspicion of a border related crime violates the Fourth Amendment.

214.    A declaratory judgment that Defendants' practice of searching Plaintiff' electronic devices because of his association with AMP and AJP violates the First Amendment.

215.    A declaratory judgment that Defendants require reasonable suspicion of a border related crime, contraband, or inadmissibility, apart from watchlist status, before performing a nonroutine search or seizure of persons on the watchlist or forensic searches of their electronic devices.

216.    An injunction that:

    a.    Enjoins Defendants from searching Plaintiff's electronic devices at the border absent a warrant supported by probable cause;

    b.    Enjoins Defendants from searching Plaintiff's electronic devices at the border because of his affiliations with organizations engaged in expression, including AMP and AJP;

      c.  Requires Defendants to expunge all information gathered from, or copies made of, the contents of Plaintiff's electronic devices, and all other information gleaned from searches of those devices;

217.    An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and,

218.    Such other and further relief as the Court may deem just and proper.

WHEREFORE, Plaintiff requests this Honorable Court grant damages to Plaintiffs against the Defendant CBP Officers in an amount to be proved at trial, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## JURY DEMAND

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand trial by jury of the above-referenced causes of action

Dated: January 16, 2026                    Respectfully Submitted,

/s/ Lena Masri
Lena Marsi
Gadeir Abbas*
Catherine Keck
Ahmad Kaki^

**CAIR Legal Defense Fund**
453 New Jersey Ave SE
Washington, D.C. 20003
Tel: (202) 742-6420
Fax: (202) 379-3317

/s/ Dina Chehata
DINA CHEHATA, ESQ.
(CA # 295596)
dchehata@cair.com
AMR SHABAIK, ESQ.
(CA # 288109)
ashabaik@cair.com

**Council on American-Islamic Relations, California**
2180 W. Crescent Ave., Suite F
Anaheim, CA 92801
T: (714) 776-1177

*Licensed in Virginia. Practice limited to federal matters
^Admission pending