## DISTRICT OF VIRGINIA
## ALEXANDRIA  DIVISION

**OSAMA ABU IRSHAID**;

        *Plaintiff*,

    v.

**PAMELA BONDI**, Attorney General of the United States, et al.;

        *Defendants*.

**Case  No.:** 1:24-cv-1405 (MSN/WBP)

District Judge Michael S. Nachmanoff

## PLAINTIFF OSAMA ABU IRSHAID'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ...................................................................................... iii

ARGUMENT ............................................................................................................. 7

I.     The Government's Forensic Searches of Dr. Abu Irshaid's Electronic Devices Violate the Fourth Amendment. .................................................................................... 7

     A.None of the Government's Purported Reasons for the Device Searches Satisfy the Reasonable Suspicion Standard.................................................................................. 8

     B.    The Government's Supposed Reasons for the Search do not amount to Reasonable Suspicion in the Aggregate. ................................................................... 13

II.    The Government's Reliance on Dr. Abu Irshaid's Affiliation with American Muslims for Palestine Violates the First Amendment. ............................................... 14

     A.    Dr. Abu Irshaid's Association with AMP is Protected by the First Amendment. 14

     B.    Defendants' Phone Searches Objectively Chill Dr. Abu Irshaid's First Amendment activity. .................................................................................................. 15

     C.    There is a Causal Relationship Between Dr. Abu Irshaid's First Amendment Activity and Defendants' Phone Searches. ................................................................ 17

CONCLUSION......................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) .......................................................................11

*Aigbekaen*, 943 F.3d .................................................................................................................. 12

*AJP Educ. Found., Inc. v. Miyares*, 806 F.Supp.3d 603 (E.D. Va. 2025) ................................... 19

*Boyd v. United States*, 116 U.S. 616 (1886)................................................................................ 20

*Brigham City v. Stuart*, 547 U.S. 398 (2006)...............................................................................11

*Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474 (4th Cir. 2005)18, 19, 20, 21

*El Ali v. Barr,* 473 F. Supp. 3d 479 (D. Md. 2020)................................................................. 12, 18

Fed. R. Civ. P. 56(a ......................................................................................................................11

*Florida v. J.L.*, 529 U.S. 266 (2000) ........................................................................................... 14

*Groh v. Ramirez*, 540 U.S. 551 (2004).........................................................................................11

*Hartman v. Moore*, 547 U.S. 250 (2006) ..................................................................................... 21

*McClure v.Ports*, 914 F.3d 866 (4th Cir. 2019)........................................................................... 18

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)........................................................... 19

*Nieves v. Bartlett*, 587 U.S. 391 (2019) ................................................................................. 21, 22

*Nkohngo*, 107 F.4th ...................................................................................................................... 12

*Reid v. Georgia*, 448 U.S. 438 (1980).......................................................................................... 16

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................................................................ 20

*Riley v. California*, 573 U.S. 373 (2014) .................................................................................11, 20

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984).............................................................................. 19

*Suarez Corp. v. Indus. v. McGraw*, 202 F.3d 676 (4th Cir. 2000).................................................. 18

*Terry v. Ohio*, 392 U.S. 1 (1968).................................................................................... 12, 14, 15, 18

*United States v. Bernard*, 927 F.3d 799 (4th Cir. 2019)........................................................... 17

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) ......................................................... 12, 20

*United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994) ............................................................ 16

*United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000) ............................................ 15

*United States v. Peters*, 60 F.4th 855 (4th Cir. 2023).................................................................. 14

*United States v. Powell*, 666 F.3d 180 (4th Cir. 2011) ................................................................ 14

*United States v. Vaughan*, 700 F.3d 705 (4th Cir. 2012) ........................................................ 17, 18

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................................................. 22

## INTRODUCTION

No government official has ever articulated an objective reason to believe that Dr. Osama Abu Irshaid will commit a crime that bears on national security. Dr. Osama Abu Irshaid has never been charged or convicted of a terror-related offense. The federal government has, however, made clear that it objects to the views Dr. Abu Irshaid expresses both individually and through his organization, American Muslims for Palestine. It has made clear that it objects to his criticism of Israel and his support of Palestine and will impose punishments on him because of the speech it disfavors.

