**DISTRICT OF VIRGINIA**
**ALEXANDRIA  DIVISION**

| | |
|---|---|
| **OSAMA ABU IRSHAID**; | |
| *Plaintiff,* | **Case  No.:** 1:24-cv-1405 (MSN/WBP) |
| v. | District Judge Michael S. Nachmanoff |
| **PAMELA BONDI**, Attorney General of the United States, et al.; | |
| *Defendants.* | |

**PLAINTIFF OSAMA ABU IRSHAID'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Dr. Osama Abu Irshaid, by and through undersigned counsel, respectfully submits

his Response in Opposition to Defendants' Motion for Summary Judgment pursuant to Federal

Rule of Civil Procedure 56.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

DISPUTED MATERIAL FACTS ........................................................................................ 1

ARGUMENT ....................................................................................................................... 3

    I.    The Government did not have Reasonable Suspicion to Search Dr. Abu Irshaid's Electronic Devices. ..................................................................................................... 3

    II.    The Government Illegally Searched Dr. Abu Irshaid's Electronic Devices Because of his Affiliation with AMP........................................................................................ 8

        A.    Ickes Does not Control Because the Expressive Materials on Dr. Abu Irshaid's Phones are not the Basis of his First Amendment Claim. ................................................ 8

CONCLUSION.................................................................................................................... 14

**TABLE OF AUTHORITIES**

**Cases**

*AAUP v. Rubio*, 802 F.Supp.3d 120 (D. Mass. 2025) .................................................................. 13

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) ......11, 12

*El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020) ........................................................................ 3

*George v. Rehiel*, 738 F.3d 562 (3d Cir. 2013).............................................................................. 13

*Illinois v. Wardlow*, 528 U.S. 119 (2000) ....................................................................................... 6

*Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646 (4th Cir. 2017) ......................................... 14

*Reid v. Georgia*, 448 U.S. 438 (1980)......................................................................................... 6, 7

*Reno v. ACLU*, 521 U.S. 844 (1997)............................................................................................. 12

*Riley v. California*, 573 U.S. 373 (2014) ...............................................................................11, 12

*Tabaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) .......................................................................8, 9, 11

*Terry v. Ohio*, 392 U.S. 1 (1968)................................................................................................. 3, 4

*United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005) ...................................................................... 8

*United States v. Martinez Fuerte*, 428 U.S. 543 (1976).................................................................. 5

*United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994) ............................................................... 6

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) ...................................................... 5

*United States v. Nkhongo*, 107 F.4th 373 (4th Cir. 2024) .............................................................. 7

*United States v. Peters*, 60 F.4th 855 (4th Cir. 2023)..................................................................... 4

*United States v. Rubio*, 727 F.2d 786 (9th Cir. 1983) ..................................................................... 9

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ............................................................................ 9

**INTRODUCTION**

The Government's theory of the case would render the Fourth Amendment's protection against unreasonable searches meaningless. Under that theory, one branch of government could tar a person through baseless claims about that person while another branch could then rely on those baseless claims as reasonable suspicion for remarkably invasive searches. This cannot be. Reasonable suspicion requires individualized, articulable facts that a person is engaging in or will soon be engaging in criminal activity. The Government presents nothing of the sort here. Instead, it provides a smattering of reasons that, when taken together, do nothing more than demonstrate that the Government recklessly accepts the baseless accusations others have levied against Dr. Osama Abu Irshaid and American Muslims for Palestine. Even worse, the Government makes clear that it zealously and blindly adopts the discriminatory animus of those who have made accusations against Dr. Abu Irshaid.

Because the Government fails to show it had reasonable suspicion that Dr. Abu Irshaid was engaged in criminal activity at the time it forensically searched his phone, the Government violates the Fourth Amendment. And because the Government searched Dr. Abu Irshaid's phone due to his lawful associations and expression, the Government also violates the First Amendment.

**DISPUTED MATERIAL FACTS**

4. **DISPUTED.** This statement is not entirely correct because it omits relevant context. Namely, Dr. Abu Irshaid's alleged appearance on the website was in 2014, ten years before the searches at issue. *See* Dkt. 137-8.

