**DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

OSAMA ABU IRSHAID;

      Plaintiff,

      v.

PAMELA BONDI, Attorney General of the
United States, et al.;

      Defendants.

**Case No**.: 1:24-cv-1405 (MSN/WBP)

District Judge Michael S. Nachmanoff

**PLAINTIFF ABU IRSHAID'S REPLY IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Plaintiff Dr. Osama Abu Irshaid, by and through undersigned counsel, respectfully submits

his Reply in support of his Motion for Summary Judgment pursuant to Federal Rule of Civil

Procedure 56.

## INTRODUCTION

The Government's opposition rests on a premise unsupported by the law: that a collection of facts with no probative value can, when assembled, amount to reasonable suspicion. They cannot. The Government points to a congressional letter untethered to reliable evidence, a decade-old website reference (or, at best, an eight month-old website reference), and wholly innocuous conduct—traveling with a backup phone because of past searches and traveling to Jordan—and asks the Court to treat their sum as suspicion of ongoing criminal activity. But the totality-of-the-circumstances test does not permit transforming speculation into justification. Facts that do not support suspicion individually do not automatically become suspicious in the aggregate. Zero plus zero plus zero does not equal one.

A similar flaw underlies the Government's First Amendment analysis. Its reliance on a letter steeped in hostility toward protected expression invites the Court to ratify an impermissible framework—one where government action may be predicated on disfavored speech and association. That is not the law. There is no border exception to the First Amendment. The Government's arguments fail at their foundation, its opposition should be rejected, and summary judgment granted.

## ARGUMENT

As an initial matter, even under the Government's articulation of the standard, it has not met its burden. It is not settled in the Fourth Circuit that reasonable suspicion, rather than probable cause, governs invasive forensic searches. *United States v. Nkongho*, 107 F.4th 373, 382 (2024) ("[N]either *Kolsuz* nor *Aigbekaen* decided whether reasonable suspicion is enough to justify a forensic search or whether probable cause is required. … [W]e need not decide whether those rulings were correct."). While Dr. Abu Irshaid's position is that the Government has not met its

burden of showing it had even reasonable suspicion, the Government's showing fails even under that standard. The Government has not carried its burden under any applicable standard.

**I.      The Totality of the Circumstances Does Not Amount to Reasonable Suspicion.**

The Government emphasizes that Dr. Abu Irshaid discusses each reason for the search in isolation before viewing them together, but that criticism is misplaced. See *United States v. Rodrigeuz-Escalera,* 884 F.3d 661, 668 (7th Cir. 2018) ("[T]he totality of the circumstances analysis does not bar courts from discussing factors separately."). As the Government acknowledges, Dr. Abu Irshaid addresses the Government's failure to show reasonable suspicion under the totality of the circumstances. *See* Dkt 137 at 13-14. More importantly, the Government's reasons for the phone searches are as weak in the aggregate as they are individually, because facts that lack probative value do not become probative when viewed together. Its reasons are: 1) an investigation letter that required no evidence to issue and little to no indicia of reliability; 2) a ten-year-old appearance on an Al Qassam website,  and 3) Dr. Abu Irshaid's decision to travel with a backup phone to protect his privacy.[1] These reasons, each wholly insufficient on its own, do not amount to reasonable suspicion when combined.

In cases where several seemingly innocuous activities combined to create reasonable suspicion, it is always the case that at least one of those factors evidenced present criminal activity. *See, e.g., United States v. Cotterman*, 709 F.3d 952, 969 (9th Cir. 2013) (holding the plaintiff's

---

[1] Plaintiff disputes that the backup phone contributed to reasonable suspicion because the searching officers learned of the backup phone after requesting Abu Irshaid to provide his phone for a search. Plaintiff argues, nonetheless, that even considering the backup phone, the searching officers lacked reasonable suspicion. Plaintiff also disputes the Government's account of the August 2024 phone search. The TECS report—the searching officer's contemporaneous record of the forensic search—does not reference a backup phone, AMP, or the website screenshot. *See* Dkt. 137-9. Instead, it only references Abu Irshaid's travel to Jordan and otherwise relies on redactions. *Id.*

