IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

OSAMA ABU IRSHAID,
      *Plaintiff*,

    v.

MARKWAYNE MULLIN, ET AL,
      *Defendants*.

No. 1:24-cv-1405-MSN-WBP

### MEMORANDUM OPINION AND ORDER

Plaintiff Osama Abu Irshaid has asserted two claims against United States Government defendants for violation of the Fourth Amendment and First Amendment retaliation arising out of defendants' searches of his cell phones at Washington Dulles International Airport in 2024. ECF 115. A bench trial was held on May 18, 2026, at which time the Court took this matter under advisement to resolve the claims. After consideration of the evidence presented, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 and determines that Plaintiff is entitled to judgment as to his Fourth Amendment claim (Count I) and Defendants are entitled to judgment on the First Amendment claim (Count II). The Court will direct the parties to provide supplemental briefing on the appropriate remedies in this matter.

**I.**     **FINDINGS OF FACT**[1]

    **A. Plaintiff's Background**

1. Plaintiff Dr. Osama Abu Irshaid is the Executive Director of American Muslims for Palestine. ECF 169 2 n.2 ("MSJ Order") at 2.

---

[1]     In ruling on summary judgment, the Court determined numerous facts to be undisputed and established in this case pursuant to Federal Rule of Civil Procedure 56(g). MSJ Order at 2 n.2. The Court restates the established facts as necessary herein.

2. AMP is a nonprofit organization dedicated to public education regarding the "just cause of Palestine and Palestinian rights and advocat[ing] for self-determination, justice, and liberation." *Id*. AMP engages in educational programming, political boycott campaigns, and protests in furtherance of its mission and "to call attention to Israel's crimes against Palestinians and push for change on American policy towards Palestine and Israel." *Id*.

3. As AMP Executive Director, Plaintiff participates in conferences and fundraisers, gives lectures and sermons, makes media appearances, and represents AMP at protests and other events. *Id*.

4. Plaintiff is a United States citizen. DEX 1 at CBP0000001.

**B.  June 3, 2024, Border Search of Plaintiff's Phone**

5. On June 3, 2024, Plaintiff arrived at Washington Dulles International Airport on a flight from Doha, Qatar. *Id*.

6. He was met by United States Customs and Border Protection ("CBP") officers prior to primary border inspection and was escorted to secondary inspection. *Id*. One of the officers was CBP Officer Scott Cowles. Trial Tr. at 27:15-18.

7. Office Cowles had advanced knowledge of Plaintiff's arrival. *Id*. at 20:5-8. In secondary inspection, Cowles questioned Plaintiff on various topics for about one hour. MSJ Order at 2.

8. Officer Cowles asked if Plaintiff was in possession of a letter from Congressman James Comer of the House Committee on Oversight and Accountability, which Plaintiff confirmed that he had received. *Id*.

2

9. The letter, which was dated May 29, 2024, and addressed to "National Students for Justice in Palestine[,] c/o Dr. Osama Abuirshaid[,] American Muslims for Palestine," stated things such as:

   a. The Committee was "conducting oversight of the funding sources of groups supporting illegal activities around the country, including at institutions of higher education, by individuals spouting pro-Hamas propaganda and engaged in antisemitic harassment and violations of the civil rights of Jewish students."

   b. "At illegal encampments on college campuses, many individuals have championed antisemitic rhetoric calling for the elimination of Jewish people from Israel, employing 'From the river to the sea, Palestine will be free' and 'Death to Israel' as rallying cries."

   c. The Committee was "concerned that organizations promulgating pro-Hamas propaganda and engaging in illegal activities at institutions of higher education might be receiving funding or other support from foreign or domestic sources which support the aims of Hamas or other foreign terrorist organizations."

   d. The Committee was seeking "documents and information from your organization to facilitate oversight into how pro-Hamas propaganda and illegal encampments are being funded."

   e. National Students for Justice in Palestine ("National SJP") was "founded and controlled by [AMP]," citing the lawsuit *Parizer v. AJP Educational Foundation, Inc.*, No. 1:24-cv-00724 (E.D. Va. 2024).

   f. AMP had "substantial ties to Hamas via its financial sponsor" AJP Educational Foundation, Inc, which was "currently under investigation by the Virginia Attorney General for violating state charitable solicitation laws and 'benefiting or providing support to terrorist organizations.'"

   g. "According to the Anti-Defamation League, AMP is the alter ego of the Islamic Association of Palestine [], once the main propaganda arm for Hamas in the U.S., which was dissolved in 2004 after being implicated in terror finance."

   *Id.* at 2–3. The letter closed with a request for documents, noting that the Committee had "broad authority to investigate 'any matter' at 'any time' under House Rule X." *Id.*

10. At trial, Officer Cowles testified that he did not do anything to verify the contents of the letter. Cowles did not know much about SJP or what they did but believed that AMP was

3

"essentially the [IAP], which was found civilly liable for the death of an American citizen." Cowles was unsure of "any criminal suspicions of [AMP]." He stated "I tried to go into [the interview] with an open mind, but I wasn't sure. But if Congress was willing to publish the letter, it was at least worth me asking." Trial Tr. at 31:16-32:18. Cowles was not previously familiar with Plaintiff but had performed some research in advance of Plaintiff's arrival and knew that he had a "public profile." *Id*. at 23:3-14.

11. Cowles believed that the letter was significant not because it was true or false, but rather because it was recent and specifically mentioned terrorism and national security. *Id*. at 42:24-43:7, 77:5-8. Cowles felt it was "necessary to draw to [Plaintiff's] attention" given his duties as a CBP officer ("being tasked with countering terrorism") and "the fact that Congress was willing to publish this letter openly." *Id*. Cowles was not aware of "what Congress had to substantiate" the letter and thought "it would be a good opportunity to let the traveler at least address it." *Id*. at 43:10-14; *see also* DEX 1 at CBP0000017 (noting "information related to an ongoing Congressional inquiry" as one reason for requesting approval for forensic search).

12. Officer Cowles and Plaintiff did not discuss the letter in much depth. Plaintiff was dismissive of the letter and told Officer Cowles that the letter was a "misunderstanding" and amounted to targeting of Plaintiff. Trial Tr. at 31:12-15. Plaintiff explained to Cowles that the letter's contents were baseless and reflected disagreement within the Congressional committee between Democrats and Republicans "on this issue." *Id*. at 114:8-14.