At issue in this case are two forensic searches of Dr. Abu Irshaid's phone that the Government conducted at the border. The Government fails to demonstrate that the officers who searched Dr. Abu Irshaid's phone had reasonable, articulable suspicion that criminal activity was afoot when it searched his phone. On the contrary, it admits that it searched Dr. Abu Irshaid's phones because of his affiliation with American Muslims for Palestine. By conducting forensic searches unsupported by reasonable, articulable suspicion and instead predicated on Dr. Abu Irshaid's protected associations and speech, the Government violates the Constitution.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

<u>American Muslims for Palestine</u>

1. Plaintiff Dr. Osama Abu Irshaid is the Executive Director of American Muslims for Palestine ("AMP"), which also does business as AJP Educational Foundation. Exhibit A – Transcript of Osama Abu Irshaid at 9:8-11:5.

2. American Muslims for Palestine is a non-profit dedicated to educating the public about the "just cause of Palestine and Palestinian rights and advocate for self-determination, justice, and liberation." Exhibit B – Interrogatory Responses of Dr. Osama Abu Irshaid at Answer 3.

3. AMP organizes educational events, political boycott campaign, and protests all in furtherance of its mission and "to call attention to Israel's crimes against Palestinians and push for change on American policy toward Palestine and Israel." *Id.*

4. In his capacity as Executive Director of AMP, Dr. Abu Irshaid participates in conferences, gives lectures and Friday sermons, and raises funds for the organization. He also makes regular media appearances and represents AMP at protests and other events. *Id.* at Answer 4.

<u>The Forensic Searches of Dr. Abu Irshaid's Electronic Devices.</u>

5. The Government seized and searched Dr. Abu Irshaid's phone many times when he returned from international travel from 2010 to 2017. *See* Exhibit C – Declaration of Dr. Abu Irshaid at ¶ 2.

6. Dr. Abu Irshaid believes the reason the Government searched his phone so frequently from 2010 to 2017 was because he was on the federal terror watchlist. He believes he was on the federal terror watchlist because, each time he traveled during that time, his boarding pass would be stamped with "SSSS" and he would be subjected to secondary screening, including pat downs, chemical swabs and questions about Dr. Abu Irshaid's travel plans. *Id.* at ¶¶ 3-4.

7. The Government stopped both the regular seizures of his electronic devices and the regular secondary screening some time in 2017. Abu Irshaid's boarding passes were no longer stamped with SSSS. During that time, Dr Abu Irshaid was rarely referred to secondary screening on rare occasions and he recalls only one phone seizure. *Id.* at ¶ 6.

8. In May 2024, the Government resumed its regular invasive screenings when he traveled. While at Dulles Airport in Dulles, Virginia (IAD), he received a boarding pass stamped with SSS and the Government subjected him to secondary screening at the TSA checkpoint and, again, at the jetway. *Id.* at ¶ 7.

9.  On June 3, 2024, Dr. Abu Irshaid returned from Doha, Qatar (DOH) and arrived at IAD. Upon arrival, he was confronted by two federal agents on the jetway. One agent took Dr. Abu Irshaid to a room for secondary screening. The agent interrogated Dr. Abu Irshaid for an hour about, among other things, his activities in his capacity as executive director of AMP. *Id.* at ¶¶ 8-10.

10. After the interrogation, the agent asked Dr. Abu Irshaid to provide his phone for a forensic examination.[1] Dr. Abu Irshaid told the agent the phone was not his primary phone but a backup phone, which he traveled with because of the Government's history of seizing and searching his phone.

11. Dr. Abu Irshaid further explained that his primary phone contains personal pictures and messages that he would not want the Government to view or download. *Id.* at ¶ 13.

12. . The agent insisted he provide it anyway. Dr. Abu Irshaid provided the phone and the agent left with it. *Id.* at ¶ 14.

13. The Government then began conducting a forensic search of Dr. Abu Irshaid's phone. *See* Dkt. 63 at 7.

14. The agent returned with Dr. Abu Irshaid's phone approximately two hours later. He told Dr. Abu Irshaid that the inspection was not complete and that the Government would return his phone at a later date. Dr. Abu Irshaid did not receive his phone until months later, after he filed this lawsuit. Ex. C at ¶ 15.