5. **DISPUTED.** This statement omits relevant context. It is true that rogue lawsuits have falsely alleged that Dr. Abu Irshaid had "advance knowledge" of October 7. None of these lawsuits, however, has even survived a motion to dismiss. *See, e.g., Parizer v. AJP Educ. Found., Inc.*, 2025 WL 2382933, Civ. No. 1:24-cv-724 at *19 ("Plaintiffs do not even allege sufficient facts to

1

plausibly show that Defendants had prior knowledge of the October 8, 2023. Instead, Plaintiffs ask this Court to draw an inference …. The Court finds that this inference is not reasonable and declines to draw such an inference.") (collecting cases). Each of these lawsuits has either been dismissed by a court or been amended to remove the outlandish allegation that Dr. Abu Irshaid had advance knowledge of the October 7 attacks.[1]

6. **DISPUTED.**.. Dr. Osama Abu Irshaid did not tell the searching agents he deleted information from his phone. He explained that he travels with a backup phone because of the Government's history of invasive phone searches and the private information he kept on his phone. *See* Dkt. 137-3 at ¶¶ 12-13. Furthermore, Dr. Abu Irshaid did not tell the Government about his backup phone until after the agents told him they would search his device. *See id.;* Dkt. 137-9 (government document showing that the searching agent decided to search the phone before learning of Dr. Abu Irshaid's backup phone).

7. **DISPUTED.** CBP Directive No. 3340-049A explicitly permits searches even when the searching officer does not have reasonable suspicion of ongoing criminal activity. Dkt. 137-4.

9. **DISPUTED.** Dr. Abu Irshaid disputes this fact to the extent that it suggests the alleged deletion of information from his phone was a factor leading to reasonable suspicion. The Government does not include this reason as a basis for the search in its supplemental answer to Interrogatory 2(f). *See* Dkt 137-6.

---

[1] The Court should forcefully reject the Government's thinly veiled attempt at fearmongering about Dr. Abu Irshaid by mentioning this without context, then never relying on this "fact" for any of its legal arguments.

## ARGUMENT

**I.    The Government did not have Reasonable Suspicion to Search Dr. Abu Irshaid's Electronic Devices.**

The Government lacked the reasonable suspicion necessary to forensically search Dr. Abu Irshaid's devices at the border. The Government did not possess "specific and articulable facts known to the searching officers …[to] demonstrate that criminal activity [was] afoot" for either searches at issue in this case. *El Ali v. Barr*, 473 F. Supp. 3d 479, 494 (D. Md. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)) (internal quotations omitted). What the government offers instead is speculation and conjecture. Its listed reasons for the search fail to meet any suspicion standard the Court may choose to follow.[2]

AMP and the House Committee Letter

The Government's argument that it had reasonable suspicion based on the House Committee Letter fails, above all else, because of this: the House Committee on Oversight and Accountability did not have or need even a drop of suspicion that Dr. Osama Abu Irshaid had ever done anything wrong to issue its "investigation" letter. Indeed, the House Committee admits that it issued the letter under its "broad authority to investigate 'any matter' at any time' under House Rule X." Dkt. 137-10. In other words, it needed no reason, let alone reasonable suspicion, to issue its demands against AMP. As illustrated *supra at* sec. II, the House Committee was primarily concerned with the lawful expression it alleged AMP engaged in. *Id.* The House Committee Letter

---

[2] The Government assumes without arguing that reasonable suspicion is the established standard for forensic searches. As Plaintiff noted in his own Brief in Support of his Motion for Summary Judgment, the Fourth Circuit has not yet determined "whether reasonable suspicion is enough to justify a forensic search or whether probable cause is required." *See United States v. Nkohngo*, 107 F.4th 383, 384 (4th Cir. 2024). To the extent the Court believes the Government has met one standard but not the other, it must decide what the appropriate standard is. Plaintiff, of course, contends that the Government has failed to meet either.

cannot be the basis of reasonable suspicion when the House Committee did not need reasonable suspicion to issue the letter.

Even if the investigation was legitimate, "'knowledge that a suspect is merely under investigation' does not demonstrate reasonable suspicion without additional facts.'" *United States v. Peters*, 60 F.4th 855, 865 (4th Cir. 2023) (quoting *United States v. Foster*, 634 F.3d 243 247 (4th Cir. 2011)). It is well established in the Fourth Circuit that even a legitimate criminal investigation is insufficient to meet the reasonable suspicion standard "without additional facts." *Id.* The additional facts here—a screenshot of a ten-year-old webpage, Dr. Abu Irshaid's decision to travel with a backup phone, and his travel to Jordan—do not help the Government get to reasonable suspicion.