TECS alert, prior child-related conviction, frequent travels, crossing from a country known for sex tourism, and collection of electronic equipment, plus the parameters of the Operation Angel Watch program, taken collectively, gave rise to reasonable suspicion of criminal activity."). The present facts are more analogous to *Rodriguez-Escalera*. 884 F.3d 661. There, the Government's claimed to have reasonable suspicion that the plaintiffs were committing a drug crime. In support of this claim, the government offered that plaintiffs 1) "appeared nervous"; 2) were traveling from Los Angeles, a "major narcotics distribution center"; 3) presented conflicted travel plans; and 4) had multiple air fresheners in their car. *Id.* at 669. The Court, first discussing each reason separately, concluded that the reasons did not amount to reasonable suspicion. *Id.* The court concluded that some of the government's proffered reasons "could describe 'a very large category of presumably innocent travelers.'" *Id.* at 671 (citing *Reid*, 448 U.S. at 441). It further concluded that the other reasons "became considerably less probative by the time" of the search at issue due to "subsequent responses to [] direct questioning." *Id.* It concluded, in sum, that the absence of "criminal history, tips, or surveillance" favored a finding against reasonable suspicion. *Id.*

*Rodriguez-Escalera* is instructive. The Government's concerns about Dr. Abu Irshaid's backup phone "became considerably less probative" when Dr. Abu Irshaid explained that he traveled with a backup phone because the Government, many times in the past, conducted forensic searches of his devices and downloaded sensitive information, including family pictures. The same goes for his travel to Jordan. Indeed, the Government did not possess any "criminal history, tips[2], or surveillance" to support a finding of reasonable suspicion.

---

[2] Tips, as described below, are from sources that observe actual criminal activity, not from accusations in letters.

4

Further missing from the Government's initial brief and its opposition is any reference to the strict temporal limitations of reasonable suspicion. There must be reasonable suspicion of *ongoing* criminal activity. *See Abu Irshaid v. Garland*, Dkt. 30, 2025 WL 756544 at *9 (E.D. Va. Mar. 10, 2025) (citing *Reid v. Georgia*, 448 U.S. 438, 440 (1980)).  The Committee Letter, the website screenshot, and Dr. Abu Irshaid's backup phone do not "warrant[] further investigation" into ongoing criminal activity. *See U.S. v. Arvizu*, 534 U.S. 266, 274-75 (2002). The Committee Letter and website screenshot have no temporal relation to the forensic searches. The Committee Letter accuses Dr. Abu Irshaid of supporting terrorism based on conduct it claims took place in 2014. Dkt. 137-10. Similarly, even accepting the Government's version of facts, the website screenshot was taken months before the June search and contains a quote made by Dr. Abu Irshaid over ten years ago. Dkt. 137-8. "Inchoate suspicions and unparticularized hunches do not provide reasonable suspicion." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010) (internal quotations omitted). Neither of these facts has any bearing on what Dr. Abu Irshaid was suspected of doing when the Government searched his phone in June and August 2024.

The Government argues that "none of the legal authority [Plaintiff] cites stands for the proposition" that the Government could not search his phone for the stated reasons. *See* Dkt. 145 at 1, 10, and 15. That argument misstates the analysis. Plaintiff need not identify a case with identical facts; the Government bears the "burden of proving the reasonableness of the officer's suspicion."[3]*United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). The Government has not carried that burden here. The Government fails to explain how its reasons, even when taken together, amount to reasonable suspicion.

---

[3] This not a qualified immunity case. Even if Plaintiff bore the burden, he would not need to identify a case with nearly identical facts to obtain injunctive relief.