13. Officer Cowles also asked Plaintiff about the appearance of his photograph and a quote attributed to him on the public website of the Al-Qassam Brigades, an entity designated as

a foreign terrorist organization by the State Department in 1997. Trial Tr. at 43:18-21; MSJ Order at 3–4.

14. A screenshot of the website shows that (1) the entire website is in Arabic; (2) the quote attributed to Plaintiff is dated July 19, 2014; and (3) other links on the page are dated October 18, 2023. Officer Cowles received this screenshot from the CBP National Targeting Center. Trial Tr. at 21:11-13; MSJ Order at 4; DEX 3.

15. The meaning of the screenshot quote is unknown to the Court, but a coworker told Officer Cowles what the quote meant and that Cowles thought it was "unremarkable." Trial Tr. at 21:22-22:8.

16. Officer Cowles testified that the screenshot did not create a national security concern but the fact that Plaintiff appeared on the website was remarkable, and it was a concern that Plaintiff was on the website of a designated foreign terrorist organization. *Id*. at 22:14-18, 25:12-17. Cowles stated he had no reason to believe that Plaintiff knew he was on the website, wanted to make Plaintiff aware of the fact of his appearance if Plaintiff did not already know, and sought to find out what Plaintiff did to affirmatively get on the website. *Id*. at 23:21-25, 24:8-11.

17. Plaintiff explained to Officer Cowles that he was "familiar with the situation but had no part in its posting and claimed that the article was likely taken from another publication and then re-published." MSJ Order at 4. Plaintiff was not sure how it got there.[2] Trial Tr. at 26:3-6.

---

[2]    Plaintiff further testified at trial that officials had shown him the screenshot during his citizenship interview in 2015, which indicated that the government knew about it since then. Trial Tr. at 111:1-11. This fact is not relevant because there is no indication that Officer Cowles knew of it at the time of the search.

18. Officer Cowles felt Plaintiff was not "being entirely candid" about the website not because "he had sought out Al-Qassam" but because Cowles expected Plaintiff to state that he knew someone who may have referred him to the website as a contributor (and identify that person). Trial Tr. at 26:17-27:2. Cowles did not know "why Hamas quotes certain people or not" but believed that "if Hamas was trying to portray themselves a certain way, they would pick a certain contributor." *Id*. at 22:21, 44:24-45:2.

19. The interview included unrelated discussion of Plaintiff's contacts while in Qatar. MSJ Order at 4. During this, Officer Cowles "told [Plaintiff] that he was likely familiar with electronic media searches at the border and asked if a review would indicate with whom he had contact." *Id*.

20. Plaintiff told Officer Cowles, and Officer Cowles believed, that he was traveling with two cell phones and that one was a backup device.[3] *Id*.

21. Although Officer Cowles could not remember the precise words used by Plaintiff, the impression that he got from Plaintiff's statements was that Plaintiff removed content from the cell phone that Plaintiff was holding in his hand while in the interview room. Trial Tr. at 34:10-15. Plaintiff stated to Cowles that a previous CBP officer had reviewed personal or family content on his phone "and that was why he removed information" from the device that Plaintiff was holding. *Id*. at 34:3-9.

---

[3] That Plaintiff told Cowles that he was traveling with two phones, including a backup, was previously deemed established in this case by the Court pursuant to Rule 56(g). MSJ Order at 4. This determination is conclusive and not subject to attack. It is properly undisputed on the summary judgment record, as Plaintiff did not deny the specific account in the CBP TECS reports and his own declaration offered only that the phone he was "carrying" was a backup—not that he was not traveling with multiple phones. ECF 125-1 at CBP0000016, -17; ECF 137-3 ¶ 12. Accordingly, Plaintiff cannot undermine this determination through his trial testimony.

Moreover, the Court finds Officer Cowles' trial testimony that Plaintiff traveled with two phones to be credible and supported by the record evidence. The Court finds Plaintiff's testimony suggesting that he traveled with only one phone on June 3, 2024, to not be credible.

22. Plaintiff also told Officer Cowles that he traveled with a backup phone because he did not want the government to have access to his personal information, family photos, and messages and because the government would seize his phone for extended periods of time.[4] *Id*. at 115:9-22.

23. Cowles believed Plaintiff's privacy concerns were legitimate and agreed that it was common for people to travel internationally with different devices, *e.g.*, *id*. at 35:1-4, 36:3-11, 37:3, 21-24, although Cowles also believed that Plaintiff was trying to conceal contacts from inspection and was "sort of front loading an excuse as to why I might find a very sterile device." *Id*. at 34:19-23, 50:2-5.

24. The phone that Plaintiff was holding during the interview was a Samsung Galaxy A14 cell phone (IMEI -6928). *Id*. at 50:13-19; MSJ Order at 5. Officer Cowles believed this was Plaintiff's "everyday" phone. Trial Tr. at 38:9-11.

25. Officer Cowles proceeded to perform a "basic" or "manual" inspection of the phone that Plaintiff was holding during the interview after receiving its passcode from Plaintiff.[5] *See, e.g.*, *id*. at 51:7-11, 37:12-17, 38:5-8; MSJ Order at 5.

26. Plaintiff testified that the phone searched was his backup phone and that this device did not contain family photos but valuable photos from his first ever visit to Palestine in August 2023.[6] Trial Tr. at 114:23-115:6, 116:7-117:9.

---

[4]    The Court credits both Officer Cowles' and Plaintiff's accounts of what was said regarding the reason for the backup phone and removal of information. That all of the statements recounted above in Findings ¶ 20 and 21 were made by Plaintiff is supported by documentary evidence. DEX 1 at CBP0000016, -17.

[5]    *See infra* Section II.A. Defendants have previously agreed that the search performed by Officer Cowles was simply an "advanced" or "forensic" search. MSJ Order at 5. Officer Cowles' trial testimony indicates that he first performed a "basic" inspection of Plaintiff's phone.

[6]    Nothing suggests that Officer Cowles knew of Plaintiff's "valuable information" explanation for nondeletion, but Plaintiff's testimony on this point is relevant to what content was on the searched phone.