---

[1] The Government originally characterized Abu Irshaid's allegation that it conducted forensic searches of his phone as a "bald claim" that Abu Irshaid "could not possibly know." The Government now stipulates that both the June 3 and August 8 searches were forensic searches.

15. On August 8, 2024, Dr. Abu Irshaid returned from Amman, Jordan (AMM) to IAD. He deplaned and took a shuttle toward baggage claim. After leaving the shuttle, he was approached by four people who later identified themselves as CBP agents. *Id.* at ¶¶ 17-18.

16. Two agents walked Dr Abu Irshaid to a closed off area for secondary screening. At secondary screening, agents interrogated Dr. Abu Irshaid for approximately 45 minutes. *Id.* at ¶ 20.

17. After the interrogation, an agent asked Dr. Abu Irshaid for his cell phone. Dr. Abu Irshaid told the agent the phone was not his primary phone but a backup phone, which he traveled with because of the Government's history of seizing and searching his phone. Dr. Abu Irshaid even informed the agent that the Government still had the last phone they seized from him in June. The agent insisted he provide the phone he was traveling with anyway. Dr. Abu Irshaid provided the phone and the agent left with it. *Id.* at ¶ 11-1.

18. The Government conducted a forensic search of Dr. Abu Irshaid's device. Dkt. 63 at 7.

19. The agent returned nearly two hours later and returned the phone to Dr. Abu Irshaid. Ex. C at ¶ 25.

<u>CBP Guidance on Phone Searches</u>

20. U.S. Customs and Border Protection issued CBP Directive No. 3340-049A on January 4, 2018. *See* Exhibit D – CBP Directive No. 3340-049A.

21. This directive permitted an officer to perform an advanced[2] search of an electronic device when "there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP, or in which there is a national security concern . . . ." *Id.*

---

[2] The Government's "advanced search" nomenclature is substantively identical to the "forensic search" language used by federal courts. *See United States v. Kolsuz*, 890 F.3d 133, 146 (4th Cir. 2018) ("'Advanced' searches (like 'forensic' searches) involve the connection of external equipment to a device … in order to review, copy, or analyze its contents, and are subject to the restrictions noted above.").

4

22. It further states that "[m]any factors may create reasonable suspicion or constitute a national security concern" including "the presence of an individual on a government-operated and government-vetted terrorist watch list." *Id.*

23. On January 1, 2026, U.S. Customs and Border Protection issued CBP Directive No. 3340-049B. *See* Exhibit E – CBP Directive No. 3340-049B.

24. This directive permits an officer to perform an advanced search of an electronic device "only in instances in which there is reasonable suspicion of activity in violation of the laws enforced or administered by CBP or, in the absence of individualized reasonable suspicion when there is a national security concern." *Id.*

The Reasons for the Forensic Searches

25. The Government states, in part, that border officers searched Dr. Abu Irshaid's phone because of his "███████████████████████████████████████." Exhibit F, Defendant's Supplemental Response to Plaintiff's Interrogatory 2(F); Exhibit G - Customs and Border Protection 30(b)(6) Deposition Transcript at 36:6-10.

26. The Government explains that his affiliation was a concern because of a House Committee letter sent to "██████████████████████████████████████████████ ████████████████████████"[3] *Id.*

27. SJP is not in care of AMP. Ex. C at ¶26.

---

[3]The Government's assertion that SJP is "in care of" Abu Irshaid is incorrect. Abu Irshaid and AMP have no official affiliation with SJP. The House Committee letter cites an *allegation in a complaint* for its claim that SJP is in the care of AMP. That complaint was ultimately dismissed by this Court. *See Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933, 1:24-cv-724-RDA/IDD (E.D. Va. Aug. 15, 2025). The Government's acceptance and restatement of this claim, apparently based on claims made in the House Committee letter, illustrates just how uninterested the Government has been in verifying the veracity of any of the claims made by the House Committee.