The Remaining Reasons for the Forensic Searches

The remaining reasons the Government asserts as reasonable suspicion are also insufficient to meet the standard. The Government first points to "Plaintiff's appearance on a website affiliated with Al Qassam Brigades." *See* Dkt. 125 at 10. The Government omits that the alleged appearance on the website is from 2014 and that no evidence exists that Plaintiff had anything to do with his appearance on that website. It further omits that despite somehow stumbling upon this ten-year-old post, the searching agents could not read Arabic—or at the very least could not be bothered to translate the post—and in a deposition where they were specifically obligated to do so, could not articulate what information in the apparently incriminating post gave rise to any suspicion, let alone reasonable suspicion. *See* Dkt. 137-7 at 93:11-94. A ten year old post that is apparently unreadable to the government cannot be a reasonable basis that a person is engaging in criminal activity. *See Terry*, 392 U.S. at 21.

4

Next, and for the June 3 search only, the Government claims the alleged fact that Dr. Abu Irshaid allegedly admitted to deleting information from his phone contributes to reasonable suspicion. As a factual matter, Dr. Abu Irshaid disputes the Government's version of that event. He maintains that the Government told him it would conduct a search of his phone *before* Dr. Abu Irshaid explained that he was traveling with a backup phone. *See* Dkt. 137-3 at ¶ 12. He never stated that he *deleted* information from any device. *Id.* Dr. Abu Irshaid explained to the CBP officer that he did this because of the Government's history of searching his phone at the border. *Id*. The TECS report produced by the Government supports Dr. Abu Irshaid's version of the story. *See* Dkt. 137-9. Further, even with the redactions, the Government's listed reasons for conducting a forensic search do not include either the alleged deletion of information or the decision to travel without a phone. *Id.* The report later mentions both the alleged deletion and Dr. Abu Irshaid's decision to travel without his regular phone but does not state that these are reasons for the search; the officer instead "empathized" with Abu Irshaid's concern. *See id.*

The timing here is dispositive. The Government learned that Dr. Abu Irshaid traveled with a backup after it had already decided to search his phone. Therefore, the Government's rationale fails because "such *post hoc* rationalizations have no place in our Fourth Amendment jurisprudence, which demands that we 'prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure.'" *United States v. Montoya de Hernandez*, 473 U.S. 531, 559 (1985) (J. Brennan, dissenting) (quoting *United States v. Martinez Fuerte*, 428 U.S. 543, 565 (1976)). The Government cannot use post-hoc rationales, especially when those rationales are contradicted by the events as they actually transpired.

But even if we believed the Government's disputed story, traveling with a backup phone does not amount to reasonable suspicion. The Government likens Dr. Abu Irshaid's decision to

delete information to "nervous, evasive behavior" upon which it can rely for reasonable suspicion. *See* Dkt 125 at 10 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). But Dr. Abu Irshaid explained in his deposition, just as he explained to the officer who already decided to search his phone, that he used a backup because of the Government's history of searching his phone, seizing it for long periods of time, and the private information his phone contained. Dkt. 137-3 at ¶ 12; Dkt 137-1 at 77:24-78:11. If the officer, for a moment, believed that Dr. Abu Irshaid's backup phone was suspicious, that suspicion should have dissipated when Dr. Abu Irshaid gave an innocent explanation for the backup phone. *See also United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994) (holding that the reasonable suspicion was "dispelled" once it was confirmed that the officer's suspicions were untrue). Alternatively, if the use of a burner phone was actually suspicious, CBP should have included it in the list of reasons for the search, not floated elsewhere in the report. *See* Dkt 137-9.

For the August 8 search only, the Government claims that Dr. Abu Irshaid's "travel to Jordan, a country known to CBP as a location providing access into areas of active unrest" contributes to reasonable suspicion. *See* Dkt. 125 at 11. Dr. Abu Irshaid, of course, did not travel to an actual area of "active unrest," so the Government wants to cast Jordan, "a major non-Nato ally,"[3] in the same light as its neighbors. But the Supreme Court has already concluded that permitting these types of searches would impermissibly subject "a very large category of presumably innocent travelers … to virtually random seizures …." *Reid v. Georgia*, 448 U.S. 438, 441 (1980). Dr. Abu Irshaid's travel to Jordan on a family visit cannot be a basis for reasonable suspicion. *See* Dkt. 137-9.