First, the Government argues that innocent explanations of suspicious conduct do not defeat reasonable suspicion. *See* Dkt. 145 at 9. While it is true that officers can "draw on their own experience and specialized training to make inferences," *id.* citing (*United States v. Arvizu*, 534 U.S. 266, 273 (2002), the deference owed to an officer is "not unlimited." *Simpson*, 609 F.3d at 1147. Indeed, "[s]ome facts must be outrightly dismissed as so innocent or susceptible to verifying interpretations as to be innocuous." *United States v. Lee*, 73 F.3d 1034, (10th Cir. 1996) (citing *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

Dr. Abu Irshaid does not argue that there are innocent explanations for otherwise suspicious behavior. He argues, instead, that his conduct is "so innocent" that it is innocuous. *Id.* There is nothing inherently suspicious about traveling with a backup phone- to protect private information, especially when the Government has conducted invasive searches without reason in the past. As the Government acknowledges, that would not materially change if we accept the Government's story that Abu Irshaid claimed to delete information from his phone because he still explained that he did it due to the many forensic searches he was subjected to in the past. Nothing in the Government's productions shows that the officers actually relied "on their own experience and specialized training" to decide that traveling with a backup phone was suspicious. *Arvizu* 534 U.S. at 273; *see United States v. Dell*, 487 Fed. App'x 440, 446–47 (10th Cir. 2012) ("[t]here is little to defer to where the investigating officer demonstrates no connection between his training and experience and the suspicion of illegality."). On the contrary, the searching officer acknowledged the reasonableness of this by "empathiz[ing]" with Dr. Abu Irshaid's choice to travel with a backup phone. Dkt. 137-9. Putting aside that the record as a whole shows the backup phone is a post hoc rationalization, even if the searching officer did indeed rely on the backup phone for the search, it does not support reasonable suspicion.

The same goes for Dr. Abu Irshaid's travel to Jordan. He does not argue that he has an innocent explanation for otherwise suspicious activity; he argues that traveling to Jordan is not suspicious. The Government's cases to the contrary do nothing to support that traveling to Jordan, even when considered with the other factors, is suspicious. It likens Dr. Abu Irshaid's travel to Jordan to *United States v. Montero-Camargo*, where the court upheld a finding of reasonable suspicion, in part, because the defendant was stopped in a "high crime" area. 208 F.3d 1122, 1139 (9th Cir. 2000). But Dr. Abu Irshaid was not stopped in a high crime area; he was stopped at the border. He was not even returning from a high crime area; he was returning from a country that allegedly borders "areas of active unrest." Dkt. 137-6. The Government cannot point to a single case where reasonable suspicion was upheld, even in part, based on travel to a country adjacent to another country the Government views with suspicion. *See* Dkt. 145 at 9-10 (citing *Wardlow*, 528 U.S. at 124 (holding that "presence *in an area of criminal* activity" can contribute to reasonable suspicion) (emphasis added)). And, again, the Government presents no evidence that the searching officers relied on expertise or training to conclude that a family trip to Jordan warrants suspicion.

The Government next turns to the Committee Letter. It first argues that an officer without personal knowledge of the underlying facts can rely on "information provided by a different enforcement entity." *See* Dkt. 145. For that proposition, it cites *United States v. Hensley* and *United States v. Gaither*. 469 U.S. 221, 229-232 (1985); 527 F.2d 456, 458 (4th Cir. 1975). These cases do not involve, as here, accusations made by another branch of government; they involve reliance on actual observations by law enforcement agencies. *Gaither*, for example, involved FBI agents who witnessed a defendant "leading the bank robbers to the bank, waiting in his car outside the bank, and fleeing as the robbers were apprehended." *Gaither,* 527 F.2d at 458. Indeed, the

Committee Letter's allegations about Dr. Abu Irshaid are not based on any observations but on speculation and his and AMP's lawful expression. *See* Dkt. 137, Statement of Facts at ¶¶ 25-31.