27. Officer Cowles expected that "a person like Dr. Abu Irshaid to have some content on his phone[,] [m]aybe not everything" but found during the basic inspection of Plaintiff's Samsung phone that there was a "suspiciously minute amount of information on the device, which led me to believe that he had deleted much, much more than personal information." *Id*. at 37:12-17. Officer Cowles felt the information was "suspiciously minute . . . for someone who would claim that they were working in Doha as an educator, I expected to see quite a bit more." *Id*. at 38:6-8.

28. Officer Cowles was familiar with CBP Directive 3340-049A (January 4, 2018), including Section 5.1.4, governing "advanced" searches. *Id*. at 52:2-8; DEX 4. Officer Cowles did not believe that there was "reasonable suspicion of activity in violation of the laws enforced or administered by CBP," but felt that there was a "terrorism" or "national security concern" with Plaintiff that would permit an "advanced" search. *Id*. at 39:16-40:9, 52:23:53-1, 57:7:13.

29. Officer Cowles thus sought and received supervisory approval for an "advanced" search. *Id.* at 53:4-15.

30. Officer Cowles performed an "advanced" or "forensic" search of Plaintiff's Samsung phone. *E.g., id*. at 51:4-6; MSJ Order at 5.

31. After about two hours, Cowles returned and told Plaintiff that inspection of his Samsung phone was not complete and that his phone would be returned at a later date, but the phone was not returned until after this case had been filed. MSJ Order at 5.

32. Officer Cowles considered searching Plaintiff's second phone (phone number -6030) on June 3, 2024, but decided against doing so because Cowles felt that Plaintiff had been very pleasant and cooperative during the inspection and believed that "repay[ing] his courtesy"

8

would create some rapport or relationship that would lead Plaintiff to "return the favor" in the future in terms of providing information. *Id*.; Trial Tr. at 56:11-57:6.

### C.  August 8, 2024, Border Search of Plaintiff's Phones

33. On August 8, 2024, Plaintiff arrived at Dulles on a flight from Amman, Jordan, by way of London Heathrow Airport. MSJ Order at 5.

34. Plaintiff had spent thirty-nine days in Jordan after departing the United Sates on July 1, 2024, on his first trip abroad following his June 3, 2024, encounter with Officer Cowles. Trial Tr. at 62:8; DEX 1 at CBP0000007; DEX 5.

35. Plaintiff was again intercepted by CBP officers and escorted to secondary inspection. MSJ Order at 5. One of the officers was CBP Officer Ali Algabyali. Trial Tr. at 60:4-5.

36. Plaintiff was selected for secondary inspection based on the details of the June 3, 2024, secondary inspection. Trial Tr. at 61:14-18.

37. Officer Algabyali did not discuss the Comer letter or Al-Qassam Brigades screenshot with Plaintiff. Trial Tr. at 72:12-19.

38. Officer Algabyali questioned Plaintiff on the nature of his trip to Jordan and he explained that it was for pleasure. MSJ Order at 5. Plaintiff told Officer Algabyali that he had visited family and met about 100 people, but Officer Algabyali did not believe Plaintiff and thought "it could have also been a business trip" because Plaintiff did not want to disclose any information about the 100 people he had met. Trial Tr. at 62:20-24, 63:4-64:7. Officer Algabyali also knew that "during that time, there were issues going on in the Middle East so that's another reason that also made me think a little more." *Id*. at 64:11-17.

39. Plaintiff also expressed some frustration with being repeatedly questioned by CBP. MSJ Order at 5.

40. Plaintiff was traveling with two cell phones on August 8, 2024. *E.g.*, Trial Tr. at 65:6-10.

41. At some point during the interview, Plaintiff "openly pulled out his [Samsung Galaxy A15 cell phone] and said 'I know you will search this phone so here it is.'" *Id*. at 69:6-9; DEX 1 at CBP0000006; MSJ Order at 6.

42. Officer Algabyali asked if Plaintiff had other electronic devices, to which Plaintiff explained that he was traveling with a back-up phone and that his new Nokia phone was in his checked luggage. *Id*.

43. Officer Algabyali felt that "people who are traveling with burner phones are trying to hide something." Trial Tr. at 66:19-20. He also believed that it was suspicious of Plaintiff to offer a phone for inspection by CBP. *Id*. at 65:20-66:2.

44. Officer Algabyali was familiar with CBP Directive 3340-049A (January 4, 2018), including Section 5.1.4, governing "advanced" searches. *Id*. at 83:4-12; DEX 4.

45. Officer Algabyali testified that he believed Plaintiff may have been violating export-import laws enforced by CBP but did not have any specific items or laws in mind. Trial Tr. at 75:16-76:11. Algabyali also testified that there was a national security concern with Plaintiff due to the Al Qassam Brigades screenshot and Comer letter. *Id*. at 72:9-11, 75:16-22.

46. Officer Algabyali sought and received supervisory approval to perform advanced searches of Plaintiff's two cell phones. *E.g.*, *id*. at 75:7-10, 87:7-17. Algabyali performed the advanced searches and returned both phones after about two hours. *Id*.; MSJ Order at 6.

### D.  CBP Port Director Waugh's Testimony

47. Christine Waugh is the CBP Port Director for the Port of Washington—Dulles, Virginia and testified as a 30(b)(6) organizational witness at trial. ECF 180 at 2; Trial Tr. at 97:4-8.

48. Director Waugh was familiar with CBP Directive 3340-049A (January 4, 2018), including Section 5.1.4, governing "advanced" searches. Trial Tr. at 93:23-24; DEX 4.

49. Director Waugh was not present at the searches at issue in this case and had no reason to disagree with the CBP reports documenting those searches or the testimony of the searching officers. Trial Tr. at 101:10-19.

50. Director Waugh testified that "when there's a national security concern, that can develop into reasonable suspicion" and also agreed that "you only need a national security concern to conduct [a] search" "with the proper supervisory approval." Trial Tr. at 94:14-95:16.

51. Waugh stated that the Comer letter contributed to the totality of circumstances leading to the decision to perform the advanced searches of Plaintiff's phones. *Id*. at 97:14-17, 24-98:2.

52. When asked what CBP understood AMP's messaging to be, Waugh stated that she could not answer the question because she did not know. *Id*. at 99:11-16.