28. The Government notes that the Committee letter accused AMP of having "substantial ties to Hamas." *Id.*

29. The Government further states that the Committee letter described an investigation by the Virginia Attorney General's office regarding alleged violation of "state charitable solicitation laws and benefitting or providing support to terrorist organizations." *Id.* (internal quotations omitted).

30. The Government cites the Committee letter's statement from the Anti-Defamation League (ADL), claiming that "AMP is the alter ego for the Islamic Association of Palestine (IAP), once the main propaganda arm for Hamas in the U.S., which was dissolved in 2004 after being implicated in terror finance." *Id.*

31. The Committee letter relied upon by the Government also raises concerns about AMP for its alleged "antisemitic rhetoric," such as chanting "From the River to the sea, Palestine will be free." It goes after AMP's alleged involvement in "college campus protests" like the "coordinated pressure campaign against university administrations and trustees to divest from the Israeli state." It denounces AMP's "efforts to promote the struggle for liberation against Zionism and US imperialism." Exhibit J – House Committee Letter.

32. The second reason the Government provides for its decision to search Dr. Abu Irshaid's phone is his "███████████████████████████████████████████ ██████████████████████████████████████████." *Id.*

33. The website featured an Arabic quote allegedly made by Dr. Osama Abu Irshaid in 2014. *Id.*; Exhibit H – CBP000078.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

35. For the Jun 3 search only, the Government also claims that a reason officers searched Dr. Abu Irshaid's device is that he "███████████████████████████" Ex. F.

36. But Dr. Abu Irshaid did not admit to deleting information from his phone, he told the searching officer that he did not travel with his primary phone. Ex. C at 12.

37. The searching officer did not learn Abu Irshaid was traveling without his primary phone until after he decided to search Dr. Abu Irshaid's phone. *Id.*; *see* Exhibit I – Excerpt of TECS Report. (CBP000052).

38. For the August 8 search only, the Government also claims that a reason officers searched Dr. Abu Irshaid's device was his "████████████████████████ ████████████████████████████████████ ██████ . . . ." Ex. F.

## SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## ARGUMENT

### I. The Government's Forensic Searches of Dr. Abu Irshaid's Electronic Devices Violate the Fourth Amendment.

The Fourth Amendment protects against unreasonable searches by the government. *See Riley v. California*, 573 U.S. 373, 382 (2014). The "touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). While reasonableness "generally requires the obtaining of a judicial warrant," *see Riley*, 573 U.S. at 382, there is an exception at the nation's borders where "no

warrant, nor any individualized suspicion" is required for *routine* searches. *United States v. Nkohngo*, 107 F.4th 373, 381 (4th Cir. 2024).

Although the "border search" exception is "broad, it is not boundless." *United States v. Aigbekaen*, 943 F.3d 713, 720 (4th Cir. 2019). Even at the border, the Government must, at minimum, have individualized suspicion to conduct a forensic search of an electronic device. *See United States v. Kolsuz*, 890 F.3d 133, 137 (4th Cir. 2018). That individualized suspicion only exists when "specific and articulable facts known to the searching officers, along with rational inferences from those facts, demonstrate that criminal activity is afoot." *El Ali v. Barr,* 473 F. Supp. 3d 479, 494 (D. Md. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)) (internal quotations omitted). The suspected criminal activity must also be tethered to "the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband.'" *See Nkohngo*, 107 F.4th at 381 (quoting *Aigbekaen*, 943 F.3d at 721).

The Fourth Circuit has not yet determined whether reasonable suspicion is sufficient or whether probable cause is required for a forensic phone search at the border. *See Nkohngo*, 107 F.4th at 382 ("[N]either *Kolsuz* nor *Aigbekaen* decided whether reasonable suspicion is enough to justify a forensic search or whether probable cause is required. … [W]e need not decide whether [those rulings were] correct."). This Court need not make that determination either. The Government based its searches of Dr. Abu Irshaid's phone on neither reasonable suspicion nor probable cause. The CBP officers who searched Dr. Abu Irshaid's phones had no evidence or reason to believe that he was committing any crime, let alone one that bears on the border exception.