---

[3] *U.S. Relations With Jordan*, U.S. Dep't of State, https://2021-2025.state.gov/u-s-relations-with-jordan/, (last visited Mar. 12, 2026).

Abu Irshaid's Watchlist Status

The Government has specifically disavowed Dr. Abu Irshaid's watchlist status as a reason for its searches. *See* Dkt. 89-1, Transcript for Hearing on Motion to compel at 17:15-18:1, 25:1-17. It explicitly stated that it would rely only on the reasons listed in its Interrogatory 2(f) supplement and the unredacted information listed in the CBP TECS records at summary judgment. *Id.* None of the Government's productions included any unredacted references to Dr. Abu Irshaid's watchlist status as a reason for the search. The Government, however, now attempts to rely on Abu Irshaid's watchlist status as evidence of reasonable suspicion.

Even if the Court chooses to consider Dr. Abu Irshaid's watchlist placement as a factor, it does not strengthen the Government's case for reasonable suspicion. Watchlist placement "cannot serve as a proxy for individualized reasonable suspicion that an individual plaintiff is engaging in—or intends to engage in—terrorist activity at all, let alone at the time of the search." *El Ali*, 473 F.Supp.3d at 521. Indeed, this Court has already held that "inclusion in the TSDB supports, at best, an inference that reasonable suspicion of national security-related crimes existed at and around the time of nomination—not months or years later." Dkt. 30 at 19 (citing *Reid*, 448 U.S. at 330. This Court further reasoned that "it is far from clear that the scope of activities that might satisfy the standard for inclusion in the TSDB necessarily relate to 'protecting national security.'" *Id.* (citing *United States v. Nkhongo*, 107 F.4th 373, 381 (4th Cir. 2024)). Because Watchlist placement is entirely untethered from both the suspicion and temporal requirements of the reasonable suspicion standard, it cannot provide the basis for a constitutionally adequate forensic search.

II. **The Government Illegally Searched Dr. Abu Irshaid's Electronic Devices Because of his Affiliation with AMP.**

A. *Ickes* **Does not Control Because the Expressive Materials on Dr. Abu Irshaid's Phones are not the Basis of his First Amendment Claim.**

The Government suggests that the First Amendment may not apply to border searches at all. *See* Dkt. 125 at 15-16 ("*Even if the First Amendment did apply* to CBP's consideration of Plaintiffs claimed expressive association during the border searches at issue …") (emphasis added). No Court has ever held that the First Amendment does not apply to border searches. *See, e.g., Tabaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (holding that the Government's border searches of individuals because of their lawful associations "implicate the protections of the First Amendment."); *United States v. Ickes*, 393 F.3d 501 (4th Cir. 2005) (holding only that the risk of uncovering expressive material during a border search does not prevent a border search under the First Amendment).

But the Government's reading of *Ickes* would create a categoric border exception to the First Amendment. . *See* Defs.' MSJ, Dkt. 125 at 14-15.  The question presented in *Ickes* was whether the First Amendment "exempts expressive material from the scope of the border search doctrine." 393 F.3d 501, 506 (4th Cir. 2005).  Ickes argued that the Government cannot search his phone because it may "uncover[] terrorist communications, which are inherently expressive." *Id.* at 506 (internal quotations omitted). Dr. Abu Irshaid does not.

Instead, he argues that what makes the Government's decision to search his phone unlawful wast that it did so because of his association with an organization that engages in protected activity. Ickes challenged border searches under a theory of what the Government may uncover while engaging in an otherwise lawful search, not whether the search was lawful in the first place. *Id.* This is a fatal distinction for the Government's argument.