Committee Letter is far from analogous to cases involving tips to law enforcement. "Tip" precedent concerns witnesses who claim to have personally observed some criminal activity and report it to law enforcement. *See, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 272 (2000). Here, the Committee Letter is not based on observations, but on a series of untested accusations. See Dkt. 137-10. To the extent the Court finds tip precedent relevant, the Committee Letter has little to no "indicia of reliability." *See Florida v. J.L.*, 529 U.S. 266, 272 (2000). It contains none of the traditional hallmarks associated with a reliable tip.

Despite the Government's claim to the contrary, Congressman Comer cannot "be held responsible if h[is] allegations turn out to be fabricated." *Id.* The Speech or Debate Clause provides absolute immunity for congresspeople against civil actions for "legislative activity," including when a House Committee exercises its "power to investigate." See *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975). There is no mechanism for holding the House Committee accountable for the accuracy of its allegations.

The Government then cites *United States v. Mitchell* for the proposition that a publicly issued tip increases the indicia of reliability. 963 F.3d 385, 394 (4th Cir. 2020); Dkt. 145 at 11-12. But that is not the holding of *Mitchell*. The *Mitchell* court held that reliability increased after a bystander's public report specifically because the bystander "expos[ed] himself or herself to potential retaliation." *Id.* The House Committee, as explained above, has no such exposure.

Finally, the Government suggests that the Committee letter "provides substantial detail about the individuals and the alleged criminal activity it describes." Dkt. 145 at 12 (citing *United States v. Elston*, 479 F.3d 314, 318 (4th Cir. 2007)). It does not. The Letter is "replete," not with

"citations to source material," but with unverified accusations by third parties. *See* Dkt. 145 at 12. For example, it claims that AMP is the "controlling entity of National Students for Justice in Palestine," but cites an allegation in a lawsuit[4] for this claim. Dkt. 137-10. AMP has no official relation with NSJP, and the Government does not dispute that fact in its opposition. It then claims that AMP is the "alter ego of the Islamic Association of Palestine" and cites a 2014 article by the Anti-Defamation league for this claim. *Id.* There is no "substantial detail" or "source material" to be found. The Government fails to cite a single case where a court found sufficient indicia of reliability on facts similar to the ones here. The Committee Letter is not a reliable "tip" to support reasonable suspicion of ongoing criminal activity.

*    *    *

The totality of the circumstances shows the Government acted not on reliable, observable information, but on accusations and hunches. Even if the court finds that the Government's hunches amount to generalized reasonable suspicion, no evidence supports reasonable suspicion of an ongoing crime. Dr. Abu Irshaid is entitled to summary judgment on his Fourth Amendment claim because the searching officers lacked reasonable suspicion to believe he was committing or about to commit a crime when they forensically searched his phones.

## II.    The Government Misinterprets *Ickes* and the Applicable First Amendment Framework.

The Government continues to rely on its incorrect interpretation of *Ickes*. Dr. Abu Irshaid addressed this argument in his Opposition to the Government's for Summary Judgment. *See* Dkt. 146 at 8-9. That argument is summarized below.

---

[4] That lawsuit has since been dismissed by this Court for failing to plausibly state a claim. *See Parizer v. AJP Educational Foundation, Inc.*, No. 1:24-cv-00724 (E.D. Va. 2024).

*Ickes* held that the potential existence of First Amendment protected material on a phone cannot bar a forensic search when the searching officer otherwise had the requisite suspicion to search the phone. *See United States v. Ickes*, 393 F.3d 501, 506. The plaintiff argued that his phone contained "inherently expressive" material and, thus, could not be searched. *Id.* The court concluded that "[f]ollowing Ickes' logic would create a sanctuary at the border for all expressive material—even for terrorist plans." Contrary to the Government's unsupported suggestions, Dr. Abu Irshaid does not seek to create such a sanctuary.