53. When asked if she understood certain statements in the Comer letter to be "the type of rhetoric that [AMP uses]," Waugh stated that she was not familiar with AMP, so she did not know. *Id*. at 99:17-100:2.

54. When asked if she understood that "one of the reasons that CBP stopped Dr. Abu Irshaid in connection with this letter is because his organization uses the type of rhetoric expressed in this letter," Waugh stated that "if it's true, then it would certainly be something that we would want to take a look at." *Id*. at 100:15-20.

### E. Impact of Searches on Plaintiff

55. Plaintiff attests that he is now "more selective about the conference and media appearances he makes in his capacity as Executive Director of AMP because of the Government's

11

searches of his phone and the other scrutiny he faces at the border," but he remains heavily involved in AMP's activities and AMP itself remains very active in its mission. MSJ Order at 6.

56. Although he is an academic expert on Hamas, he is "very careful now about discussing" it and other Palestinian geopolitical issues "because I am always cognizant that this could be used against me." *Id*. He also states that he avoids using "controversial phrases" such as "From the river to the sea, Palestine will be free," because of his belief that he will be targeted for border searches, but he has "never thought it's helpful for our messaging[.]" *Id*. at 6–7

57. Plaintiff has repeatedly attributed changes in his expressive behaviors to the October 7 terrorist attacks. *Id*.

58. While Plaintiff states that he travels with a "dumb" basic phone because of the searches, Trial Tr. at 134:20-24, 135:3-9, which limits his speech while overseas, MSJ Order at 7, he also states that he was traveling with a basic phone in 2022. *Id*.

## II.     CONCLUSIONS OF LAW

### A. Count I – Fourth Amendment

Count I of Plaintiff's Second Amended Complaint asserts that Defendants' June 3, 2024, and August 8, 2024, searches of his cell phones violated his Fourth Amendment rights.[7] ECF 115 ¶¶ 192–204. The Fourth Amendment protects the "right of the [people] to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and generally

---

[7]     Plaintiff's Fourth Amendment claims originated with the assertion that his phones were searched for the sole reason that he was included in the Terrorist Screening Dataset. ECF 1; ECF 19; ECF 30 at 18–19. As this case currently stands, it has nothing to do with the Terrorist Screening Dataset, as Defendants have disavowed any notion that they rely on Plaintiff's inclusion (or non-inclusion) in the Terrorist Screening Dataset as to both the Fourth Amendment and First Amendment claims.

requires an officer to obtain a warrant, supported by probable cause, before searching or seizing a person's property. *Riley v. Cal.*, 573 U.S. 373, 382 (2014). An exception applies at the nation's borders, where border agents "need no warrant, nor any individualized suspicion, to conduct 'routine searches of the persons and effects of entrants.'" *United States v. Nkongho*, 107 F. 4th 373, 381 (4th Cir. 2024); *United States v. Nkongho*, 2021 WL 4421883, at *4 (D. Md. Sept. 27, 2021) (collecting cases) ("In the Fourth Circuit, manual or conventional searches of electronic devices have been found routine, while forensic searches or imaging of such devices are considered nonroutine").

But still, while "the government's interests at the border are paramount, and forensically searching a traveler's electronic devices may be vital to promoting those interests . . . given the sheer mass of intimate information available in a forensic search," a forensic search of electronic devices at the border requires the government to show that it had "individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband."[8] *Nkongho*, 107 F. 4th at 382 (quoting *United States v. Aigbekaen*, 943 F. 3d 713, 721 (4th Cir. 2019)); *Aigbekaen*, 943 F. 3d at 721 ("If a nonroutine search becomes too 'attenuated' from these historic rationales, it 'no longer [will] fall under' the exception."). Forensic searches thus must satisfy two requirements under the border exception: "(1) reasonable suspicion and (2) a nexus to the sovereign interests underlying the border search exception." *Nkongho*, 2021 WL 4421883, at *4.

---

[8]    Plaintiff proposes that the Court recognize that "the border search exception 'is limited in scope to searches for contraband'" and that there must be reasonable suspicion that "the device itself contains contraband." ECF 177 Conclusions ¶ 2 (citing *United States v. Cano*, 934 F. 3d 1002, 1020 (9th Cir. 2019)). The Ninth Circuit recognizes such a limitation but the rule in the Fourth Circuit is not so narrow. *Nkongho*, 107 F. 4th at 381 & n.2 (a phone "may contain evidence of ongoing transnational criminal activity, such as communications between conspirators").

13

Reasonable suspicion is a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). It exists when there are "'specific and articulable facts' known to the searching officers, along with 'rational inferences from those facts,' [that] demonstrate that criminal activity is afoot.'" *El Ali v. Barr*, 473 F. Supp. 3d 479, 520 (D. Md. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "'A mere hunch is not enough' and "[w]hether reasonable suspicion exists depends on the totality of the circumstances observed by a reasonable law enforcement officer in the agent's position." *Id*. (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

In this case, Defendants contend that the searches of Plaintiff's phones were permissible because there was reasonable suspicion to believe that Plaintiff was engaged in terrorism financing.[9] *E.g.*, ECF 174 ¶ 39 n.5. Terrorism financing is obviously a crime, *e.g.*, 18 U.S.C. § 2339C, and one with clear national security implications such that the border exception for forensic device searches could theoretically apply. However, the evidence marshaled by Defendants— focused on the Comer letter, Al-Qassam Brigades screenshot, Plaintiff's statements regarding deleting information or carrying a backup phone, and (for the August 8, 2024, searches only) Plaintiff's travel to Jordan—does not rise to the level of reasonable suspicion.

First, the Comer letter contributes little to the calculus. On its best day, the letter simply provides that AMP was under investigation by the House Committee on Oversight and Accountability and Virginia Attorney General. Indeed, this is consistent with how the letter was actually regarded by Officer Cowles. As all parties acknowledge, ECF 174 ¶ 38; ECF 177

---

[9] At trial and at various times in this litigation, the issue of whether CBP Directive 3340-049A permits advanced searches without reasonable suspicion and only on the basis of a "national security concern" has arisen. The Court does not understand Defendants to have asserted that the searches here did not violate the Fourth Amendment because there was simply a free-floating "national security concern" detached from any crime. Nor is the Court aware of any case law that supports such a principle. What the CBP witnesses subjectively believed was permitted under CBP Directive 3340-049A or the Fourth Amendment is irrelevant, as the reasonable suspicion inquiry is an objective one.