**A. None of the Government's Purported Reasons for the Device Searches Satisfy the Reasonable Suspicion Standard.**

8

The Government's stated reasons for forensically searching Dr. Abu Irshaid's devices do not provide reasonable suspicion for the search either independently or in the aggregate. Each of the stated reasons describes either innocent behavior (even when considered context or otherwise), false allegations about AMP, or Dr. Abu Irshaid's lawful associations and expression. Even when viewed in totality, these reasons cannot amount to reasonable suspicion that Dr. Abu Irshaid was committing a crime on June 3 or August 8, 2024.

1. Affiliation with American Muslims for Palestine

The Government states, in part, that border officers searched Dr. Abu Irshaid's phone because of his "████████████████████████████████████" Ex. F; Ex. G at 36:6-10. The Government explains that his affiliation was a concern because of a House Committee letter sent to "████████████████████████████████ ████████████████████████████"[4] *Id.* The Government notes that the committee letter accused AMP of having "substantial ties to Hamas." *Id.* The Government further states that the committee letter described an investigation by the Virginia Attorney General's office regarding alleged violation of "state charitable solicitation laws and benefitting or providing support to terrorist organizations." *Id.* (internal quotations omitted). Finally, the Government cites the letter's statement from the Anti-Defamation League (ADL), claiming that "AMP is the alter ego for the Islamic Association of Palestine (IAP), once the main propaganda arm for Hamas in the U.S., which was dissolved in 2004 after being implicated in terror finance." *Id.*

---

[4]The Government's assertion that SJP is "in care of" Abu Irshaid is incorrect. Abu Irshaid and AMP have no official affiliation with SJP. The House Committee letter cites an *allegation in a complaint* for its claim that SJP is in the care of AMP. That complaint was ultimately dismissed by this Court. *See Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933, 1:24-cv-724-RDA/IDD (E.D. Va. Aug. 15, 2025). The Government's acceptance and restatement of this claim, apparently based on claims made in the House Committee letter, illustrates just how uninterested the Government has been in verifying the veracity of any of the claims made by the House Committee.

The Government's reliance on the House Committee letter is unlawful. "'[K]nowledge that a suspect is merely under investigation' does not demonstrate reasonable suspicion without additional facts." *United States v. Peters*, 60 F.4th 855, 865 (4th Cir. 2023) (quoting *United States v. Foster*, 634 F.3d 243 247 (4th Cir. 2011)). If courts permitted investigations and accusations to create reasonable suspicion, "any person with any sort of criminal record—or even worse, a person with arrests but no convictions—[could] be subjected to an investigative stop … at any time without the need for any other justification at all." *United States v. Powell*, 666 F.3d 180, 188 (4th Cir. 2011). The Government's searches here are exactly what the Fourth Circuit has cautioned against. The Government cannot claim that it had reasonable suspicion based on conclusory accusations and investigations that required no evidence to initiate. Notably, Dr. Abu Irshaid has never even been charged or arrested of any crime, terrorism related or otherwise.

A second shortcoming of the Government's reliance on the Committee letter is the absence of any personal observation by the searching officers. " [R]easonable suspicion analysis is of an *officer-centered nature*." *Peters*, 60 F.4th at 864 (emphasis original). The searching officer must be able to "point to specific and articulable facts which … reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The CBP officers had no such contemporaneous information. They rely only on secondhand accusations, from sources that did not claim firsthand knowledge of criminal wrongdoing, that they made no attempt to corroborate at the time of the search. *See Florida v. J.L.*, 529 U.S. 266, 272 (2000) (stating that reasonable suspicion from a "tipster" requires "reliable" knowledge of concealed criminal activity). The searching officers had no reason to believe any of the claims made in the Committee letter and made no effort to verify its reliability or lack thereof.

2. Appearance on a Public Website

The Government next states that border officers searched Dr. Abu Irshaid's phone because he appears on a public website published by Al Qassam Brigades, ███████████████████ ███████████████████████████████████. The Government produced a screenshot of the webpage. Ex. H CBP-000078. But nothing in the screenshot, including any statement attributed to Dr. Abu Irshaid, points to reasonable suspicion at the time of the search that criminal activity was "afoot". *Terry*, 392 U.S. at 21. Nor is there any evidence that the searching officers knew what the Arabic quote actually said. *See* Ex. G at 93:11-94. Taken at face value, it is a statement attributed to Dr. Abu Irshaid by Al Qassam that he allegedly made and was published on the website *over ten years* before he was stopped.