8

After stretching *Ickes* well beyond its actual holding to suggest it applies here, the Government then turns to a series of cases about "challenges to search-warrant applications implicating freedom of association concerns." Dkt. 125 at 13. None of these cases are relevant here. Take, for example, *United States v. Rubio*. 727 F.2d 786 (9th Cir. 1983). *Rubio* is a Ninth Circuit case challenging the facial validity of a warrant targeting associational information. *Id.* at 791. The warrant there, unlike the forensic search here, was issued by a magistrate upon a finding that probable cause existed. *Id.* The court held that the "'preconditions of a warrant—probable cause, specificity … should afford sufficient protection against the [associational] harms that are assertedly threatened.'" *Id.* (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978)). Here, however, no such search warrant existed and the explanation the Government offers illegally relies on his lawful association with a lawfully-operating nonprofit organization.

The Government's conclusion that the "Fourth Circuit has declined to recognize exactly the sort of First Amendment safe haven Plaintiffs advocate" is a misstatement of both the case law and of Plaintiff's claim. Dkt. 125 at 15. On the contrary, it is the Government's assertion that First Amendment rights may disappear at the border that is precluded by Fourth Circuit precedent. No case the Government cites supports its position, because no such support exists. A person's lawful association with an organization that engages in expression cannot be the basis of an adverse government action.

### B. *Tabaa* does not mean what the Government wants it to mean.

The Government unlawfully retaliated against Dr. Abu Irshaid because of his lawful associations with a lawful organization. In an attempt to rebut Dr. Abu Irshaid's claim, the Government makes much of *Tabaa v. Chertoff*. 509 F.3d 89 (2d Cir. 2007). But *Tabaa* supports, rather than diminishes, Dr. Abu Irshaid's retaliation argument. 509 F.3d. 89 (2d Cir. 2007).

First, the *Tabaa* court explicitly held that the border searches *did* burden the plaintiffs' associational rights because the "penalty" of border searches "in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect." *Id.* at 101. The court in *Tabaa* held that the burden can only survive scrutiny if it "serves compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* at 102 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984)). It was the factual record in *Tabaa* that allowed the Government to satisfy strict scrutiny in that case, not the law.

Second, the court held that the searches survived scrutiny because they were conducted when the plaintiffs were returning from a conference that "certain individuals who were associated with terrorist organizations or activities" attended. *Id.* The government's asserted interest in *Tabaa* was "preventing terrorists from entering" the country based on specific evidence of a specific threat. *Id.* at 103-105. And the challenged searches—fingerprints and photographs—were "necessary to ensure that they were who they claimed to be." *Id.* at 105. So, the *Tabaa* holding affects only how the government may burden associational rights at the border when the associational rights are 1) related to the travel and 2) the burden is narrowly tailored to the Government's concerns about the associations a person makes while traveling. And there, the burdens were less severe than those at issue here and actually related to specific evidence of an articulable threat.

None of those facts exist here. To start, the Government admits that it searched Dr. Abu Irshaid's phone because of his general association with AMP, and the House Committee's decision to target AMP because of its expressive activities. *See* Dkt. 137-6; Dkt 137-10. The Government makes a vague reference to Dr. Abu Irshaid's travel to places of "unrest" for the August 8 phone

10

search but this vague concern is not like the specific evidence addressed in *Tabaa*.  509 F.3d. at 102. [CITE 2F]. Indeed, the Government has not alleged that Dr. Abu Irshaid  rubbed shoulders with known terrorists or any evidence remotely as specific. And, even if the Government was concerned about Dr. Abu Irshaid's specific associations while he traveled,  the forensic phone searches it commenced were far from "necessary to ensure" that he was who we claimed to be. *Tabaa*, 809 F.3d at 105. Finally, the Committee letter the Government relies on, by its own terms, establishes that AMP is being investigated by the House Committee for AMP's lawful expression. *See* Dkt. 137-10.

**C.**        ***Constantine* controls, and Plaintiff easily satisfies its test**

 The burden of having one's devices searched each time he travels is self-evident, and the Court should approach this issue with the commonsense understanding of how central one's phone is to the expressions a person makes. The Government nevertheless argues that it has caused nothing more than a "*de minimis* inconvenience" to Dr. Abu Irshaid's exercise of his First Amendment rights. This is not true.

But even if it were, the Government fails to respond to the common sense notion that forensic searches at the border "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500. Forensic searches produce reports that are hundreds of pages long and can contain "personal contact lists, emails, messenger conversations, photographs, videos, calendar, web browsing history, along with a history of [a plaintiff's] physical location down to precise GPS coordinates." *Kolsuz*, 890 F.3d at 139. There is no doubt that such a search, if done in retaliation for the exercise of First Amendment rights, would chill the expression of a "person of ordinary firmness." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *cf. Riley v. California*, 573 U.S. 373, 403 (2014)

11

("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'" (quoting *Boyd v. United States*, 116 U.S. 616, 625 (1886))).