Instead, following the established First Amendment retaliation framework, Dr. Abu Irshaid argues that his First Amendment-protected activity cannot *motivate* an adverse government action like an invasive phone search. This would not create a blanket prohibition against forensic searches; it would prohibit the Government from targeting First Amendment-protected activity. *See Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (holding that searches at the border for lawful associations "implicate the protections of the First Amendment.").

The Government unlawfully retaliated against Dr. Abu Irshaid because of his association with a lawful organization. In an attempt to rebut Dr. Abu Irshaid's claim, the Government, again, turns to *Tabbaa*. 509 F.3d 89. As Plaintiff made clear in his Opposition to the Government's Motion for Summary Judgment, *Tabbaa* supports, rather than diminishes, Dr. Abu Irshaid's First Amendment claim. *See* Dkt. 146 at 9-10. First, the *Tabbaa* court explicitly held that the border searches *did* burden the plaintiffs' associational rights because the "penalty" of border searches "in itself can constitute a substantial burden, even if the government did not prevent the group from associating and regardless of any future chilling effect." *Id.* at 101. Second, the *Tabbaa* holding affects only how the government may burden associational rights at the border when the associational rights are: (1) related to the travel and (2) the burden is narrowly tailored to the

10

Government's concerns about the associations a person makes while traveling. *Id.* There, the burdens were less severe than those at issue here and were tied to specific evidence of an articulable threat. *Id.*

The appropriate framework for a First Amendment retaliation claim, even at the border, is *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 500 (4th Cir. 2005). Absent the Government's attempt to shoehorn this case into the *Ickes* analysis, the Government does not cite a single case suggesting that an alternative standard applies. When the Government finally turns to *Constantine*, it makes the same mistakes as it has in the past.

First, on the "chill" element, objective chill of First Amendment rights can exist even without subjective chill. *See Constantine*, 411 F.3d at 500. Although the Government acknowledges that subjective chill is merely "evidence" of objective chill, the Government stakes its entire argument on its claim that Abu Irshaid was not subjectively chilled. *See* Dkt. 125 at 18 (citing *Constantine*, 411 F.3d at 500). The actual burdens of Dr. Abu Irshaid's association amount to a subjective chill. Dr. Abu Irshaid changes how he speaks and instructs AMP employees to change how they speak because of the Government's searches of his phone. *See* Dkt 137-2; Dkt. 137-1 at 60:20- 61:15. He further travels with a backup phone because of the searches and, as a result, his speech is substantially limited while he's overseas. *See* Dkt 137-1 at 76:14-78:11.

Second, Dr. Abu Irshaid's First Amendment activity caused the forensic searches. The Government's argument that investigations, rather than Dr. Abu Irshaid's expression, led to the searches ignores that those investigations themselves were premised on his protected expression. The Government cannot rely on investigations triggered by protected activity as a basis for adverse action and then treat those investigations as independent justification. The House Committee makes clear that it placed its sights on Dr. Abu Irshaid and AMP because it disfavored their speech.

11

*See* Dkt. 137-10. The Government chose to rely on a letter that expresses animus toward protected First Amendment activity. As such, it cannot now suggest that "obvious, alternative explanations" besides protected speech justify its invasive forensic searches. *See* Dkt. 145 at 15 (citing *George v. Rehiel*, 738 F.3d 562, 586 (3d Cir. 2013).

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Summary Judgment on both his Fourth Amendment and First Amendment claims.

Dated: March 19, 2026

/s/ Lena F. Masri
Lena F. Masri
lmasri@cair.com
Gadeir I. Abbas
gabbas@cair.com
Catherine Keck
ckeck@cair.com
Ahmad Kaki
akaki@cair.com
453 New Jersey Ave., S.E.
Washington, DC 20003
Phone: (202) 742-6420
Fax: (202) 488-0833
**CAIR LEGAL DEFENSE FUND**

*Attorneys for Plaintiffs*