14

Conclusions ¶ 6, mere "'knowledge that a suspect is merely under investigation' does not demonstrate reasonable suspicion without additional facts." *United States v. Peters*, 60 F. 4th 855, 865 (4th Cir. 2023) ("holding otherwise would allow 'any person with any sort of criminal record . . . [to] be subjected to an investigative stop . . . at any time without the need for any other justification at all'"); *United States v. Foster*, 634 F. 3d 243, 247 (observing "a person's Fourth Amendment rights cannot be lessened simply because he or she is 'under investigation' by the police," noting that such is "an even more tentative, potentially innocuous step towards determining criminal activity" than knowledge of past arrests or convictions).

Here, that principle is particularly apt—and the probative value of the letter particularly small—for several related reasons. For one, CBP officers did not corroborate the Comer letter's content at any time and did not extensively question Plaintiff about it. The letter also accused AMP, not Plaintiff directly, and even so, in tenuous ways not entirely relevant to criminality. And, the letter was not directed to CBP, and Congress is neither a law enforcement entity nor a tipster in the traditional sense in the Fourth Amendment analysis as a matter of the constitutional separation of powers.[10] That is because the legislative branch has its own legitimate prerogatives and purposes apart from that of federal law enforcement agencies and further enjoys significant immunity in aid of performing such duties effectively. *See, e.g.*, DEX 2 at CBP-000076 (letter stating that "[t]he Committee on Oversight and Accountability is the principal oversight committee of the U.S. House of Representatives and has broad authority to investigate 'any matter' at 'any time' under House Rule X"); *Fla. v. J.L.*, 529 U.S. 266, 270 (2000) (explaining that "known

---

[10] The House and Virginia Attorney General investigations are not even criminal in nature, which makes the fact of their existence an "even more tenuous, potentially innocuous step towards determining criminal activity" than the existence of an ordinary criminal investigation. *Foster*, 634 F. 3d at 247; Va. Code § 2.2-511. The Court also notes that no part of the Comer letter, nor any evidence at trial, suggests that AMP or Plaintiff have been formally investigated, charged, or accused of criminal wrongdoing by law enforcement officials.

informant[s]" may be deemed reliable because their "reputation can be assessed" and they can be "held responsible if [their] allegations turn out to be fabricated"); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503–04 (1975) (absolute immunity from criminal and civil actions attaches to "legislative activity" including the "power to investigate").

The remaining evidence does not provide the requisite "additional facts." The appearance of Plaintiff's photograph (a headshot that appears to be a frame grab from a video) and quotation on the Al-Qassam Brigades website raises some legitimate concerns, but those concerns must necessarily be very slight under the circumstances. The post depicting Plaintiff was more than ten years old at the time of the searches, which detracts significantly from any support it may lend to an inference of ongoing criminal activity.[11] The meaning of the Arabic quotation apparently attributed to Plaintiff remains unknown to this Court, but Officer Cowles knew of it, and nothing in the record presents any reason to doubt Officer Cowles' assessment that the quote was "unremarkable." Accordingly, the quote itself does not contribute to reasonable suspicion. Officer Cowles instead attributed significance to the fact of Plaintiff's appearance on the website itself. However, the weight of that appearance must necessarily be tempered by the plain fact that no person's internet presence is entirely within their own control and that one's likeness can easily be utilized by others for their own purposes.[12] Nothing in the record seriously suggests that Plaintiff

---

[11]    Defendants aver that the fact that the post in question is from 2014 is irrelevant because terrorism financing is "not the type of isolated crime that directly implicates staleness concerns." ECF 175 ¶ 39 n.5 (citing *United States v. Plemmons*, 770 F. App'x 650, 652 (4th Cir. 2022)). This proposition is true in the abstract, but the record does not contain any evidence supporting the notion that a long-running terrorism financing effort facilitated by any relevant party exists such that there is no staleness issue here. *See, e.g.*, *United States v. Dowdell*, 546 F. App'x 128, 133–34 (citing *United States v. Leasure*, 319 F. 3d 1092, 1099 (9th Cir. 2023)) (noting that "when an affidavit establishes the existence of a widespread, firmly entrenched, and ongoing narcotics operation, staleness arguments lose much of their force," concluding that "the length of the criminal conspiracy in this matter and the ongoing nature of the criminal activities weigh heavily against Dowdell's staleness argument").

[12]    The criminal inference drawn from one's appearance on the website of a designated foreign terrorist organization might be stronger if the website indicated coordination or at the very least, agreement or approval of the subject's sentiments by the organization. No such evidence exists in the record.

16

had anything to do with his appearance on the Al-Qassam Brigades website. Officer Cowles' testimony too reflects that he too did not think Plaintiff sought out the website or any association with it. Rather, Officer Cowles felt that Plaintiff was not being entirely candid as to the website because he expected that Plaintiff would have mentioned that "he might know someone who would have referred him to the publication." But this belief evinces only a strained, attenuated connection between Plaintiff and the website, and it is one which the Court declines to credit as reasonable in the objective analysis.[13]

Defendants' third principal source of evidence relates to Plaintiff's phones themselves—namely, the statements that were made by Plaintiff regarding his Samsung Galaxy A14 and what Officer Cowles asserts he saw during a basic examination of that phone. The statements—that Plaintiff had removed content from the Galaxy A14 after a CBP officer had previously reviewed personal or family content on it and that he traveled with a backup phone because he did not want the government to access his personal or family information, photos, and messages, and also because the government had previously seized his phone for extended periods of time—are not worth much as they are simply too benign. Considering the centrality of cell phones to modern life, the importance of the data that they hold, and our citizenry's reverence for privacy from the government, these statements are at least as innocuous as they are consistent with guilt under the circumstances,[14] and significant reliance on them presents a serious catch-22 for Americans at the

---

[13]    Although Cowles expected that Plaintiff would mention that he "might know someone who would have referred him to the publication," there is no indication why he believed that could be the case or who that person could have been. Accordingly, that expectation amounts to too much of a speculative hunch to qualify as a reasonable inference. *Reid*, 448 U.S. at 441.