Even if Al Qassam featured Dr. Abu Irshaid on their website the day officers searched him, it could not provide reasonable suspicion because it would provide no indicia of individualized wrongdoing. "[B]oth courts and law enforcement must be careful not to tar people with the sins of their neighbors." *United States v. Montero-Camargo*, 208 F.3d 1122, 1139, n.32 (9th Cir. 2000) (en banc). The Government cannot "demonstrate that criminal activity is afoot" through an unknown third party's publication of his image or alleged words to a website associated with bad "neighbors."

### 3.  Alleged Deletion of information

For the June 3 search only, the Government claims that Dr. Abu Irshaid's alleged deletion of information from his phone provided a basis for reasonable suspicion. As a factual matter, Dr. Abu Irshaid disputes the Government's version of the story. The Government told him it would conduct a search of his phone before Dr. Abu Irshaid explained that he was traveling with a backup phone. *See* Ex. C at ¶ 12. He never stated that he *deleted* information from any device. *Id.* Abu Irshaid explained to the CBP officer that he did this because of the Government's history of

11

searching his phone at the border. *Id.* The TECS report produced by the government supports Dr. Abu Irshaid's version of the story. *See* Ex. I. Even with the redactions, it is clear that the Government is stating the reasons for the forensic search, and these reasons do not include either the deletion of information or the decision to travel without a phone. *Id.* The report later mentions both the alleged deletion and Dr. Abu Irshaid's decision to travel without his regular phone but does not state that these are reasons for the search; the officer instead "empathized" with Abu Irshaid's concern. *See id.*

If the officer, for a moment, believed that Dr. Abu Irshaid's backup phone was suspicious, that suspicion should have dissipated when Dr. Abu Irshaid gave an innocent explanation for the backup phone. *See also United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) *(*holding that the reasonable suspicion was "dispelled" once it was confirmed the officer's suspicions were untrue). But the Government does not claim, and would not be able to articulate, lawful reasonable suspicion arising from the events as they actually transpired.

4.  Travel to "areas of active unrest"



For the August 8 search only, the Government claims that Dr. Abu Irshaid's "█████████" provides reasonable suspicion because the Government claims Jordan "████████ █████████████████████████████████████████████ ████████████████████" Ex. F. To put that in clearer terms, the Government believes Dr. Abu Irshaid's travel to Jordan can contribute to reasonable suspicion of criminal activity because Jordan borders Palestine and Syria. The Supreme Court considered a similar circumstance where it concluded that permitting a search would "subject a very large category of presumably innocent travelers" to "virtually random seizures." *Reid v. Georgia*, 448 U.S. 438 (1980). Precedent dictates that this cannot provide the basis for reasonable suspicion.

5. <u>CBP Forensic Search Directives</u>

Importantly, the Government's policy for advanced searches, both at the time it searched Dr. Abu Irshaid's devices and presently, does not require an officer to have reasonable suspicion to conduct an advanced search. The directive at the time was that the searching officer must have reasonable suspicion of criminal activity "*or* [when] there is a national security concern." Ex. D (emphasis added). *Id.* The new policy, adopted in January 2026, is no better. It explicitly permits forensic searches "in the absence of individualized reasonable suspicion" when there is a "national security concern. Ex. E. On its face, the CBP directive the searching officers were acting pursuant to permits forensic searches even when an officer does not have any suspicion of ongoing criminal activity.

**B. The Government's Supposed Reasons for the Search do not amount to Reasonable Suspicion in the Aggregate.**

Reasonable suspicion may arise from the "totality of the circumstances," *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019), but must still reflect that the searching officer had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Vaughan*, 700 F.3d 705, 710 (4th Cir. 2012).