Likewise, the Government's argument against objective chill simply does not exist.   The Government acknowledges that subjective chill is merely nondispositive "evidence," but stakes its entire argument on that claim anyway. *See* Dkt. 125 at 18 (citing *Constantine*, 411 F.3d at 500). But, one not need be subjectively chilled in order to be objectively chilled. *Constantine*, 411 F.3d at 500 (holding that the First Amendment may be violated even without subjective chill).

Nevertheless, the actual burdens on Dr. Abu Irshaid's association and speech are more than *de minimis* and amount to a subjective chill. Because of these border searches of his devices, Dr. Abu Irshaid avoids discussing Hamas, despite writing his PhD thesis about Hamas and coauthoring a study about Hamas through the U.S. Institute of Peace. *See* Dkt 137-2; Dkt. 137-1 at 60:20-61:15. He avoids making certain lawful statements that he believes the Government would use to scrutinize him and justify phone searches. *Id.* at 4. He instructs his own employees at AMP to do the same.  Dkt. 137-1 at 74:21-75-6. He also chooses to travel without his personal cell phone or laptop because he expects his electronics to be searched by the Government,  both because of the Government's general history of searching his phone dating back to the 2010s, and separately because of the two forensic searches at issue in this case. *See* Dkt 137-1 at 76:14-78:11. The cell phone he now travels with does not have access to the internet out of concern that the Government will use a phone's "cloud" connection to search "data stored on remote servers rather than on the device itself." *See id*. at 77:2-22; *Riley*, 573 U.S. at 397; *see Reno v. ACLU*, 521 U.S. 844, 851 (1997) (recognizing the internet as a "unique medium" for the dissemination of ideas). Forced by

12

the Government to travel without a smart phone, Dr. Abu Irshaid's speech is substantially limited while he's overseas. .

And the Government's argument that it did so only because of t the House Committee letter that initiated an "investigation" of AMP begs the Court to ignore the contents of the letter itself. *See* Dt. 125 at 22 (citing *George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013)). The House Committee letter is clear that it is the viewpoint that AMP expresses that is the basis of its investigation. The House Committee attacks what it calls "antisemitic rhetoric," such as chanting "From the River to the sea, Palestine will be free." Dkt. 137-10. It goes after "college campus protests" like the "coordinated pressure campaign against university administrations and trustees to divest from the Israeli state." *Id.* (internal quotations omitted). It denounces "efforts to promote the struggle for liberation against Zionism and US imperialism." Id. The letter is a laundry list of protected speech the House Committee despised for the viewpoints expressed in favor of Palestinians, and against the Israeli government. See e.g., *AAUP v. Rubio*, 802 F.Supp.3d 120, 175 (D. Mass. 2025) (holding that the government's targeting of speech critical of Israel is "viewpoint discriminatory" and "chills protected speech."). Even a non-partisan free speech organization has written a letter noting the House Committee's related attacks against not only AMP, but other organizations that engage in Palestine-related expression.[4] The House Committee's letter, because it was issued on the basis of AMP's views, dooms the Government's defense against Plaintiff's retaliation claim.

---

[4] *House Oversight Committee Continues Chilling Investigation into Student Groups and Nonprofits*, Foundation for Individual Rights and Expression (FIRE) (July 2, 2024), https://www.thefire.org/news/house-oversight-committee-continues-chilling-investigation-student-groups-and-nonprofits.

Dr. Abu Irshaid meets his burden of "proving that his exercise of his First Amendment rights was a substantial or motivating factor" in the Government's invasive, forensic searches. *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 654 (4th Cir. 2017).

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment.

Dated: March 13, 2026

/s/ Lena F. Masri
Lena F. Masri
lmasri@cair.com
Gadeir I. Abbas
gabbas@cair.com
Catherine Keck
ckeck@cair.com
Ahmad Kaki
akaki@cair.com
453 New Jersey Ave., S.E.
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 488-0833
**CAIR LEGAL DEFENSE FUND**

*Attorneys for Plaintiffs*

14