[14]    Defendants also compare Plaintiff's stated actions to "nervous, evasive behavior." ECF 174 ¶ 40 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). But this only underscores the perilousness of weighing such actions heavily. *See Farag*, 587 F. Supp. 2d at 459–60 (collecting cases, noting that observations of "nervousness" were of "minimal probative value" given that "most citizens, whether innocent or guilty, are likely to exhibit some signs of nervousness when confronted by the police").

17

border who have not committed any wrongdoing. *See Riley*, 573 U.S. at 403; *Farag* v. *United States*, 587 F. Supp. 2d 436, 458–60 (E.D.N.Y. 2008) (collecting cases) (variety of behaviors of airline passengers including switching of seats, checking watch, deletion of phone numbers, talking loudly and "otherwise drawing attention to themselves," and general nervousness did not support probable cause of terrorist surveillance to arrest in light of their commonality, dissipating facts known by officers, and speculative nature of adverse inferences); *Reid v. Ga.*, 448 U.S. 438, 441 (1980) (rejecting reliance on "circumstances [that] describe a very large category of presumably innocent travelers"); *cf. Nkongho*, 107 F. 4th at 382 (recognizing that "a forensic search of an electronic device necessarily involves seizing it, as the search can take weeks to complete" and that "[a] traveler has a strong possessory interest in her phone and other electronic devices"). Indeed, Officer Cowles himself believed that Plaintiff's concerns were legitimate expressions, knew that Plaintiff's devices had been subject to advanced searches in the past, and that international travelers frequently carried backup or different devices.

Accordingly, what Officer Cowles actually observed on Plaintiff's Galaxy A14 is of greater interest. Under the border exception for routine searches, Cowles was permitted to perform a basic (or "manual" or "conventional") inspection of Plaintiff's phone without any individualized suspicion at all. *United States v. Belmonte Cardozo*, __ F. 4th __, 2026 WL 2014649, at *6 (4th Cir. July 13, 2026) ("[W]e hold that manual cell phone searches are routine border searches that do not require individualized suspicion."); *see Nkongho*, 2021 WL 4421883, at *4 (citing *United States v. Kolsuz*, 185 F. Supp. 3d 843, 858 (E.D. Va. 2016); *United States v. Kolsuz*, 890 F. 3d 133, 145 (4th Cir. 2018)). Such a search consists of navigating the (here, unlocked) phone by hand. *Kolsuz*, 185 F. Supp. 3d at 855. But there are practical limitations to the depth of this approach (which is the reason for why they are permitted without any suspicion in the first place)—manual

18

inspections are "brief procedures" that essentially amount to "scrolling through" the phone, border agents "cannot download and peruse the phone's entire contents," and it is difficult for them to "tap into the revealing nooks and crannies of the phone's metadata, encrypted files, or deleted contents." *United States v. Mendez*, 103 F. 4th 1303, 1310 (7th Cir. 2024); *Belmonte Cardozo*, 2026 WL 2014649, at *6 (similar, noting that a manual search "sees only what a user can access on a device" and "ends when the officer's time, patience and attention give out," but a forensic search is "comprehensive" and a forensic, as opposed to manual, search permits recovery of deleted material).

Thus, while Officer Cowles performed a manual inspection and stated that Plaintiff's device had a "suspiciously minute amount of information" for someone apparently "working in Doha as an educator," which apparently suggested that he "deleted much, much more than personal information," the Court cannot assess this assertion as reasonable. Undoubtedly, in some circumstances, contextualizing facts may enable an adverse inference to be drawn from the absence of certain information. But that sort of detail does not exist in the record here, where the extent of Officer Cowles' manual review, what he found on the device, what he expected to see, and what clues give rise to the belief of deletion, is not described in specific terms. Without this, the Court must conclude that the manual inspection simply does not show what a manual inspection does not show, and that its probative value here is low.[15] Moreover, the results of the

---

[15]     Additionally, Officer Cowles was aware that Plaintiff was traveling with at least one backup phone, and the inspected device not containing much information would seem to be consistent with usage as a backup phone. These facts are relevant in the totality of circumstances.

    The Court observes that, consistent with the difficulty of ascertaining meaning from the absence of information, the case law suggests that where a basic search is followed by a forensic search based on reasonable suspicion, the former often yields affirmatively suspicious material of some sort. *See, e.g.*, *Mendez*, 104 F. 4th at 1305 (manual inspection of phone revealed apparent child pornography); *United States v. Vergara*, 884 F. 3d 1309, 1311 (11th Cir. 2018) (same); *United States v. Walden*, 2025 WL 3154359, at *2 (E.D.N.Y. Nov. 12, 2025) (manual inspection revealed presence of Cash App account known by agents to be associated with CSAM acquisition); *Abidor v. Napolitano*, 990 F. Supp. 2d 260, 268 (E.D.N.Y. 2013) (manual inspection revealed pictures of Hamas and

manual inspection bear only a threadbare connection to the Comer letter and Al-Qassam screenshot.

Finally, for the August 8, 2024, searches only, the fact that Plaintiff was traveling from Jordan (in the Middle East—where Officer Algabyali identified "issues [were] going on"—and which Defendants assert is a "country of interest" and "a transit hub into and out of the Palestinian territories and Syria," "which were areas of active civil unrest at the time," MSJ Order at 6) is pertinent to the reasonable suspicion inquiry, but only just. Such a fact is hardly particularized to Plaintiff, generally describes a "very large category of presumably innocent travelers," *Reid*, 448 U.S. at 441, is not clearly informed by law enforcement expertise, and what exactly Defendants ask the Court to make of it is not abundantly clear.[16]

The conclusion that must be drawn from all of this is that there was not reasonable suspicion of Plaintiff engaging in terrorism financing to search his devices. Viewing all of the evidence collectively in the totality of the circumstances, it cannot be said that whole is greater than the sum of parts here. The Comer letter established the simple fact that AMP (not Plaintiff) was under non-criminal investigation, the screenshot was a decade old and without any indication of Plaintiff's involvement, Plaintiff's statements about his phone were uninteresting and the

---

Hezbollah rallies); *United States v. Eta*, 2024 WL 3398331, at *3 (N.D. Ill. July 11, 2024) (manual inspection revealed "messages and notifications" consistent with prior bank and other information obtained in Nigerian fraud scheme investigation); *United States v. Carpenter*, 2023 WL 358794, at *2 (N.D. Ill. Jan. 23, 2023) (manual inspection revealed images of other people's credit cards and mail, consistent with ongoing postal theft investigation, but granting motion to suppress for lack of transnational connection). No such discovery is apparent here.