For the June 3 stop, the Government claims that the aggregate information providing reasonable suspicion of criminal wrongdoing was: (1) Dr. Abu Irshaid's Association with AMP and the corresponding House Committee letter, (2) Dr. Abu Irshaid's appearance on the Al Qassam website in 2014, and (3) an allegation that Dr. Abu Irshaid stated that he deleted information from his phone. Ex. F. For the August 8 search, the Government claims that reasonable suspicion arose from: (1) the AMP association and House Committee letter, (2) the Al Qassam webpage, and (3) Dr. Abu Irshaid's travel to Jordan, which borders two countries of "active unrest." *Id.* On these bare facts and allegations, the Government is hard-pressed to explain what "rational inference[]"

13

it could make that a specific, articulable criminal activity was afoot at the time of either phone search. *Terry*, 392 U.S. at 1. Because the Government cannot establish a "particularized and objective basis for suspecting legal wrongdoing," *Vaughan*, 700 F.3d at 710, its non-routine, forensic searches of Dr. Abu Irshaid's phone were unlawful.[5]

## II. The Government's Reliance on Dr. Abu Irshaid's Affiliation with American Muslims for Palestine Violates the First Amendment.

The Government retaliated against Dr. Abu Irshaid for associations protected by the First Amendment. The Government "may not respond to 'constitutionally protected activity with conduct or speech that would chill or adversely affect [t]his protected activity.'" *McClure v. Ports*, 914 F.3d 866, 871 (4th Cir. 2019) (quoting *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006)). "A plaintiff seeking to recover for First Amendment retaliation must allege that (1) she engaged in protected First Amendment Activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (citing *Suarez Corp. v. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)).

### A. Dr. Abu Irshaid's Association with AMP is Protected by the First Amendment.

Dr. Abu Irshaid engaged in protected First Amendment activity through his association with AMP, an organization committed to advocacy on behalf of Palestinians. "The Supreme Court has 'long understood as implicit in the right to engage in the activities protected by the First Amendment a corresponding right to associate with others.'" *AJP Educ. Found., Inc. v. Miyares*,

---

[5] The Government has stated that it only relied on the reasons provided in its Rule 2(f) supplement to establish reasonable suspicion. Those reasons did not include Dr. Abu Irshaid's watchlist status. Nevertheless, it should be noted that the watchlist "cannot serve as a proxy for individualized reasonable suspicion that an individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at the time of the search." *El Ali*, 473 F. Supp. 3d at 521.

806 F.Supp.3d 603, 622 (E.D. Va. 2025) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)).

Through his association with AMP, Dr. Abu Irsahid engages in expressive activity. AMP's mission is to "educate the public about the just cause of Palestine and Palestinian rights and advocate for self-determination, justice and liberation." *See* Ex. B. AMP "raises awareness on the issues pertaining to Palestine. . . ." *Id.* In furtherance of its mission, AMP organizes protests, holds targeted boycott campaigns for political purposes, and engages in political advocacy. *Id.; see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911-12 (1982) (holding that boycotts which seek to "bring about political social, and economic change" are protected by the First Amendment).

In his capacity as executive director of AMP, Abu Irshaid himself gives speeches advocating for Palestinian liberation and criticizing American support of Israel, performs media interviews, and represents AMP at protests and other events. *See* Ex. B. It cannot be seriously disputed that Dr. Abu Irshaid engages in protected, First Amendment. activity through his association with AMP.

### B. Defendants' Phone Searches Objectively Chill Dr. Abu Irshaid's First Amendment activity.

Defendants' phone searches adversely affect Dr. Abu Irshaid's First Amendment activity. "[A] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500 (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). This is an objective standard, but subjective chilling provides evidence of the objective effect of government action. *Id.*

The Government has refused to produce what exactly it extracted when it forensically searched Dr. Abu Irshaid's phone, but precedent gives him reason to believe that the searches were

remarkably expansive. Forensic searches produce reports that are hundreds of pages long and can contain "personal contact lists, emails, messenger conversations, photographs, videos, calendar, web browsing history, along a history of [a plaintiff's] physical location down to precise GPS coordinates." *Kolsuz*, 890 F.3d at 139. There is no doubt that such a search, if done in retaliation for the exercise of First Amendment rights, would chill the expression of a "person of ordinary firmness." *Constantine*, 411 F.3d at 500; *cf. Riley*, 573 U.S. at 403 ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" (quoting *Boyd v. United States*, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1886))).