[16] Defendants draw something from Plaintiff's travel to Jordan but the reasoning for why they do so and how that is probative of the matter of terrorism financing is conclusory and made in general and euphemistic terms. It is not for this Court to conjure reasons for why Jordan is a "country of interest" to a reasonable officer in his training and experience—that is Defendants' burden, and they have not seriously attempted to meet it. *See United States v. Montero-Camargo*, 208 F. 3d 1122, 1138-39 & n.32 (9th Cir. 2000) ("The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity . . . . courts should examine with care the specific data underlying any such assertion. Moreover, both courts and law enforcement must be careful not to tar people with the sins of their neighbors.").

manual inspection of his phone was inconclusive, and his travel to Jordan equally descriptive of untold numbers of people and of unclear import. Hardly any of this had any tangible connection to terrorism financing. For these reasons, Plaintiff is entitled to judgment on Count I.

### B. Count II – First Amendment Retaliation

Count II of Plaintiff's Second Amended Complaint asserts that Defendants' June 3, 2024, and August 8, 2024, searches of his cell phones violated his First Amendment rights because the searches were made in retaliation for his affiliation with AMP and his advocacy for Palestinians through AMP. ECF 115 ¶¶ 205–12. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in First Amendment protected activities. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). In general, a retaliation claim requires Plaintiff to show that (1) he engaged in protected First Amendment activity; (2) Defendants took some action that adversely affected his First Amendment rights; and (3) there was a causal relationship between his protected activity and Defendants' conduct. *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F. 3d 474, 499 (4th Cir. 2005). Plaintiff cannot carry his burden.

The first element is not in serious question in this case, as Plaintiff clearly associated with AMP and both he and AMP advocated for Palestinian causes.

As for the second element, Defendants' actions must be "likely to deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Id*. Importantly, there must be "more than a '*de minimis* inconvenience'" to [Plaintiff's] exercise of First Amendment rights." *Snoeyenbos v. Curtis*, 60 F. 4th 723, 730 (4th Cir. 2023). Where the alleged adverse action implicates search or seizure, proof of a Fourth Amendment violation is highly relevant to ascertaining the severity of the action's deterring effect. *See Kariye v. Mayorkas*, 650 F. Supp. 3d

865, 902 (C.D. Cal. 2022) ("the question is not whether Plaintiff[']s [] search and questioning violated the Fourth Amendment; instead, the question is whether a person of ordinary firmness would have been chilled . . . But given . . . case law regarding what constitutes a routine border search, the court cannot say that Plaintiff['s] border search . . . would chill a person of ordinary firmness"); *George v. Rehiel*, 738 F. 3d 562, 586 (3d Cir. 2013) ("because we have found that the . . . search and questioning of George during the [airport] screening did not violate George's Fourth Amendment rights, we are hard-pressed to find that it could result in a First Amendment retaliation claim on this record"); *cf. Nieves*, 587 U.S. at 400-01 ("plaintiffs must also prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause"). Because Plaintiff is entitled to judgment on Count I, and the Court recognizes the significant privacy interest and intuitive chill implicated by the unjustified forensic search of cell phones, the second element is also not in any real doubt.[17]

However, turning to the third element, Plaintiff cannot establish the requisite causation—and to put a finer point on this element, the required animus on the part of Defendants too. There are two considerations here. It is axiomatic that Plaintiff must establish a but-for "'causal connection' between the government defendant's 'retaliatory animus' and [his] 'subsequent injury.'" *Nieves*, 587 U.S. at 398 ("Specifically . . . the adverse action against the plaintiff [must]

---

[17]    Of course, in addition to the foregoing principles, general retaliation case law holds that Plaintiff's "actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity," even if "it is not dispositive." *Constantine*, 411 F. 3d at 500. And still, "retaliation 'may be justified [i.e., not actionable] when legitimate countervailing government interests are sufficiently strong' to override the private interest in the challenged action." *McClure v. Ports*, 914 F. 3d 866, 872 (4th Cir. 2019).

Along these lines, it is clear that the searches at issue have had very little, if any effect, on Plaintiff's First Amendment activities, particularly in light of his repeated attributions of changes in his expressive behavior to the October 7, 2023, Hamas attacks—not Defendants' phone searches. But Plaintiff's subjective reaction does not control the objective inquiry, which looks to a hypothetical person of "ordinary firmness," not necessarily an apparently outspoken and well-known public advocate. Moreover, to the extent that Defendants insist that the government's interest overrides Plaintiff's, the Court is skeptical of whether this can be the case where a Fourth Amendment violation has already been established. In any case, the Court resolves the First Amendment claim on the third element, discussed below.

not have been taken absent the retaliatory motive"). But the more foundational threshold requirement is that a retaliation action requires a showing of e.g., a "forbidden motive," "retaliatory animus," "retaliatory motive," "malicious motive," "subjective animus," "intent to punish," or the like in the first place. *Id*. at 398-400, 403-04 (citing, e.g., *Hartman v. Moore*, 547 U.S. 250 (2006)) (imposing requirement of showing of no probable cause in addition to subjective intent)); *id*. at 404 ("if the plaintiff establishes the absence of probable cause, then . . . [t]he plaintiff must show that retaliation was a substantial or motivating factor . . . and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to retaliation"). This makes sense as a definitional matter, but also particularly because "protected speech is often a 'wholly legitimate consideration' for officers" when deciding whether to perform a search or seizure. *Id*. at 401. Indeed, it would be nonsensical to hold that an officer's honest miscalculation of reasonable suspicion or probable cause in circumstances involving protected expression gives rise to a per se violation of the First Amendment, because "the retaliation cause of action must be administered in a way that balances governmental and private interests to avoid imposing liability in everyday encounters." *Snoeyenbos*, 60 F. 4th at 730. That is especially so at the border, where the government has "the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Ickes*, 393 F. 3d 501, 506 (4th Cir. 2005) (citing *United States v. Flores Montano*, 541 U.S. 149 (2004)).