Evincing the objective effect of the Government's searches, Dr. Abu Irshaid's First Amendment activity was chilled. Out of fear of renewed Government invasion of his privacy, Dr. Abu Irshaid avoids discussing Hamas, despite writing his PhD thesis about Hamas and co-authoring a study about Hamas through the U.S. Institute of Peace. *See* Ex. B; Ex. A at 60:20-61:15. He avoids lawful statements that he believes the Government would use to scrutinize him and justify phone searches. *Id.* at 4. He chooses to travel without his personal cell phone or laptop because he expects his electronics to be searched by the Government. Ex. A 76:14-78:11. Traveling without his cellphone substantially limits his speech, because the cell phone he now travels with does not have access to the internet out of concern that the Government will use a phone's "cloud" connection to search "data stored on remote servers rather than on the device itself." *See id.* at 77:2-22; *Riley*, 573 U.S. at 397; *see Reno v. ACLU*, 521 U.S. 844, 851 (1997) (recognizing the internet as a "unique medium" for the dissemination of ideas). While it is already clear that the Government's phone searches would deter a person of ordinary firmness from exercising their

First Amendment protected rights, this subjective chill is further evidence of the searches' adverse effects.

### C. There is a Causal Relationship Between Dr. Abu Irshaid's First Amendment Activity and Defendants' Phone Searches.

The third and final element of a First Amendment retaliation claim is that there must be a "causal connection" between the protected activity and the Government's adverse action." *Constantine*, 411 F.3d at 500. A defendant's retaliatory motive must be a "but-for" cause of the adverse action taken by the government. *See Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019). If the unlawful retaliatory motive rests with a third-party, the plaintiff must show the "retaliatory animus of one person" induced "the action of another." *Hartman v. Moore*, 547 U.S. 250, 262 (2006)

Courts are often left to rely on circumstantial evidence because the government does not typically reveal its retaliatory motive. *See id*. Not so here. On both occasions, the Government expressly searched Abu Irshaid's phone because of his affiliation with AMP. Ex. F; Ex. G at 36:6-10.

To the extent the Government would argue that AMP's speech is not the basis of its suspicion, but the bald assertions contained within the House Committee letter, Abu Irshaid may instead point to the retaliatory animus plain on the face of the House Committee letter. The House Committee attacks what it calls "antisemitic rhetoric," such as chanting "From the River to the sea, Palestine will be free." Ex. J. It goes after "college campus protests" like the "coordinated pressure campaign against university administrations and trustees to divest from the Israeli state." *Id.* (internal quotations omitted). It denounces "efforts to promote the struggle for liberation against Zionism and US imperialism." *Id.* The letter is a laundry list of protected speech the House Committee despised for the viewpoints expressed in favor of Palestinians, and against the Israeli

government. *See e.g., AAUP v. Rubio*, 802 F.Supp.3d 120, 175 (D. Mass. 2025) (holding that the government's targeting of speech critical of Israel is "viewpoint discriminatory" and "chills protected speech."). The House Committee "could not justify" its targeting of AMP "without reference to the content" of AMP's speech. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The Government admits that both forensic searches of Abu Irshaid's phone were "induced" by the House Committee letter. Thus, even if the Government professes innocent reliance on the House Committee, Abu Irshaid has established the "but-for" causal connection between the retaliatory animus of the Committee and the Government's adverse actions that chilled his First Amendment rights. *See Nieves,* 587 U.S. at 398.

## CONCLUSION

For the foregoing reasons, this Court should grant Dr. Abu Irshaid's Motion for Summary Judgment.


Dated: February 27, 2026                    Respectfully Submitted,

                                            CAIR LEGAL DEFENSE FUND

                                            BY: /s/ Lena F. Masri
                                            Lena F. Masri
                                            lmasri@cair.com
                                            Gadeir I. Abbas
                                            gabbas@cair.com
                                            Catherine Keck
                                            ckeck@cair.com
                                            Ahmad Kaki*
                                            akaki@cair.com
                                            453 New Jersey Ave., S.E.
                                            Washington, DC 20003

Phone: (202) 742-6420
Fax: (202) 488-0833

*Attorneys for Plaintiffs*

*\*admission and appearance forthcoming*