Plainly, the evidence presented at trial fails to establish any retaliatory animus. It cannot be said that the officers bore any ill will towards Plaintiff's First Amendment activity that amounted to a substantial or motivating factor for the phone searches. No relevant testimony was adduced from Officer Algabyali on this point, and the same is true of Officer Cowles (except to the extent he stated that his research indicated that Plaintiff had a public profile and that Cowles

23

did not know much about SJP or AMP). The Court rather finds that Officers Cowles and Algabyali behaved professionally and fairly and that their testimony and documentation is a reflection of such. Port Director Waugh's testimony also fails to move the ball for Plaintiffs. When asked if she understood that "one of the reasons that CBP stopped [Plaintiff] in connection with this letter is because his organization uses the type of rhetoric expressed in this letter," Waugh stated that "if it's true, then it would certainly be something that we would want to take a look at." The meaning of Waugh's testimony is indeterminate under the circumstances as it could be reasonably understood as either condemning or condoning stops of the sort described by counsel. It is also unresponsive and irrelevant to the circumstances as hand, as it concerns stops or interviews (for which there is no individualized suspicion requirement under the Fourth Amendment at all) and not nonroutine forensic searches which, under the principles discussed above, retaliation may not be actionable. *Cf. Tabbaa v. Chertoff*, 509 F. 3d 89, 101-05 (2d Cir. 2007) (non-individualized routine questioning and screening of persons at border on the basis of attending Islamic conference in Canada burdened but did not violate First Amendment associational rights). Further, Waugh was not present for any of the searches, was not familiar with AMP or its rhetoric or messaging, testified in the hypothetical, and had no reason to disagree with any of the CBP documentation of the searches or the testimony of Officers Cowles and Algabyali. On the whole, the Court finds that Waugh was not a well-informed or oriented witness and declines to overanalyze her testimony. Plaintiffs fail to present any animus of Defendants and the CBP officers.

There is finally no causal connection between any retaliatory animus and the searches. As recounted above, Defendants did not bear any animus to Plaintiff's protected activity. Plaintiff rather ascribes animus to statements of the Comer letter regarding "AMP's Palestine-related expression" "including AMP's alleged involvement with college campus protests . . . campaigns

24

to divest from Israel, and "[promotion of] the struggle for liberation against Zionism and US imperialism" and asserts that asserts that because the letter contents factored into the search calculus, but-for causation is established.[18] ECF 177 Conclusions ¶ 23. But no evidence indicates that the CBP officers took any interest in these aspects of the Comer letter in determining whether to search Plaintiff's phones and the Court rejects any inference of inducement or malice on the part of the CBP officers. To the contrary, Cowles was drawn to the letter's mentioning of "terrorism and national security, given my job as a CBP officer and being tasked with countering terrorism" and it was the simple existence of the letter, its recency, and an "ongoing congressional inquiry" that was relevant. *Cf. Kariye*, 650 F. Supp. 3d at 902 (rejecting that CBP officer's statement that he was asking questions "because of what we found in your journal" to be indicative of retaliatory animus as "the allegations more plausibly allege that the questions resulted from information learned in the routine search rather than as retaliation for . . . maintaining a personal journal or speaking with border officers"). Regardless of the existence and propriety of the letter's other sentiments, these are legitimate objects of inquiry that law enforcement officers are not required to ignore. And it is further the case here that the officers acted in well-intentioned independent misjudgment, based on information from numerous sources[19] and their own

---

[18]    Plaintiff's reliance on the alleged animus of Congress presents a "particularly complex" causal inquiry as "the official with the malicious motive does not carry out the retaliatory action himself" but rather "induce[s] the action of" another. *Nieves*, 587 U.S. at 400; *see also id*. at 401 (noting that causation is also complex because "protected speech is often a 'wholly legitimate consideration' for officers when deciding whether to make an arrest"). In related retaliatory arrest and prosecution contexts, the Supreme Court has addressed this "complex" problem by requiring an additional showing of no probable cause because its "absence will . . . generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite." *Id*. at 402; *Hartman*, 547 U.S. at 263–65; *see also Stanley v. Bocock*, 2024 WL 4270092, at *6 (W.D. Va. Sept. 23, 2024) (applying to retaliatory search warrant claim). But at the same time, it has acknowledged that lack of probable cause is "not necessarily dispositive" or "conclusive" in showing "that the inducement succeeded" or "guarantee[ing] that the inducement was not the but-for-fact in a prosecutor's decision." *Hartman*, 547 U.S. at 264. Adapting such principles here, the absence of reasonable suspicion for the searches weighs in favor of causation, but for the reasons below, it cannot overcome the other evidence indicative of non-inducement.

[19]    It is worth noting that the Comer letter was not directed to any law enforcement entity and was instead addressed to Plaintiff and published publicly on the internet.

25

observations, and not as mere "rubber stamp[s]" for an allegedly retaliatory entity. *Hartman*, 547 U.S. at 263–64 ("Some sort of allegation . . . is needed  [] to bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action . . . at the trial stage, some evidence must link the allegedly retaliatory official to a prosecutor whose action has injured the plaintiff . . . . [such as] evidence that a prosecutor was nothing but a rubber stamp for his investigative staff or the police").

For all of these reasons, Defendants are entitled to judgment on Count II.

## III.    CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff is entitled to judgment on Count I (Fourth Amendment search) and Defendants are entitled to judgment on Count II (First Amendment retaliation). As Defendants have requested to be heard on the issue of relief, and because it is appropriate to do so, the Court will defer entry of judgment until further briefing and order on remedies in this matter.

Accordingly, it is hereby

ORDERED that within twenty-one (21) days of the entry of this Memorandum Opinion and Order, each party will submit a brief of no more than twenty (20) pages setting forth their position on the appropriate remedy in this matter.

**IT IS SO ORDERED.**

The Clerk of Court is directed to forward a copy of this Order to counsel of record.

/s/
_____
Michael S. Nachmanoff
United States District Judge

July 15, 2026
Alexandria, Virginia